UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       .
                                .
          Plaintiff,            .   CR No. 21-0575 (JDB)
                                .
     v.                         .
                                .
01 DAVID JOHN LESPERANCE,       .   Washington, D.C.
02 CASEY CUSICK,                .   Tuesday, July 11, 2023
03 JAMES VARNELL CUSICK JR.,    .   9:25 a.m.
                                .
          Defendants.           .   Pages 195 through 417
. . . . . . . . . . . . . . . . .

DAY 2
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:          FRANCESCO VALENTINI, ESQ.
                             U.S. Department of Justice
                             Criminal Division
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530

                             SONIA MURPHY, ESQ.
                             U.S. Department of Justice
                             Civil Division
                             1100 L Street NW
                             Washington, DC 20530

For Defendants:              JOHN M. PIERCE, ESQ.
                             ROGER ROOTS, ESQ.
                             John Pierce Law, P.C.
                             21550 Oxnard Street
                             Suite 3rd Floor OMB 172
                             Woodland Hills, CA 91367

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

# C O N T E N T S

Preliminary Jury Instructions ......................... 212

Government Opening Statement ......................... 222

Defense Opening Statement ........................... 230

## TESTIMONY

TIA SUMMERS:        Direct Examination.................... 238
                    Cross-Examination.................... 350
                    Redirect Examination................. 381

ELIZABETH GLAVEY:   Direct Examination.................... 388
                    Cross-Examination.................... 405
                    Redirect Examination................. 414

## EXHIBITS RECEIVED

Government Exhibit No. 501 ............................. 242
Government Exhibit No. 507 ............................. 244
Government Exhibit No. 506 ............................. 246
Government Exhibit No. 502 ............................. 253
Government Exhibit No. 503 ............................. 256
Government Exhibit No. 504 ............................. 262
Government Exhibit No. 505 ............................. 267
Government Exhibit Nos. 101-106 ....................... 272
Government Exhibit No. 303 ............................. 272
Government Exhibit Nos. 101A-105A ..................... 273
Government Exhibit Nos. 407, 408 ...................... 294
Government Exhibit No. 404 ............................. 296
Government Exhibit No. 127 ............................. 314
Government Exhibit No. 129 ............................. 334
Government Exhibit No. 131 ............................. 342
Government Exhibit No. 132 ............................. 344
Defendant Exhibit No. 12 .............................. 372
Government Exhibit No. 301 ............................. 393
Government Exhibit No. 302 ............................. 394

*   *   *

PROCEEDINGS

THE COURT:  All right.  We're just about there with the jurors, so we'll be ready to go.  I understand you have no preliminary matters.  But as soon as we have one of the deputy clerks come in, we'll call the case and I will address just briefly the defendant's trial brief and objections to government exhibits.

THE DEPUTY CLERK:  We are on the record in criminal No. 21-575, the United States of America versus David John Lesperance, Casey Cusick, and James Varnell Cusick Jr.

Counsel, if you would please come to the lectern and identify yourselves for the record.

MS. MURPHY:  Good morning, Your Honor.  Sonia Murphy on behalf of the government and with me at counsel table is our paralegal, Ms. Josephine Roberts, my co-counsel Francesco Valentini, and our agent Kris Miyasato.

THE COURT:  Good morning.

MR. PIERCE:  Good morning, Your Honor.  John Pierce on behalf of the defendants James Cusick, Casey Cusick, and David Lesperance, who are here in the courtroom with us, along with my co-counsel, Roger Roots.  And as soon as they get through the line downstairs, we expect to have our paralegals Emily Lambert and Jonathan Moseley here as well.

THE COURT:  That line downstairs is always a problem. Good morning to all of you.

1          So how are we on the jury?  Is the jury all here yet?

2                  THE DEPUTY CLERK:  I still have one that I'm waiting

3      on.

4                  THE COURT:  All right.  We have received the

5      defendants' trial brief early yesterday morning, which

6      contains objections to exhibits even though at the pretrial

7      last week we had gone over exhibits and these objections were

8      not specifically raised.  I will scold defense counsel for

9      being late in filing this document.  I will say that other

10     than the objections to a handful of exhibits, it's basically a

11     repeat of arguments that have been made before, particularly

12     arguments with respect to First Amendment protections which

13     the Court has addressed and not adopted, shall we say.  And

14     we'll leave it at that.

15         With respect to the exhibits, why don't we touch on those

16     objections while we're waiting for the jurors.  So the

17     first -- and this was alluded to yesterday, Government

18     Exhibits 220 and 221, which are short video clips from one of

19     the defendants' phones or the iCloud, the repository from one

20     of the defendants' phones.  It does seem these are a bit of a

21     stretch in terms of relevance, but let me hear from the

22     government as to why views of fencing the next day are

23     relevant.

24                 MR. VALENTINI:  The videos are relevant because they're

25     extracted from the iCloud account of one of the defendants,

 1    Mr. Lesperance.  And the fact that --

 2            THE COURT:  That doesn't make them relevant.

 3            MR. VALENTINI:  The fact that they were extracted from

 4    that account makes it highly likely that the defendant in fact

 5    recorded those videos and --

 6            THE COURT:  Let's assume that's true.  It's the next

 7    day.

 8            MR. VALENTINI:  Yes.  Other evidence will show exactly

 9    that point, that the defendant recorded those videos on the

10    east side of the Capitol on January 7 around eleven o'clock in

11    the morning.  The fact that the defendant went back to the

12    quintessential scene of the crime the day after does speak to

13    the intent of the defendants vis-à-vis the riot that happened

14    on January 6.

15            THE COURT:  That's a pretty attenuated argument in

16    terms of relevance, but it is an argument in terms of

17    relevance.  So I guess the only question then would -- if you

18    pass the relevance threshold, would be whether there's some

19    prejudice in a 403 context from admitting short videos taken

20    the next day.  I understand that there could be, but it

21    doesn't seem to me that there would be substantial prejudice.

22      I mean, the confusion of the jury is the primary thing, but

23    as long as it's clear when they were taken, it just doesn't

24    seem to me that it's going to waste much time.  They're very

25    short, right?

1            MR. VALENTINI:  Oh, they're seconds.

2            THE COURT:  All right.  So I'm not going to exclude

3    them at this time.  We'll see where we are in a particular

4    context if an objection is made, but I think you've probably

5    satisfied the threshold requirements both with respect to 401

6    and with respect to 403.

7        On the Exhibit 503, which is a not atypical Area Closed

8    sign, we're going to have -- and now I'm speaking to

9    Mr. Pierce and Mr. Roots.  We're going to have exhibits that

10   are not necessarily, in terms of the proof, things that the

11   defendants themselves saw.

12       Is that the only objection?  This particular exhibit seems

13   to have been taken a little bit more than an hour before the

14   defendants came to the Capitol.  But there's going to be other

15   evidence as well that is not on its face material that the

16   defendants themselves would have experienced or seen.  Is that

17   the only objection that you have to this particular exhibit?

18           MR. ROOTS:  Well, let's put it this way.  It's

19   misleading to the jury because the jury will be misled into

20   thinking that an Area Closed sign that is seen on a screen is

21   something that these defendants saw and then I guess

22   disregarded.

23           THE COURT:  But that's going to be a large part of this

24   case, what notice did they have.  And I don't understand how I

25   could exclude everything that the government thinks would be

1    providing that notice.

2        MR. ROOTS:  Well, and then there's the question of

3    relevance.  If it's not something they saw, then what really

4    is the relevance?  It's not only misleading, it's irrelevant.

5    It almost is inadmissible as evidence.  What would be the

6    relevance?

7        THE COURT:  Well, he's going to respond to that.  I

8    don't respond to your questions, but Mr. Valentini perhaps

9    will.

10        MR. VALENTINI:  The exhibit in the 500 series that are

11   objected to in this trial brief that was filed yesterday

12   depict the west side of the Capitol and signage that was in

13   place on the west side of the Capitol at the beginning of the

14   riot.

15       Now, they have a view as to when exactly the defendants

16   crossed into the restricted perimeter, went through those

17   barricades.  They can provide that narrative.  The state of

18   the signage at the beginning of the riot is relevant both

19   because it shows that the -- whether the defendant had notice

20   of that or not, that may go to knowledge, but the fact that

21   the perimeter was restricted and was intended to be restricted

22   in the first place goes to one of the elements of 1752.  So

23   there's the fact of the restricted perimeter.  It is

24   quintessentially probative of that.

25       If they want to show that by the time the defendants got

1     there the signage had been scattered around because a mob had

2     already come through those barricades, and if they want to

3     argue to the jury that they had no idea that a riot had

4     happened and that a mob just swept through the signage, they

5     can do that.  But that's not a base to exclude evidence.  It's

6     a base to cross-examine; it's a base to present an argument to

7     the jury.

8          THE COURT:  I'm not going to exclude Government's

9     Exhibit 503 and Government Exhibit 505 which are similar in

10    that regard; they are Area Closed signs.

11     504 has the additional twist of being a violent scene, at

12    least as described by the defendants.  So that would be more a

13    403 argument focused on showing activity that was not part of

14    what the defendants either participated in or are charged

15    with.

16     So how much evidence in addition to Exhibit 504 do we have

17    of videos showing violent confrontations -- and again, that's

18    their term, violent confrontations -- between

19    rioters/demonstrators and the police?

20          MR. VALENTINI:  The evidence will be minimal in terms

21    of video evidence.  We do have a compilation video that has a

22    few frames from the breach of the Peace Circle.  But one point

23    I wanted to make to the Court is that compared to the exhibits

24    that were provided last week and in light of the Court's

25    directive or preference at -- suggestion at the pretrial

1      conference, we have gone back and pared down that video

2      exhibit, Exhibit 106, from 15 minutes, I believe it was, to

3      about 8 minutes, and we specifically omitted and edited out

4      scenes that involved the lower west tunnel and areas that are

5      not at issue in this case.  So I think the Court will see that

6      the video evidence will be extraordinarily tailored to these

7      defendants.

8              THE COURT:  I'm going to allow in some evidence that

9      depicts scenes taking place at the Capitol more generally than

10     specifically with respect to these defendants.  And so I will

11     not exclude 504.  If we get too cumulative and too much, then

12     certainly I will entertain an objection and consider cutting

13     it off at some point.  But at this point I will not exclude

14     504.

15          And that brings us to the last two exhibits you've raised,

16     154, which is simply an image of some officers standing around

17     near the Capitol.  I would not call it a police line.  Is this

18     a still photo or is this from a video?

19             MR. VALENTINI:  It's a still photo.

20             THE COURT:  What's the particular relevance of this

21     still photo?

22             MR. VALENTINI:  The government expects to call one of

23     the three -- I believe there's a different technical term, but

24     SWAT team officers from MPD, and present the body-worn camera

25     from all three officers.  Very short snippets.

1          THE COURT:  They're depicted in this photo?

2          MR. VALENTINI:  Correct.  And because the defense had

3     not been willing to stipulate as to authenticity of body

4     camera, we wanted to lay a proper foundation that these three

5     officers actually entered the Capitol together.  Of course,

6     one of these officers will also testify to the same point, but

7     this photograph goes to the foundation for that evidence.

8          THE COURT:  All right.  Anything further that the

9     defendants wish to say with respect to Government Exhibit 154?

10         MR. ROOTS:  Well, it's not -- he said because we hadn't

11    stipulated to the authenticity that he has to show this

12    picture.  Well, when they get to these officers, they're going

13    to testify, well, then they can say here's my body cam and

14    they can authenticate it that way.  They don't need this

15    picture.

16         THE COURT:  I don't see the prejudice from this

17    picture, that actually shows a witness who's going to be

18    testifying about body-worn camera of himself and others in

19    this picture.  So I will not exclude Government Exhibit 154.

20       Last one is Government Exhibit 502.  And as long as it is

21    properly explained -- there's been some issue with respect to

22    this exhibit in past cases, I believe, with respect to the red

23    line.  As long as it's properly explained, I believe it can be

24    admitted.

25         MR. VALENTINI:  Thank you, Your Honor.

1          THE COURT:  So, with that, do we have the full jury?

2          THE DEPUTY CLERK:  We do not.  We still are missing

3     one.  I have tried to contact them by phone.

4          LAW CLERK:  They might have just come in.

5          THE DEPUTY CLERK:  Perfect.  Let me go check.

6          THE COURT:  All right.  Why don't you check.  And if

7     they are all here, go ahead and bring them in.

8       Anything else we need to address before we bring the jury

9     in?

10         MR. ROOTS:  I'll just explain a little bit why Your

11    Honor indicated we were late with objections.  You know we had

12    that Zoom pretrial.  And we were not all together at that

13    time.  Once we got all together and we realized in discussions

14    with these defendants that these images were not taken -- the

15    Area Closed sign, for example, that those were not taken by --

16    those were not seen by these defendants and we realized that

17    after that pretrial hearing.

18         THE COURT:  All right.  And I understand that, although

19    that's your logistical problem or fault.  But I will say that

20    objections to exhibits can actually be made during the trial.

21    So there's not really that much harm or prejudice to these

22    being made except for the fact that they could have been made

23    earlier and it would have been a little bit easier for

24    everyone.

25       The trial brief is a different question, but I'm not going

1     to address the trial brief in any substance here today.

2         So what we'll be doing, we'll bring the jury in, we'll

3     swear the jury, and then we will proceed with preliminary jury

4     instructions and get right into the opening statements which

5     are still estimated to be 10 to 15 minutes for each side.

6     Following that, we'll have our first witness.

7             MR. ROOTS:  Your Honor, one issue.  I was just told by

8     Ms. Lambert that the compilation video -- and I guess you guys

9     were planning on showing that at the opening, the compilation

10    video?

11            MS. MURPHY:  No.

12            MR. ROOTS:  Okay.  Well, I was just told that she has

13    reviewed it, and it contains nothing but the greatest hits of

14    violence on January 6.  So they are literally just doing a

15    compilation video of violence and trying to get that into

16    evidence.

17            MR. VALENTINI:  Your Honor, what you just heard is

18    false -- I don't say this lightly.  It's a highly misleading

19    statement.  If they have specific references, I am happy to

20    review them.  If they are referring to property destruction

21    and breaking the windows to get in the Senate Wing doors, the

22    same windows that those defendants walked by and the same door

23    that those defendants walked into, yes, there is the evidence

24    of the breaking of those windows.  I understood your question

25    to be about violence on officers.

1          And if you have a time cite that you can offer the Court, I

2     will be very happy to respond to that concern.

3          MR. ROOTS:  Well, we would object.  If there's videos

4     of people breaking windows, it's not relevant to these guys

5     who might have seen a broken window but they had no knowledge,

6     they have no way to assess, they did not know how the windows

7     were broken.  And it's just totally irrelevant, it's

8     misleading, and it's very prejudicial.  It's overly

9     prejudicial.  To the extent there's any probative value, it

10    violates 403.

11         THE COURT:  Go ahead.

12         MR. VALENTINI:  Your Honor, if there are some time

13    stamps that we can look at, I am happy to go through any

14    review.  Again, this would have been a good subject matter for

15    the pretrial conference, and we understand we have a jury

16    waiting, but we are happy to address any objections to

17    specific images in the videos.  This fly-by or drive-by kind

18    of notion that everything in there is like a greatest hits of

19    violence, it's unwarranted, it's too late, and frankly makes

20    no sense, Your Honor.

21         THE COURT:  I do think the defense has a responsibility

22    to help make this case efficient, and you're not assisting in

23    that by raising these concerns with respect to a government

24    exhibit at this late time.  You've had that exhibit for some

25    time.  You've had the opportunity to raise the concerns at the

1      pretrial conference, which was specifically for that purpose,

2      and you didn't do so.

3          So I'm not going to -- I will overrule your objection, but

4      you may preserve it, and if there are specific things that you

5      want to raise a concern about when the government is

6      introducing the exhibit, specific portions of the exhibit, you

7      can do it at that time.

8          But at this time I'm not going to -- you haven't given me

9      anything to rest a conclusion on that would find that portions

10     of the video are prejudicial or irrelevant.  All you've said

11     is here's our concerns, but not with respect to any particular

12     portion thereof.

13         With respect to the windows being broken or the doors being

14     broken down, I find that that is relevant.  The government can

15     introduce evidence of how those entryways into the Capitol

16     were breached since the defendants did come through that area

17     and would have presumably observed that.  And the government

18     needs to be able to establish to the jury that it was not some

19     construction worker who accidentally broke those windows two

20     days earlier.  So that objection is overruled.

21         MR. VALENTINI:  Your Honor, may I just raise an issue

22     that was just presented to us within the last few minutes.  We

23     just received just minutes ago a new version of the defense

24     exhibit list which I believe -- and I believe the Court has it

25     too now.  I believe it has --

1          THE COURT:  I don't personally have it, but we have a

2     copy of it.

3          MR. VALENTINI:  I meant the Court in the broader sense.

4          THE COURT:  I know.

5          MR. VALENTINI:  But I believe there are 221 exhibits on

6     this list.  They made some progress over the weekend.  I think

7     the exhibit list that was filed on Friday, I believe it had

8     136 exhibits, and it appears that we're back up to 221.  And

9     again, these exhibits have not been produced --

10          THE COURT:  Well, let me grab that.  Mr. Pierce and

11     Mr. Roots, is that true?  Is this exhibit list an exhibit list

12     that adds defense exhibits?

13          MR. ROOTS:  I don't believe that's true.

14          THE COURT:  You don't believe it's true.  Well, I have

15     an exhibit list from the defense -- and I hope everyone's

16     listening to me, not listening to Ms. Lambert.  I have a

17     defendants' exhibit list that has 136 exhibits on it.  This

18     exhibit list seems to end with No. 221.  So what's the

19     explanation?

20          MR. ROOTS:  There are repeated files.  Maybe if we

21     could have just one moment while we're trying to understand

22     it.

23       (Defense conferring.)

24       Yeah, I've just been told it's a smaller number now than it

25     was before.  And I would add, I believe the government's

1    exhibit list is six pages and ours is four pages.

2        THE COURT:  Yours is four pages?  The exhibit list --

3    I'm trying to understand exactly what I've gotten from you.

4        MR. ROOTS:  Remember, we are the defense, so we put on

5    stuff to defend and rebut what is --

6        THE COURT:  I understand that.  I'm trying to

7    understand the logistics here.  The document you just provided

8    at the bottom says "Defense Trial Exhibit List Page 1" on page

9    1.  On page 2 it says "Government's Trial Exhibit List Page

10   2," and it then runs for 15 pages.  So what the four-page list

11   you're talking about is, I have no idea, Mr. Roots.

12       MR. PIERCE:  So it appears there was simply an error in

13   which exhibit list we produced that we gave.  So we're going

14   to fix that right away.

15       THE COURT:  All right.  You fix that, we're going to

16   proceed with the jury with the government's case.

17       MR. ROOTS:  But I would just make a point, we do not

18   know exactly what the government's going to put on.  So we

19   have a larger array of potential exhibits.

20       THE COURT:  That's fine, Mr. Roots.  I've tried lots of

21   cases, and maybe you have too, and that's true in every case:

22   You don't know exactly what the government's going to put on.

23   But the government's given you a consistent, stable exhibit

24   list and a list of witnesses.  You're giving me one list, then

25   another list, then another list, and oops, that's not the

1    right list.  Don't start throwing stones at the government

2    for that fiasco.  That's on your shoulders.  So correct it.

3    In the meantime, we'll proceed.

4        MR. VALENTINI:  The last point is we still need to

5    receive, and I believe Ms. Lambert is working on it now, but

6    we still have not seen these exhibits or these materials in a

7    form that we could actually read and review.

8        THE COURT:  Did I give you a deadline for providing

9    the exhibits to the government, Mr. Pierce?

10        MR. PIERCE:  They were provided in a Dropbox file.

11    I guess there may be some issues with respect to downloading

12    that we'll certainly address immediately, Your Honor.

13        MR. VALENTINI:  We can address that separately.  There

14    was a Dropbox upload of 32 gigabytes of data that we've not

15    been able to download.  That's why I mention we need it in a

16    format we're able to see.  Thank you, Your Honor.

17        THE COURT:  You need to address that.

18        MR. PIERCE:  Yes, Your Honor.

19        THE COURT:  And I'll be raising it again later today

20    to see whether it has been addressed.

21        All right.  Let's bring the jury in.

22        (Jury in at 9:55 a.m.)

23        THE COURT:  Good morning, ladies and gentlemen.

24    I'm sorry for the delay.  We had to get everybody here, and

25    then we had a few preliminary matters that had to be dealt

1    with.  But we're ready to proceed now.  And the first order of

2    business is to swear the jury in, and I'll turn that over to

3    the deputy clerk.

4        (The jury is sworn.)

PRELIMINARY JURY INSTRUCTIONS

6        THE COURT:  Members of the jury, now that you've been

7    sworn in, I'm going to give you some preliminary instructions

8    on the legal rules and procedures that should guide you in

9    your participation in this trial.  These preliminary

10    instructions are just that; they're not intended to substitute

11    for the more detailed instructions that you will receive at

12    the end of the trial before you begin your deliberations.

13    They're just to give you a sense of the proceedings and what

14    your responsibilities are.

15        This is a criminal case, which began when the government

16    filed a criminal information against the defendants.  The

17    information in this case charges each defendant, and that is

18    David John Lesperance, Casey Cusick, and James Cusick Jr.,

19    with the criminal offenses of:  No. 1, Entering and Remaining

20    in a Restricted Building; No. 2, Disorderly and Disruptive

21    Conduct in a Restricted Building; No. 3, Violent Entry and

22    Disorderly Conduct in a Capitol Building; and No. 4, Parading,

23    Demonstrating, or Picketing in a Capitol Building.  The

24    charges relate to events that occurred on January 6, 2021 at

25    the United States Capitol.

1        You should understand clearly that the criminal information

2    I just summarized is not evidence.  The information is just a

3    formal way of charging a person with a crime in order to bring

4    him or her to trial.  You must not think of the information as

5    any evidence of the guilt of a defendant or draw any

6    conclusion about the guilt of a defendant just because he has

7    been indicted.

8        As I explain how the trial will proceed, I will refer to

9    the government and to the defendants.  When I mention the

10   government, I'm referring to the persons who are presenting

11   the evidence in support of the charges contained in the

12   information.  In this case, that is attorneys Francesco

13   Valentini and Sonia Murphy.

14       When I mention the defendants, I'm referring to either

15   the defendants themselves, that would be Messrs. Lesperance,

16   Casey Cusick and James Cusick Jr., or to their attorneys,

17   John Pierce and Roger Roots.

18       It will be your duty to find from the evidence what the

19   facts are.  You and you alone will be the judges of the facts.

20   You will then have to apply to those facts the law as the

21   Court will give it to you.  You must follow that law whether

22   you agree with it or not.

23       Nothing this court may say or do during the course of the

24   trial is intended to indicate or should be taken by you as

25   indicating what your verdict should be.

1    You must not be influenced by the nature of the charges in

2    arriving at your verdict.  Your responsibility is to decide

3    this case solely on the evidence presented in the courtroom.

4    As a result, you must not conduct any independent

5    investigation on your own of the case, through the internet or

6    by any other means.

7    The evidence from which you will find the facts will

8    consist of the testimony of witnesses, documents and other

9    things received into the record as exhibits, and any facts

10   that the lawyers agree to or stipulate to or that the Court

11   may instruct you to find.

12   Certain things are not evidence and must not be considered

13   by you.  Let me list them for you:  Statements, arguments,

14   and questions by lawyers are not evidence.  Objections to

15   questions are not evidence.  Lawyers have an obligation to

16   their clients to make objections when they believe evidence

17   being offered is improper under the rules of evidence.  You

18   should not be influenced by the objection or by the Court's

19   ruling on it.  If the objection is sustained, ignore the

20   question.  If it is overruled, treat the answer like any

21   other.

22   If you are instructed that some of the evidence is received

23   for a limited purpose only, you must follow that instruction.

24   Testimony that the court has excluded or told you to disregard

25   is not evidence and must not be considered.  Anything you have

1    seen or heard outside the courtroom is not evidence and must

2    be disregarded.  You are to decide the case solely on the

3    evidence presented here in this courtroom.

4        There are two kinds of evidence: direct and circumstantial.

5    Direct evidence is direct proof of a fact such as the

6    testimony of an eyewitness.  Circumstantial evidence is proof

7    of facts from which you may infer or conclude that other facts

8    exist.  I will give you further instructions on these as well

9    as other matters at the end of the case.  But keep in mind

10   that you may consider both kinds of evidence.

11       The government and the defendants may stipulate, that is

12   agree, to certain facts.  You should consider any stipulation

13   of fact to be undisputed evidence.  The government and the

14   defendants may also stipulate, that is agree, to the testimony

15   a particular witness would have given if she or he had

16   testified in the case.  You should consider this stipulated

17   testimony to be exactly what the witness would have said had

18   he or she testified here.

19       I may take what is called judicial notice of public acts,

20   places, facts and events that I consider to be matters of

21   common knowledge or matters that can be determined easily

22   through undisputed sources.  When I take judicial notice of a

23   particular fact, you may, if you choose to do so, regard that

24   fact as proven evidence.  Because you are the sole judges of

25   the facts, however, you are not required to accept any fact

1    that is judicially noted.

2        Some of you may have watched *CSI* or other legal shows on

3    television.  Please do not be influenced by those in any way.

4    *CSI* is interesting, it's entertaining, but it's rather

5    far-fetched, and many of the theories they demonstrate as far

6    as evidence collection and case development are unrealistic

7    even with today's technology and resources.  Thus, please do

8    not expect *CSI* to appear in this courtroom.  Just listen to

9    the evidence that comes in and wait for my final instructions

10   before you begin your deliberations.

11       It will be up to you to decide which witnesses to believe,

12   which witnesses not to believe, and how much of any witness's

13   testimony to accept or reject.  I will give you some

14   guidelines for determining the credibility of witnesses at the

15   end of the case.

16       As you know, this is a criminal case.  There are three

17   basic rules about a criminal case that you should keep in

18   mind.  First, each defendant is presumed innocent until proven

19   guilty.  The criminal information against the defendants

20   brought by the government is only an accusation, nothing more.

21   It is not proof of guilt or anything else.  Each defendant,

22   therefore, starts out with a clean slate.

23       Second, the burden of proof is on the government until the

24   very end of the case.  A defendant has no burden to prove his

25   innocence or to present any evidence or to testify.  Since a

1    defendant has the right to remain silent, the law prohibits

2    you from arriving at your verdict by considering that a

3    defendant may not have testified.

4        Third, the government must prove each defendant's guilt

5    beyond a reasonable doubt.  I will give you further

6    instructions on this point later, but bear in mind that in

7    this respect, a criminal case is different than a civil case.

8        Now with respect to the charges in this case.  In this case

9    each defendant is charged with, as I have said, entering and

10   remaining in a restricted building, disorderly and disruptive

11   conduct in a restricted building, violent entry and disorderly

12   conduct in a Capitol building, and parading, demonstrating, or

13   picketing in a Capitol building.

14       I will give you detailed instructions on the law at the

15   end of the case and those instructions will control your

16   deliberations and your decision.  But in order to help you

17   follow the evidence, I will now give you a brief summary of

18   the elements of the offenses that the government must prove

19   to make its case.

20       In order to prove a charge against a defendant the

21   government must establish each of these elements beyond a

22   reasonable doubt:  To prove Count 1 of the information,

23   entering and remaining in a restricted building, the

24   government must prove beyond a reasonable doubt each of the

25   elements of this offense.

1        No. 1, that the defendant entered or remained in a

2   restricted building or grounds without lawful authority to do

3   so, and No. 2, that the defendant did so knowingly, meaning he

4   knew that the building or grounds was restricted, and he knew

5   he lacked lawful authority to enter or remain there.

6        To prove Count 2 of the information, disorderly and

7   disruptive conduct in a restricted building, the government

8   must prove beyond a reasonable doubt each of the elements of

9   this offense.  First, that the defendant engaged in disorderly

10  or disruptive conduct in or in proximity to any restricted

11  building or grounds.  Second, that the defendant did so

12  knowingly and with the intent to impede or disrupt the orderly

13  conduct of government business or official functions.  And

14  third, that the defendant's conduct in fact impeded or

15  disrupted the orderly conduct of government business or

16  official functions.

17       To prove Count 3 of the information, violent entry and

18  disorderly conduct in a Capitol building, the government must

19  prove beyond a reasonable doubt each of the elements of this

20  offense.

21       No. 1, that the defendant engaged in disorderly or

22  disruptive conduct in any United States Capitol building,

23  No. 2, that the defendant did so with the intent to impede,

24  disrupt, or disturb the orderly conduct of a session of

25  Congress or either house of Congress, and No. 3, that the

1    defendant acted willfully and knowingly.

2        Finally, to prove Count 4 of the information, parading,

3    demonstrating, or picketing in a Capitol building, the

4    government must prove beyond a reasonable doubt each of the

5    elements of this offense.  First, that the defendant paraded,

6    demonstrated or picketed in any United States Capitol

7    building, and second, that the defendant acted willfully and

8    knowingly.

9        As I said, you will receive more elaborate instructions on

10   the law relating to these charged offenses at the end of the

11   case, which will control your deliberations.  And actually,

12   you will be given a copy of those written final instructions

13   to have with you in your deliberations.

14       Now a few words about your conduct as jurors.  First, I

15   instruct you that during the trial you are not to discuss the

16   case with anyone or permit anyone to discuss it with you.

17   Until you retire to the jury room at the end of the case to

18   deliberate on your verdict, you simply are not to talk about

19   the case.

20       Second, do not read or listen to anything touching on this

21   case in any way outside the courtroom.  If anyone should try

22   to talk to you about it, please bring it to my attention

23   promptly.

24       Third, do not try to do any research or make any

25   investigation about the case on your own.  That means do not

attempt to do any research or make inquiries on the internet about the subject of the case or any participants.

And finally, do not form an opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

Now, when you took your seats you've noticed that you each had a notebook and pencil waiting for you, and that is because I permit jurors to take notes during trial if they wish. Whether you take notes or not is entirely up to you. Many people find that taking notes helps them remember testimony and evidence. Others find it distracts them from listening to the witnesses.

You will be permitted to take your notebooks back with you into the jury room during your deliberations. You should remember, however, that your notes are only an aid to your memory. They are not evidence in the case and they should not replace your own memory of the evidence. Those jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by another juror's notes.

Other than during your deliberations, the notebooks will remain locked in the courtroom during recesses and overnight. You will not be able to take the notebooks with you as you come and go, and you will not be permitted to take them home with you overnight. At the end of the trial, when you come back into the courtroom to deliver your verdict, your

notebooks will be collected and the pages torn out and destroyed.  No one, including myself, will ever look at any notes you have taken, so you may feel free to write whatever you wish.

Trial will now begin.  First, each party will make an opening statement.  An opening statement is neither evidence nor argument.  It is an outline of what the party intends to prove, offered to help you follow the evidence the lawyers expect will be introduced.

Next the government will present its evidence, including witnesses, and the defendants may cross-examine them.  Then the defendants will present their evidence, including witnesses, if they choose to do so.  And the government may cross-examine those witnesses.  The government may then present rebuttal evidence if it wishes.

After that the attorneys will make their closing arguments to summarize and interpret the evidence for you.  The closing arguments, like the opening statements, are not evidence in the case.  The Court will then give you detailed instructions on the law that you must follow as you consider your verdict. You will then retire to deliberate your verdict.  And your verdict must be unanimous.

Let me address two last things before we begin the trial. You've probably noticed that there are 14 of you sitting in the jury box.  Only 12 of you will retire to deliberate in

1    this matter.  I will not disclose who the alternate jurors are
2    until the end of my final instructions just before you begin
3    your deliberations.  Therefore, it is important that all of
4    you think of yourselves as regular jurors during the trial and
5    that all of you give the case your fullest and most serious
6    attention.

7        At the beginning of the jury selection process you were
8    introduced to the potential witnesses only by name.  If at any
9    time during this trial you suddenly realize that you recognize
10   or might know any witness, lawyer, or someone else who's
11   mentioned in the testimony or evidence, or anyone else
12   connected with the case in any way, you should raise your hand
13   immediately and ask to speak with me.  You should not tell any
14   other member of the jury about your discovery.

15       If you realize you are acquainted with someone connected to
16   the case while a witness is testifying, you should nonetheless
17   raise your hand immediately and ask to speak privately to the
18   marshal or with me at the bench.

19       With that, we are now ready to proceed with the opening
20   statements in the case.  We will hear first from the
21   government and Ms. Murphy.

22                    GOVERNMENT OPENING STATEMENT

23       MS. MURPHY:  Good morning.

24       On January 6, 2021, a mob of rioters stormed the United
25   States Capitol, outnumbering and overpowering police officers

who were there to protect the Capitol and the people inside.
Defendants David John Lesperance, Casey Cusick, and James
Varnell Cusick Jr. were part of that mob of rioters.

Now, on that day a joint session of Congress convened in
order to certify the 2020 presidential election results.  And
a joint session of Congress includes members of both the
United States House of Representatives and United States
Senate and is presided over by the vice president of the
United States.  And it was their job that day to declare a
winner.

Now, this process, the certification of our presidential
election has occurred throughout history and resulted in the
transition, the peaceful transition of power from one
administration to the next since our country was founded.

But all of that changed on January 6, 2021 when a mob of
rioters stormed the Capitol, interrupted Congress's
certification of the presidential election, and forced members
of Congress to evacuate.  By all accounts, it was chaos.  And
the defendants took advantage of that chaos and joined the
mob.

Now, a mob gets its force through its people, through its
members.  And to that end, every single participant in a mob
plays a role.  By joining the mob, the defendants added fuel
to the fire.  They added fuel to the riot.

Now, their actions were deliberate and they were

1    undeterred.  They were deliberate because they knew exactly

2    what they were doing.  They wanted to interrupt the

3    congressional proceedings, and that they did, along with

4    hundreds of other rioters.

5        They were also undeterred.  They saw police fencing that

6    had been used to block off the area around the Capitol.  They

7    ignored it.  Undeterred.  They forged ahead.

8        They saw police officers, even in riot gear.  Undeterred.

9    They forged ahead.  They saw Area Closed signs.  Walked past

10   them.  Undeterred.

11        MR. ROOTS:  Objection to that.  Misstates the likely

12   evidence.

13        THE COURT:  You may proceed.  The jury will hear the

14   evidence and make its mind up.

15        MS. MURPHY:  They illegally entered the Capitol grounds

16   and the Capitol building, knowing they weren't supposed to be

17   there.  And they knew that their presence, alongside of

18   hundreds of other rioters, would and did interrupt the

19   congressional proceedings.

20        Now, during this trial we'll walk you step by step through

21   the defendants' illegal actions and conduct on January 6.  For

22   now, I'll give you just a brief overview of what the evidence

23   will show.

24        The evidence will show that defendants entered and

25   approached the Capitol area from the west, which means that

the Washington Monument was behind them.  They entered into

the restricted area around the Capitol.  And when I say

restricted area, I mean this is the area that you'll learn

from Capitol Police where the public was not permitted to be

on January 6.  They entered from the west and proceeded

towards the Capitol building, towards the west, in the

direction of the green arrow here on the screen.

Now, we don't have to guess what defendants saw as they

approached the Capitol because one of them was recording on

his cell phone.  So we know that as they approached the

Capitol, defendants saw scores of people descending on this,

the West Lawn.  They saw people climbing on the scaffolding

that was being used to build the inaugural stage.  And we know

that when they saw that, Defendant David Lesperance knew

exactly what that scaffolding was for, because he remarked,

"Do the inauguration in the basement!"  Deliberate.

One of the other defendants said, "I wanna get inside,

man," to which Defendant David Lesperance said, "I'll go."

Deliberate.  Defendant Casey Cusick, who was leading the pack

at the time, turns around and tells the other defendants,

"Whoa!  Someone fell from a wall."  But that doesn't stop

them.  Instead, they move closer to the Capitol building,

undeterred.

At one point defendants approach rioters literally scaling

the west side of the Capitol building itself.  And Defendant

David Lesperance remarks, "Look, Ma, it's your troublemaking son, at it again!"  "A proud moment indeed," he says.  "Now this is doing it bigly."

These are snapshots from video Defendant David Lesperance recorded on his phone as the three defendants made their way closer and closer to the Capitol building.  So we know that defendants saw snow fencing.  And as I said, snow fencing was being used by the Capitol Police to block off the area around the Capitol.  They saw it and ignored it, undeterred.

We also know that they saw Area Closed signage on bike racks which was being used, again, to block off the area around the Capitol.  They forged ahead.

And importantly, we know that they saw police officers. Police officers in riot gear.  They saw lots of police officers outside of the Capitol building.  But they didn't turn around.  Undeterred.  They forged ahead.

You'll hear Defendant David Lesperance refer to the Capitol riot as an "open house" as the three defendants make their way closer and closer to the building itself.  "We're almost in, man."  "Let's go," he says, as they charge ahead.  "The people are home!" he says as they get even closer.  Deliberate, and undeterred, eventually the three defendants make their way inside of the Capitol building.

Now, the evidence will show that the defendants entered through what's called the Senate Wing doors, which are

1    indicated here on the map by the green arrow.  You'll hear a

2    lot about these doors throughout the course of the trial.

3    These doors were breached because the windows on the sides of

4    those doors were broken by rioters, who then climbed through

5    those windows and let other rioters in through the inside.

6        You'll learn from the Capitol Police that those doors were

7    not an entryway into the Capitol, and accordingly, alarms

8    blasted when those doors were breached.

9        This is a picture taken from Defendant David Lesperance's

10   phone of Defendant James Varnell Cusick Jr. moments before

11   they entered into the Senate Wing doors.  They saw the broken

12   glass.  They were undeterred.

13       The defendants entered the Capitol using those Senate Wing

14   doors at approximately 3:09 p.m.  They walked into the Senate

15   Wing doors, they saw a line of police officers in riot gear.

16   Undeterred, however, Casey Cusick pointed them in the opposite

17   direction and they turned away from the police officers and

18   walked deeper inside the Capitol building.

19       Now, listen carefully and watch closely.  I want you to

20   hear what defendants heard and see what defendants saw when

21   they entered the Capitol building.

22       (Video played.)

23       Chaos.  But, again, the defendants were undeterred and

24   their actions were deliberate.

25       Defendants proceeded down a hallway towards the center of

1     the Capitol to an area called the Crypt.  And you'll hear a

2     lot about the Crypt during this trial as well.  The Crypt is

3     at the center of the Capitol directly under the Capitol

4     Rotunda which falls right under the Capitol dome.

5         Defendants proceeded to the Crypt, and you'll hear during

6     the trial that as they walked Defendant David Lesperance

7     declared, "This is my house, don't break anything."

8         They entered the Crypt on one side and exited the Crypt on

9     the other side and proceeded down the hallway on the opposite

10     side of the Capitol building toward the House Wing doors.  So

11     at this point they are on the opposite side to which they

12     entered, almost exactly.

13         And undeterred, they passed the House Wing doors and a line

14     of police officers, and having scaled almost the entire width

15     of the entire Capitol building, outside of the two chambers

16     where Congress was forced to evacuate, defendants then turned

17     around, head back toward the line of police officers, which

18     has grown in size, and heads back into the Crypt.

19         Now, this time the defendants don't just enter and exit the

20     Crypt.  They decide to stand in the Crypt for a while.  They

21     go in one direction and then they go in another direction, and

22     then they plant themselves at the center of the United States

23     Capitol building, joining up hundreds of other rioters.  And

24     the evidence will show that during this time rioters were

25     chanting "Whose house?  Our house."  Defendants didn't leave.

1    They were undeterred.

2        Eventually, Defendant James Cusick leaves the Crypt, walks

3    back down the Senate hallway where they entered.  Shortly

4    thereafter, the other two defendants, David Lesperance and

5    Casey Cusick, do the same.  James Cusick exits through the

6    Senate Wing doors at approximately 3:20 p.m., surrounded by

7    police officers who are actively working to get rioters out of

8    the building.

9        Four minutes later defendants David Lesperance and Casey

10   Cusick leave through the exact same door.  And the evidence

11   will show that when the three defendants were reunited outside

12   the Capitol, they didn't leave the Capitol grounds.  They

13   stuck around on the Capitol grounds, joining hundreds of other

14   rioters, chanting and continuing to be unlawfully on Capitol

15   grounds.

16       Now, I won't restate the charges for you.  Judge Bates has

17   already instructed you on the charges.  I will just remind you

18   that they generally fall into two categories, and that's

19   trespassing and disorderly conduct.  And I remind you that,

20   again, a mob, a riot gets its power through its participants.

21   And here, the defendants were participants in a riot.

22       At the end of this case -- I'll also remind you, I'm sorry,

23   that it is our burden, the government's burden, to prove each

24   of these charges to you beyond a reasonable doubt.  And at the

25   end of this case, my colleague, Francesco Valentini, will come

1    before you and he'll walk you specifically through the

2    elements of each of these charges and through the facts that

3    you've learned and the evidence you saw during the trial, and

4    explain to you why each of those elements is met through the

5    evidence you saw during this trial.

6        And then you'll return to the jury room to deliberate.  And

7    at that time, with all that you've seen and all of the

8    evidence that will have been presented, there will be just one

9    verdict that is reasonable, that is logical, and that is

10   consistent with the evidence, and that is guilty of all

11   charges for all three defendants.  Thank you.

12           THE COURT:  Mr. Pierce.

13                 DEFENSE OPENING STATEMENT

14       MR. PIERCE:  Thank you very much, ladies and gentlemen.

15   Thank you for your time and attention in being here.  My name

16   is John Pierce, I'm lead counsel for the defendants in this

17   case.  Defendants, who myself and my colleague Roger Roots

18   represent here today, are David Lesperance, who is from the

19   Melbourne, Florida, area.  He is 72 years old.  He is a

20   veteran.  He has owned an air conditioner and heating

21   contractor business for decades, mostly working on ordinary

22   homes.  He has been married to his wife for 40 years, and they

23   have two children.

24       James Cusick is also from the Melbourne, Florida, area.

25   He is a Vietnam veteran who volunteered and earned a Bronze

Star and a Purple Heart.  James is widowed after 40 years of
marriage.  She and he pastored a church together for 35 years
and ran a school as part of the church.  He has four children
and eight grandchildren.

James's son, Casey Cusick, is also from the Melbourne,
Florida, area.  He attended the same Bible college as his
father.  Casey has been married for eight years, he has three
children.  Casey had a business doing remodeling in support of
the sale of homes through realtors, and lost that business
after January 6.

You will hear testimony from family members of all three
defendants about their character for being law-abiding
citizens.

The defendants in this case did not travel to Washington,
D.C., to take over the government and never even intended to
go to the Capitol building or the Capitol grounds that day.
They simply went to Washington to hear the president speak and
to exercise their First Amendment right to peaceably assemble
and to have their voices be heard.

In fact, they bought round trip plane tickets to do so.
They flew to D.C. on January 5 and they returned to Florida a
few days later on January 8, 2021.

When they got to D.C. on January 6, they simply went to the
Ellipse area where the president was speaking.  They all went
through metal detectors at the Ellipse.  They did not bring

1    any weapons and they did not wear any tactical gear of any

2    sort.  They simply went there to attend a speech.

3        During the speech, the president encouraged the attendees

4    to go to the Capitol to peacefully protest.  So they decided

5    they would start walking in the direction of the Capitol.

6    However, Mr. Lesperance actually couldn't find his backpack

7    because they had to all put all their backpacks in a big pile

8    during that speech, before going through the metal detectors.

9    It took him about a half hour to try to find his backpack,

10    which he never actually did.

11        After trying to find Mr. Lesperance's backpack, the

12    defendants gradually started making their way to the Capitol.

13    They were in no rush.  They simply wanted to see what was

14    going on.  Walking along Pennsylvania Avenue, there were

15    preachers on every corner.  They stopped to listen to many of

16    the preachers.  Again, they were in no rush to get down to the

17    Capitol area.

18        Eventually, they did get down to the Capitol grounds.  You

19    will see video from defendants' phones showing what was going

20    on when they got down there.  They arrived a couple hours

21    after much of the commotion and the violence that you've heard

22    about and perhaps seen had already happened.  They had no idea

23    that those things had happened and they played no part in that

24    sort of violence whatsoever.  The videos will show that they

25    were far back of the crowd as they approached and that they

1    were entirely peaceful.

2        As they gradually moved a bit closer to the Capitol

3    building, it became clear to them that the doors to the

4    Capitol building were open and that many people were

5    peacefully coming in and out of the Capitol, including

6    children and elderly people.

7        The weather was very cold and windy.  They are from

8    Florida.  Among other things, the U.S. Capitol would be warm

9    and they thought it was open to the public as people were

10    wandering in and out.  They decided to go out of the cold and

11    maybe find a bathroom.  The vast majority of facilities in

12    D.C. that day and near the Capitol were closed and there were

13    barely any restrooms available.

14        In addition, they thought there was no problem at all and

15    thought there was nothing illegal about walking into the

16    Capitol building.  And there are multiple reasons for this.

17    Like I said, the doors were open and they saw many people

18    walking in and out of the Capitol building peacefully, simply

19    milling around and essentially acting as tourists, taking

20    pictures and the like.  They didn't see any barricades or

21    signs indicating that the Capitol building was closed or

22    restricted.

23        Quite the contrary, as they approached, they could tell

24    that the police were not doing anything at all to prevent

25    folks from going in, nor did they hear any announcements

indicating that they should not go into the Capitol or that the Capitol building was closed.

In addition, James Cusick would take students from his church school on an annual tour to visit Washington, D.C., including visiting the U.S. Capitol each year and providing teaching on American government and history.  He was familiar with the usually very public nature of the Capitol building and its grounds.  James has lobbied to members of Congress over decades and expected the Capitol to be open as it normally is.  His son Casey has also been to the Capitol many times over the years.

While Mr. Lesperance had never been to the Capitol before, he was also familiar generally with its usually public nature and actually was interested in going inside since they were already there that day.

The videos will show you, including video from the CCTV footage at the Capitol building, that the defendants very peacefully walked into the open doors when there were numerous police calmly standing around and interacting with the crowd in a friendly manner.

Indeed, you will see how the Capitol officers were giving numerous people very friendly fist bumps.  After they came in, they simply walked around to see what was going on and to observe the building.  According to the government's photos, they entered approximately at 3:09 p.m. and left at

approximately 3:18 or 3:20 or shortly thereafter, for it looks like a total of 10 to 15 minutes.  The congress had already recessed at about 2:13 to 2:20 p.m., and that was about an hour after the commotion and the violence that you may have seen news coverage of.

It was a bit difficult for defendants to figure out what was going on due to the noise and the people inside.  You can see some of their confusion on the video as the defendants are discussing among themselves what was being said by various people.

You will hear on one video recording when other people inside were chanting "Whose house?  Our house."  And then Mr. Lesperance says, somewhat more quietly but heard on a cell phone camera, "So use a coaster," unquote, suggesting he was not part of the chanting of "our house" but was mindful that if the Capitol is the people's house, the people need to protect it and to take care of it.

At one point Mr. Lesperance and Casey Cusick briefly lost track of where James Cusick was.  They also observed that the bathroom line was too long to be able to get into.  So after reconnecting with James Cusick and realizing the bathroom line was too long, and having had a chance to see what was going on inside, they simply decided to leave.  So after asking a police officer which way to go, they peacefully left the building.  They left the Capitol, and a couple days later

1    simply flew back to Florida.  That's it.  That's all the

2    defendants did that day.

3        You are going to see some pictures and videos from that

4    day.  Both the government and we will show you those during

5    the trial.  We're going to ask when you deliberate to look at

6    each of those pictures and videos very, very closely.

7        When you do that, you will see a few things very clearly.

8    First, the defendants did not engage in any violence or

9    disorderly conduct whatsoever on January 6.

10       Second, you will see that they were peaceful, when they

11   entered the building, for the few minutes they were in the

12   building, and when they left the building.  You will also see

13   that there were many, many law enforcement officers standing

14   around and observing the crowd.  Not one of them suggested to

15   defendants that it was illegal for them to be there or ordered

16   them to leave.  Indeed, those officers were acting friendly.

17       Also, you will see that at no point did any of the

18   defendants engage in any sort of picketing or parading

19   activity.  They were simply milling around the way tourists

20   would to see what was going on.

21       In addition, you will see what defendants saw and heard

22   themselves, that there were no signs or barricades that they

23   observed or announcements indicating that they were not

24   allowed to be on the Capitol grounds or to go inside the

25   Capitol building.

1    You will also hear testimony from all three defendants
2    themselves in this case.  They will testify that they had no
3    intent to break the law and that they had no idea that the
4    Capitol building or grounds were restricted in any way that
5    day.
6    The Capitol is a massive building.  I believe it is
7    750 feet long, as large as a small ocean liner.  What was
8    happening at one part at certain times of the day was not
9    happening in other parts.  Whatever was going on in other
10   parts of the Capitol that day at other times, what defendants
11   saw and what defendants did was totally peaceful.
12   They did not go there to riot, and they did not riot.
13   The defendants simply walked into an open building, looked
14   around and left voluntarily without even being asked to do so.
15   These defendants did not even know that any riot had taken
16   place until they got back to their hotel.
17   The defendants are happy to finally have their day here in
18   court.  We look forward to showing the evidence in this case,
19   and the defendants look forward to getting on the witness
20   stand and telling you in their own words what happened that
21   day.  At the conclusion of the trial, all we are going to ask
22   you to do is look very, very closely at all of the evidence,
23   listen very carefully to the judge's instructions, and reach
24   the verdict in this case that you believe is the right one.
25   Thank you very much.

 1                    THE COURT:  All right.  Thank you to both counsel,

 2          and we are now ready to proceed with the government's case.

 3              Mr. Valentini, the government's first witness.

 4                    MR. VALENTINI:  Government calls Captain Summers.

 5                 TIA SUMMERS, WITNESS FOR THE GOVERNMENT, SWORN

 6                              DIRECT EXAMINATION

 7          BY MR. VALENTINI:

 8          Q.    Good morning.

 9          A.    Good morning.

10          Q.    Could you please state and spell your name for the

11          record?

12          A.    My name is Tia Summers.  My first name is spelled T-I-A,

13          last name S-U-M-M-E-R-S.

14          Q.    Are you currently employed?

15          A.    Yes.

16          Q.    Where do you work?

17          A.    United States Capitol Police.

18          Q.    How long have you worked for the Capitol Police?

19          A.    Twenty-three years.

20          Q.    And what is your current title?

21          A.    Right now I am a captain.

22          Q.    Could you please explain to the jury the rank of captain

23          within the Capitol Police hierarchy?

24          A.    Sure.  A captain is more or less the commander of a

25          division.  For instance, my purview -- under my purview, I

1   cover our command center, our court liaison section and our

2   reports processing section.  So usually a captain has several

3   entities that might be under them.

4   Q.   And how long have you been a captain?

5   A.   Two years.

6   Q.   How many Capitol Police employees and officers do you

7   supervise as a captain?

8   A.   Currently, myself, I have a mixture of civilians and

9   sworn personnel, so I have about in total, I would say maybe

10  30.

11  Q.   And what is the mission, the overall mission of the

12  United States Capitol Police?

13  A.   The overall mission is protection of the Capitol building

14  and its grounds along with members, staff, and any visitors,

15  as well as making sure there's always a continuation of

16  government.

17  Q.   And are there different divisions within the United

18  States Capitol Police?

19  A.   Yes.

20  Q.   And what divisions are there?

21  A.   Oh, my gosh.  So we are actually broken up into bureaus.

22  Under those bureaus are different divisions.  We have the

23  Uniformed Services Division, our Protective Services Division,

24  and our -- I'm trying to think, there's so many -- and then

25  have one more that is escaping me at the moment.

1          But Uniformed Services is our largest, which houses most

2     of our divisions and the things that fall under those are

3     House Division, Senate Division, Library Division because we

4     are responsible for the security of the Library of Congress

5     buildings, as well as the Capitol Division.

6     Q.   In your years at the United States Capitol Police, what

7     sort of jobs have you held?

8     A.   So I've worked as a chamber officer, which chamber

9     officers are responsible for the immediate security outside of

10    the Senate and the House chamber, inside and outside.  I've

11    been a sergeant.  I've been an instructor out at our training

12    academy.  I've worked as an executive officer for a chief for

13    several years.  So I've done just a little bit of everything.

14    I've worked in our communications section, and like I said,

15    right now I am in our command center.

16    Q.   Having served on the Capitol Police for a lengthy period

17    of time, are you familiar with the Capitol building itself?

18    A.   Yes.

19    Q.   And you're familiar with both the interior and the

20    exterior of the Capitol building?

21    A.   Yes.

22    Q.   Are you familiar with the Capitol grounds more generally?

23    A.   Yes.

24    Q.   What are the Capitol grounds as opposed to the Capitol

25    building?

1    A.    So Capitol grounds is kind of complicated.  We venture

2    outside of the Capitol building.  We have the three office

3    buildings on either side.  You have the House Office

4    Buildings, the Senate Office Buildings, and we pretty much

5    just kind of extend to in the west 3rd Street, and in the east

6    I believe it's about 3rd Street.  But we do have an extended

7    jurisdiction, it does go as far as 7th Street on either side.

8    Q.    And what is the formal address of the United States

9    Capitol building?

10   A.    It's No. 1 First Street NW.

11   Q.    Let me show you what has been marked as Exhibit 501.  If

12   you could please let me know when you see it on your screen.

13   A.    Yes.  It's there.

14   Q.    And Captain Summers, do you recognize what's in Exhibit

15   501?

16   A.    Yes.

17   Q.    Is Exhibit 501 an accurate representation of the Capitol

18   building as it existed on January 6, 2021?

19   A.    Yes.

20   Q.    That's a representation from above?

21   A.    Yes.  It is an aerial view of the immediate Capitol

22   grounds.

23   Q.    And it also reflects portions of the Capitol grounds

24   around the Capitol building?

25   A.    Yes.

1          MR. VALENTINI:  The government would move to admit

2     Exhibit 501 into evidence.

3          MR. PIERCE:  No objection.

4          THE COURT:  Without objection, Government's Exhibit

5     501 is admitted and may be published.

6                              (Government Exhibit No. 501

7                               received into evidence.)

8     BY MR. VALENTINI:

9     Q.   Let's do some geography, Captain Summers, if we may.

10    Which side of the picture is north?

11    A.   May I draw on the screen?

12    Q.   Yes.

13    A.   Okay.

14    Q.   It's a touch screen that you may use.

15    A.   Yes.  Thank you.

16         So the top of the screen is north.

17    Q.   The bottom of the screen is south?

18    A.   Yes.  The bottom of the screen.  So west is to the left

19    and east is to the right.

20    Q.   Let me circle the green colored rectangular structure on

21    the north side.  Could you please tell the jury what building

22    I've just marked on the touch screen?

23    A.   Okay.  This is the Senate Wing, and in that particular

24    area, that houses the Senate chamber.

25    Q.   Let's do the same for the south side.  I have marked the

1    rectangular building at the far south end of the Capitol

2    building.  What building is that?

3    A.    Yes.  That is the House Wing of the Capitol, and that

4    area houses the House chamber.

5    Q.    And what is in the middle in between the House and the

6    Senate?

7    A.    The center portion of the Capitol building, that is

8    where the Rotunda is.  It's directly underneath the dome.

9    Q.    Now, the Capitol building has multiple floors.

10   A.    Yes.

11   Q.    And let me clear the marks from the screen.  Does the

12   Rotunda occupy every floor of the Capitol building?

13   A.    No.

14   Q.    What is beneath the Rotunda, if anything?

15   A.    Yes.  That area is called the Crypt.

16   Q.    And we can stop publishing, please.

17         And let me show you what has been marked as Exhibit 507,

18   which is not yet in evidence.

19         Captain Summers, do you recognize what's in Exhibit 507?

20   A.    Yes.

21   Q.    And is Exhibit 507 an accurate floor plan of the first

22   floor of the Capitol as it existed on January 6, 2021?

23   A.    Yes.

24         MR. VALENTINI:  The government moves to admit Exhibit

25   507 into evidence.

1          MR. PIERCE:  No objection.

2          THE COURT:  Without objection, Government's 507 is

3     admitted and may be published.

4          MR. VALENTINI:  Thank you.

5                              (Government Exhibit No. 507

6                               received into evidence.)

7     BY MR. VALENTINI:

8     Q.   You testified a moment ago that the Crypt is right

9     beneath the Rotunda.

10    A.   Yes.

11    Q.   And the Rotunda, which floor is the Rotunda on?

12    A.   Second floor.

13    Q.   And so which floor is the Crypt on?

14    A.   The first floor.

15    Q.   Could you please circle the Crypt on Exhibit 507 for the

16    jury.

17    A.   Sure.

18    Q.   And a moment ago you also testified that the Senate Wing

19    of the Capitol is on the north side of the Capitol?

20    A.   Yes.

21    Q.   Could you please circle that for the jury as well?

22    A.   Yes.

23    Q.   Let's do the same for the House side.  You testified

24    before the House side is on the south side?

25    A.   Yes.

```
 1    Q.   Thank you.  And we can -- if we could please stop
 2    publishing this exhibit.  Thank you.
 3         Let's pull up for a second Exhibit 501, which is already
 4    in evidence.  If it could be published.  Thank you.
 5         You have testified that the Rotunda and the Crypt are
 6    in the center of the Capitol building in this exhibit.
 7    A.   Yes.
 8    Q.   What is the area immediately to the left of the Rotunda?
 9    A.   Immediately to the left of the Rotunda, which would be --
10    let me see, if I'm standing in there... depending on where I'm
11    standing in the Rotunda.
12    Q.   Oh.  What is the area immediately to the west of the
13    Rotunda?
14    A.   To the west of the Rotunda, that is the Upper West
15    Terrace.
16    Q.   And further to the left, further to the west of the Upper
17    West Terrace, is there a white column structure that you can
18    see in this exhibit?
19    A.   Yes.
20    Q.   And what is that structure?
21    A.   That is the inaugural stage.
22    Q.   Could you please circle the inaugural stage for the jury?
23    A.   Yes.
24    Q.   Could you please explain what the inaugural stage is?
25    A.   Basically, during election years, the Architect of the
```

1     Capitol and along with other construction companies erect a
2     stage that is used for inaugural festivities for the swearing
3     in of the new president of the United States.
4     Q.    And was construction on the inaugural stage completed as
5     of January 6, 2021?
6     A.    No.
7     Q.    And was there scaffolding around parts of the inaugural
8     stage?
9     A.    Yes.
10    Q.    Let me show you what has been marked as Exhibit 506,
11    which is not yet in evidence.
12         Captain Summers, do you recognize what's in the exhibit?
13    A.    Yes.
14    Q.    And is the exhibit an accurate rendering of the west side
15    of the Capitol as it existed on January 6, 2021?
16    A.    Yes.
17         MR. VALENTINI:  The government moves to admit Exhibit
18    506 into evidence.
19         MR. PIERCE:  No objection.
20         THE COURT:  Without objection, Government's 506 is
21    admitted and may be published.
22                        (Government Exhibit No. 506
23                            received into evidence.)
24    BY MR. VALENTINI:
25    Q.    Could you please identify for the jury the inaugural

1    stage you were just discussing in the previous exhibit?

2    A.   Yes.

3    Q.   And could you please also identify the area that you

4    called before the Upper West Terrace of the Capitol.

5    A.   Yes.  It's also on this side.

6    Q.   The Senate Wing, could you please identify the Senate

7    Wing as well.

8         (Witness complies.)

9         And the House Wing.

10   A.   Sorry.  My circles are terrible.

11   Q.   I'm going to clear the markings from this exhibit and I'm

12   going to ask Ms. Roberts if we could please pull up Exhibit

13   501 which is already in evidence.

14        Does the Capitol have a Visitor Center?

15   A.   Yes.

16   Q.   Where is that Visitor Center located compared -- within

17   the grounds of the Capitol?

18   A.   So it's located on the east side of the building, totally

19   underground.

20   Q.   So this is -- Exhibit 501 is an aerial view of the

21   Capitol.

22   A.   Yes.

23   Q.   So you cannot see underground.

24   A.   You cannot.  However, if I may, these two areas here are

25   skylights that look directly down into the Capitol Visitor

1    Center.  They look down the Grand Staircases on either side

2    from the top floor to the bottom.

3    Q.   And for the record, Captain Summers, you have circled on

4    the touch screen two skylights which are on the east side of

5    the Capitol on a paved plaza.

6    A.   Yes.

7    Q.   And is it possible to go from the Capitol Visitor Center

8    to the Capitol building without exiting the building?

9    A.   Yes.

10   Q.   So let's talk a little bit -- and we can take down this

11   exhibit, please.

12        So let's talk a little bit about security procedures for

13   visitors at the Capitol.  As a captain in the Capitol Police,

14   are you familiar with the security procedures to enter the

15   Capitol?

16   A.   Very.

17   Q.   And are you familiar with those procedures as they

18   existed on January 6, 2021?

19   A.   Yes.

20   Q.   Okay.  How about as they existed before January 2021?

21   A.   Yes.

22   Q.   So let's think back to a normal day before the COVID

23   pandemic, before March 2020.  What kind of security was a

24   member of the public required to go through to enter the

25   Capitol at that point?

1    A.    Sure.  If you decided you wanted to come to the building

2    for a tour, you would enter through the Capitol Visitor

3    Center.  There you would be subjected to an administrative

4    search, which means you would subject your personal belongings

5    to x-ray and maybe hand check.  You would subject your person

6    to a walk-through magnetometer or walk-through metal detector.

7        If you were to set that walk-through metal detector off,

8    you would then subject yourself to a handheld metal detector

9    and possibly a physical pat-down to determine what on your

10   body may have alarmed the walk-through metal detector.

11   Q.    What is the purpose of the screening that you just

12   described?

13   A.    So we're looking for -- our biggest thing of course is

14   we're looking for weapons, looking for any other hazards.

15   Coming through the Visitor Center, there are some other

16   restrictions like food, water, some other things that we don't

17   allow into the building for safety reasons.

18   Q.    Now, the Capitol building is a relatively old building?

19   A.    A very old building, yes.

20   Q.    It has a lot of entrances and exit points?

21   A.    Yes.

22   Q.    So thinking back before March 2020, were members of the

23   public allowed to go in and go through the screening that you

24   just described at any door of the Capitol?

25   A.    No.  So depending on what your business there -- if you

1    were there just as a visitor, you just wanted to see the
2    building, you would enter through the Visitor Center.
3    However, if you had official business at the building where
4    you wanted to visit a member or an office, you would go
5    through either the north entrance or the south entrance of the
6    building where you would go to the appointment desk on either
7    side.  If you were there for an appointment, you would check
8    in there.
9    Q.    So let's fast-forward to March 2020.  So before January
10   2021 but after the COVID pandemic began.  Were uninvited
11   members of the public allowed to enter the Capitol building
12   for tours?
13   A.    No.
14   Q.    Were they allowed to enter the Capitol building for any
15   reason?
16   A.    No.
17   Q.    How about members of the public who had a reason to be at
18   the Capitol, say, for a meeting?  What kind of procedure was
19   in place for those --
20   A.    They would still go through the same security procedures,
21   walk-through magnetometer, x-ray your items, those things.
22   And then again, they would go to the appointments desk so
23   whoever they had an appointment with could be notified that
24   they were there.
25   Q.    And which processing areas were in place to carry out

1    that function after March 2020 and before January 2021?

2    A.    North and south doors.

3    Q.    And what kind of security procedures would an invited

4    member of the public have to go through?

5    A.    The very same.  Still have to go through the

6    walk-through, still have to subject your items to be checked.

7    Nothing changes.

8    Q.    Now, let's fast-forward to January 6, 2021.  Was the

9    Capitol building open to the public?

10   A.    No.

11   Q.    Why was it not open to the public?

12   A.    One, for COVID.  COVID precautions, the buildings were

13   closed.  And second, we were doing the confirmation of the

14   Electoral College votes for the presidential election.

15   Q.    You mentioned the certification of the electoral vote?

16   A.    Yes.

17   Q.    And were additional restrictions in place on January 6,

18   2021, because of the certification of the Electoral College?

19   A.    Yes.

20   Q.    Was a restricted area established around the Capitol

21   building, not just the Capitol building itself, on January 6,

22   2021?

23   A.    Yes.

24   Q.    So it wasn't just the Capitol building that was closed

25   to the public on January 6, 2021.

1    A.    Correct.  There was a portion of the grounds that were

2    closed as well.

3    Q.    Let me show you what's been marked as Exhibit 502, which

4    is not yet in evidence.

5          Do you recognize what's in this exhibit?

6    A.    Yes.

7    Q.    And is this an accurate representation or rendering of

8    the security area as it existed around the Capitol building

9    on January 6, 2021?

10   A.    Yes.

11   Q.    And does Exhibit 502 actually represent that perimeter?

12   A.    Yes.

13         MR. VALENTINI:  The government would move to admit

14   Exhibit 502 into evidence.

15         MR. ROOTS:  Your Honor, we object to the red lines

16   along the lines we discussed previously.

17         THE COURT:  Maybe a little more foundation with respect

18   to the red line.

19   BY MR. VALENTINI:

20   Q.    Captain Summers, this map with the red line perimeter did

21   not exist as such prior to January 6, 2021.

22   A.    No.

23   Q.    You never seen it before January 6, 2021.

24   A.    Not this rendering, no.

25   Q.    But the rendering was created after January 6, 2021,

1    based on the Capitol Police restricted area put in place for

2    January 6, 2021.

3    A.   Yes.

4         MR. VALENTINI:  The government moves to admit Exhibit

5    502 into evidence.

6         MR. ROOTS:  Same objection.

7         THE COURT:  The objection is overruled based on the

8    understanding from the witness as to the creation of this

9    document after January 6, 2021.  502 is admitted and may be

10   published.

11                          (Government Exhibit No. 502

12                              received into evidence.)

13   BY MR. VALENTINI:

14   Q.   So now that the jury can see Exhibit 502, let me ask you

15   some of the same questions.  What does Exhibit 502 reflect?

16   A.   The perimeter that we had in place for January 6, 2021.

17   Q.   And that perimeter is denoted in red in Exhibit 502?

18   A.   Yes.

19   Q.   And what were the borders of the secured perimeter on the

20   north side?

21   A.   On the north side it was Constitution Avenue.

22   Q.   Could you please circle the north edge of the perimeter

23   for the jury?

24        (Witness complies.)

25        Let's talk about the west side.  Where, approximately, is

1   the west side of the secured perimeter that was in place in

2   January 2021?

3   A.    That extended to First Street.

4   Q.    Could you please circle the west side?

5         (Witness complies.)

6         How about the south side?

7   A.    On the south side it was Independence Avenue.

8   Q.    Could we circle that as well?

9         (Witness complies.)

10        Now let's do the same for the east side.

11  A.    So on the east side it extended to the East Plaza.

12  Q.    And Captain Summers, when you say it extended to the

13  East Plaza, you mean to say that the East Plaza was within

14  the restricted perimeter?

15  A.    Yes.

16  Q.    And just for clarity, when you say the East Plaza, you

17  mean the paved plaza that is immediately to the east of the

18  Capitol building where the skylights for the Visitor Center

19  are.

20  A.    Yes.

21  Q.    Captain Summers, what did the Capitol Police do to mark

22  off the security perimeter -- and let's start with the west

23  side -- on the west side?

24  A.    So on the west side we used bike rack, we used snow

25  fencing, and snow fencing is a plastic mesh that comes on a

1    roll for easy deployment.  We can just kind of roll it out,

2    hold it in place with metal stakes.  We also use signage.

3    We use police officers as well.

4    Q.   Let's talk a little bit about these bike racks.  Are

5    these bike racks maybe three feet high?

6    A.   No.  A little taller than that.  I'd say maybe four, four

7    and a half, and heavy.

8    Q.   And do they -- is there an ability for them to interlock?

9    A.   Yes.  On the sides they have kind of poles that stick out

10    and then they can go into like a connecting piece on the other

11    side.

12    Q.   You explained a little bit about snow fencing.  Let me

13    ask you about signage.  Were signs posted on the bike racks?

14    A.   Yes.  We had signs on the bike rack and snow fencing.

15    Q.   And generally speaking what did the signs say?

16    A.   It says "Area Closed by Order of the Capitol Police

17    Board."

18    Q.   Inside the red perimeter -- and I'm going to clear the

19    markings.  Inside the red perimeter that is marked in Exhibit

20    502, were there additional line -- perimeters?

21    A.   Yes.  In the fall of 20 -- well, sorry -- in fall of

22    2020, a portion of the west front was closed for the inaugural

23    stage construction.

24    Q.   Let me show you what has been marked as Exhibit 503,

25    which is not yet in evidence.

1          Do you recognize the image represented in Exhibit 503?

2     A.    Yes.

3     Q.    What is it?

4     A.    This is a photograph taken, looks like from the First

5     Street area, looking at the west front of the Capitol

6     building, and it's showing some of our security measures that

7     we had in place.

8          MR. VALENTINI:  The government moves to admit Exhibit

9     503 into evidence.

10          MR. ROOTS:  Objection.  Irrelevant with regard to these

11     defendants.

12          THE COURT:  I think we've discussed this before, and

13     the objection is overruled.  The exhibit will be admitted and

14     may be published.

15                              (Government Exhibit No. 503

16                               received into evidence.)

17     BY MR. VALENTINI:

18     Q.    Captain Summers, could you please orient the jury as to

19     what they're seeing in Exhibit 503.

20     A.    Sure.  This looks like it was taken from First Street,

21     looking at the west front of the Capitol.  Immediately in the

22     foreground we have some of the snow fencing, which is the

23     stuff here.  This is our Area Closed sign that we use, and we

24     usually place those along the fence about every five feet or

25     so to keep -- so that -- to make sure people can see it.

1    You'll see officers back here in the background.  That's part

2    of our security as well.  And then there's more snow fencing

3    and signage back in this area here.  In this area here, more

4    signage and snow fencing.

5           THE COURT:  Mr. Valentini, could you and the witness

6    orient the jury to when this photo was taken.

7    BY MR. VALENTINI:

8    Q.   Based on what's reflected and the state of the fencing,

9    are you able to tell the jury approximately when this picture

10   was taken?

11   A.   Yes.  On January 6, 2021.

12   Q.   Are you able to be a little bit more specific than that?

13   Based on your understanding of the state of the fencing over

14   the course of the day, are you able to say if this was early

15   in the day or after the events of January 6, 2021?

16   A.   Oh, this was earlier in the day.

17   Q.   And how can you tell that?

18   A.   I'm sorry?

19   Q.   How are you able to say that?

20   A.   Because everything is in place.

21   Q.   So let me take some of the security measures that you

22   described.  Let me take those in turn.  You mentioned that

23   you see a sign in this picture?

24   A.   Yes.

25   Q.   And do you see any writing in red on that sign?

```
1    A.    Yes.

2    Q.    And what does it say?

3    A.    "Area Closed."

4    Q.    Do you have an understanding of why the lettering is in

5    the red color?

6    A.    Red is a very vibrant color, it usually gets your

7    attention, and red normally means stop.  So that's why we use

8    red.

9    Q.    Because area closed, informing the public that the area

10   was closed was the whole point of this sign?

11   A.    Correct.

12         MR. ROOTS:  Leading.

13   BY MR. VALENTINI:

14   Q.    And you said that these signs are about five feet apart?

15   A.    Yes.

16   Q.    And what is the purpose of having --

17         MR. ROOTS:  Objection.  Leading with regard to the five

18   feet apart.

19         MR. VALENTINI:  Your Honor, the witness has already

20   testified --

21         THE COURT:  It's already been testified to.  So the

22   objection is overruled.  But do avoid leading questions.

23   BY MR. VALENTINI:

24   Q.    Could you explain the purpose of having the signs posted

25   five feet apart?
```

 1    A.    To ensure that anyone that approaches the fenced area can

 2    see the signs.

 3    Q.    I would ask Ms. Roberts to please zoom in to the middle

 4    of the frame, approximately where we see the markings right

 5    now.

 6          Do you see a row of white marks from left to right in the

 7    zoomed-in area?

 8    A.    Yes.

 9    Q.    That's from -- if I have this right, it's from north to

10    south.

11    A.    Yes.

12    Q.    Do you know what those signs say?

13    A.    Yes.  Those are the same Area Closed signs that we saw

14    in the foreground of the picture, spaced out along the snow

15    fencing.

16          MR. PIERCE:  Objection.  Foundation with regard to

17    this vantage point being able to read those signs from that

18    distance.

19          THE COURT:  I think she's testifying from her knowledge

20    of what those signs were.  So the objection is overruled.

21    BY MR. VALENTINI:

22    Q.    Going to foundation too, do you know who put those signs

23    there?

24    A.    Yes.

25    Q.    Do you know why they were put there?

1    A.    Yes.

2    Q.    Can you explain to the jury why those signs were put

3    there?

4    A.    So that particular portion of the perimeter was put in

5    place for the construction of the inaugural stage, and we do

6    that every four years, and it's pretty much the same setup

7    where they put the fence line in the center of the west center

8    panel, with the same signs, about five feet apart.

9    Q.    So is it fair to say that on January 6, 2021, there are

10   multiple layers of perimeter fencing on the west side of the

11   Capitol?

12   A.    Yes.

13   Q.    And we have seen two of these layers of perimeter

14   fencing?

15   A.    Yes.

16   Q.    What do you see in between these two layers of perimeter

17   fencing?

18   A.    There are police officers standing there.

19   Q.    Do you have an understanding based on Capitol Police

20   procedures of why those officers are standing there?

21   A.    Yes.  To ensure that we keep a watchful eye on the outer

22   perimeter.

23   Q.    Okay.  If we could please stop publishing the exhibit.

24   And let me show you what has been marked as Exhibit 504,

25   which is not yet in evidence.

```
 1              Is Exhibit 504 a photograph?
 2    A.   Yes.
 3    Q.   Do you recognize what it depicts?
 4    A.   Yes.
 5    Q.   And is Exhibit 504 a fair and accurate depiction of
 6    a portion of the Capitol grounds on January 6, 2021?
 7    A.   Yes.
 8              MR. VALENTINI:  The government moves to admit
 9    Exhibit 504 into evidence.
10              THE COURT:  Since it's a photograph that has
11    participants, if you will, in it, can we have an
12    approximation, if the witness knows, of the time?
13    BY MR. VALENTINI:
14    Q.   Based on the appearance of this photograph, are you able
15    to tell approximately at what time on January 6, 2021, it was
16    taken?
17    A.   Not really.  I wish I could give a better time.  I would
18    say after the noon hour, but I'm not sure exactly what time.
19              MR. VALENTINI:  Okay.  Government moves to admit 504
20    into evidence.
21              MR. ROOTS:  Objection.  Irrelevant from the viewpoint
22    of these defendants.  Also it's unfairly prejudicial with
23    regard to the violence or the pushing shown.
24              THE COURT:  The objection is overruled.  The photograph
25    is only for what it depicts and can be used in examination by
```

1    either side with the jury.  So I will allow 504 to be admitted

2    and published.

3                        (Government Exhibit No. 504

4                         received into evidence.)

5    BY MR. VALENTINI:

6    Q.    Captain Summers, based on your knowledge of the Capitol

7    grounds, are you able to say where this picture was taken?

8    A.    Yes.  This is along First Street, and I believe it's

9    Pennsylvania Avenue walkway.

10   Q.    Is that area also referred to as the Peace Circle area?

11   A.    Yes.

12   Q.    Would that area be between the Ellipse and the Capitol if

13   one is walking from the west side towards the Capitol?

14   A.    The Ellipse you're talking about near the White House?

15   Q.    Yes.

16   A.    Yes.

17            THE COURT:  I think that we'll take our morning break.

18   Is this a good spot?

19            MR. VALENTINI:  Sure.  This would be a good point.

20            THE COURT:  So we're going to take a break.

21      Let me just remind you, ladies and gentlemen of the jury,

22   that you need to follow certain instructions during any recess

23   of the court.

24      First, until I submit the case to you at the end of my

25   final instructions, you must not discuss it with anyone, not

1     with the parties, witnesses, attorneys or anyone else

2     connected with the case.  Don't even discuss it with your

3     fellow jurors, friends or family members.

4         And to be fair to both the government and the defendants,

5     you should keep an open mind throughout the trial.  You should

6     reach your conclusions only during the final deliberations

7     after all the evidence is in and you have heard the attorneys'

8     closing arguments and my instructions to you on the law.

9         Second, do not permit any other person to discuss the case

10    in your presence.  This applies to anyone, including members

11    of your family, friends or relatives, courtroom spectators,

12    witnesses, reporters, and parties to the case and attorneys.

13        If anyone attempts to discuss the case with you, tell them

14    not to do it.  If anyone attempts to discuss the case with you

15    or you overhear any discussion of the case, you must report

16    that to me as soon as you can.  However, you should not

17    discuss that with any of your fellow jurors -- that being that

18    someone tried to discuss the case with you or that you

19    overheard a discussion -- nor should you discuss with them any

20    other fact that you feel necessary to bring to the Court's

21    attention.  If you need to advise me of such matters, please

22    do so through the marshal or the clerk.

23        And finally, although it's a natural human tendency to talk

24    with people with whom you may be thrown into contact, you must

25    not talk to any of the parties or their attorneys or any

witness during the time that you serve on the jury.  If you
encounter anyone connected with the case outside the
courtroom, you should avoid having a conversation with them,
overhearing their conversation, or having any contact with
them at all.

    For example, if you inadvertently find yourself in a
courthouse corridor, the elevator, the cafeteria or any other
location where the case is being discussed by attorneys,
parties, witnesses or anyone else, you should immediately
leave to avoid hearing such discussions.  If you do overhear
a discussion about the case, you should report that to me as
soon as you can.

    And finally, if you see an attorney or witness involved
in the case and they turn and walk away from you, they're not
being rude; they are merely trying to avoid any contact with
you as they have also been instructed.

    And in some cases, although not necessarily this one, there
may be reports in the newspaper or on the radio, internet,
television while the trial is occurring.  If there should be
such coverage, you may be tempted to read, listen to, or watch
it, but you must not do so.  You must decide this case instead
solely on the basis of the evidence presented in the
courtroom.

    If any publicity about the trial inadvertently comes to
your attention during trial, please do not discuss it with any

1    of the other jurors or anyone else; just let me or the clerk

2    know as soon as that happens and I will then briefly discuss

3    it with you.

4       You may not communicate with anyone not on the jury about

5    the case.  This includes electronic communications such as

6    emails, texts, blogging, etc.  In addition, you may not

7    conduct any independent investigation during deliberations,

8    and this means you may not conduct any research in person or

9    electronically via the internet or in any other way.

10      With that, let's take a 15-minute break.  We'll resume at

11   11:30.  Thank you.

12         (Recess from 11:14 a.m. to 11:37 a.m.)

13         THE COURT:  Welcome back, members of the jury.

14   Captain Summers, I remind you you're still under oath.

15      Mr. Valentini.

16         MR. VALENTINI:  Thank you, Your Honor.

17   BY MR. VALENTINI:

18   Q.   If you could, please, pull up Exhibit 504 again.

19   Thank you.

20      Captain Summers, you mentioned before that bike racks were

21   used as a security measure to mark the restricted perimeter

22   around the Capitol on January 6, 2021?

23   A.   Yes.

24   Q.   And you said that some of these bike racks were

25   interlocking?

1    A.    Yes.

2    Q.    Is Exhibit 504 a good example of how the bike racks are

3    supposed to interlock?

4    A.    Sort of.  You can see a portion, a very small portion of

5    the locking mechanisms, but it's kind of hard to see because

6    there's a person right there in the center.

7    Q.    And the point of interlocking these bike racks is so that

8    a crowd from the outside could not break them apart.

9    A.    Correct.  To make a continuous line.

10   Q.    Continuous line.  And you also see a sign on the

11   left-hand side of the picture?

12   A.    Yes.

13   Q.    And that's one of those Area Closed signs that you were

14   describing before?

15   A.    Correct.

16   Q.    And is Exhibit 504 a fair representation of how these

17   signs were generally affixed to the bike racks?

18   A.    Yes.

19   Q.    If we could pull down this exhibit, and if we could

20   please pull up Exhibit 505.  Do you recognize what is depicted

21   in Exhibit 505?

22   A.    Yes.

23   Q.    What is it?

24   A.    This is one of our Area Closed signs.

25         MR. VALENTINI:  We would move to admit Exhibit 505

1    into evidence.

2          MR. ROOTS:  Objection.  Foundation.  Where was this

3    taken?

4    BY MR. VALENTINI:

5    Q.   Captain Summers, was the Area Closed sign depicted in

6    Exhibit 505, is it a fair and accurate representation of the

7    signs that were posted around the restricted perimeter around

8    the Capitol on January 6, 2021?

9    A.   Yes.

10          MR. VALENTINI:  The government moves to admit Exhibit

11   505 into evidence.

12          THE COURT:  Any further objection?

13          MR. ROOTS:  Same objection.  Where and when.

14          THE COURT:  The objection will be overruled.  It's only

15   being offered as a fair depiction of the Area Closed signs

16   that were there at the Capitol.  And on that basis it will be

17   admitted.  505 may be published.

18                          (Government Exhibit No. 505

19                           received into evidence.)

20   BY MR. VALENTINI:

21   Q.   Now that the jury has an opportunity to see the exhibit,

22   Captain Summers, let me ask you, is this a fair and accurate

23   example of the Area Closed signs that the Capitol Police used

24   on January 6, 2021?

25   A.   Yes.

1    Q.   Could you please read the full wording of that sign for

2    the jury?

3    A.   Sure.  It says "Area Closed By Order of the United States

4    Capitol Police Board."

5    Q.   And this is the standard sign that the Capitol Police

6    uses for whenever a restricted area is set up for events

7    around the Capitol.

8    A.   Yes.

9    Q.   We can stop publishing this exhibit.

10        And, Captain Summers, I wanted to shift gears a little

11   bit and talk about what you did on January 6, 2021.

12        Your rank now is captain?

13   A.   Yes.

14   Q.   What was your rank as of January 6, 2021?

15   A.   I was a lieutenant.

16   Q.   And what was your role as a lieutenant on January 6?

17   A.   On that day, I was assigned to our communications

18   section.  I was the overall commander for Communications

19   Section 2 and for coverage of the event that was going on

20   for the day.

21   Q.   Do you recall, what time did you arrive to work that

22   day, if you recall?

23   A.   6 a.m.

24   Q.   And you said that you were assigned to the communications

25   section that day?

1    A.    Yes.

2    Q.    And what was scheduled to occur on January 6, 2021, at

3    the Capitol?

4    A.    The confirmation of the Electoral College votes for the

5    presidential election.

6    Q.    Did that proceeding require what is called a joint

7    session of Congress, if you know?

8    A.    Yes.

9    Q.    And who attends a joint session of Congress?

10   A.    Usually all the senators and all the members of the

11   House.

12   Q.    And until what time were you supposed to work your shift

13   on January 6, 2021?

14   A.    I was supposed to leave at 2 p.m. that day.

15   Q.    Were you able to leave at 2 p.m. that day?

16   A.    No.

17   Q.    At what time did you leave on January 6, 2021?

18   A.    I don't recall exactly what time; I just remember it was

19   dark.

20   Q.    Let's take a step back.  Your time with the Capitol

21   Police, did you also become familiar with the security cameras

22   that the Capitol Police uses?

23   A.    Yes.

24   Q.    And are these cameras sometimes referred to as CCTV

25   cameras?

1    A.    Yes.

2    Q.    Do you know what that stands for?

3    A.    Closed-circuit television.

4    Q.    What do the Capitol Police use the CCTV cameras for?

5    A.    We use it for virtual patrol, documentation of evidence,

6    officer safety.

7    Q.    Just generally speaking, without giving any details about

8    specific locations, are these cameras -- are there CCTV

9    cameras in the interior of the Capitol building?

10    A.    Yes.

11    Q.    Are there also CCTV cameras on the exterior of the

12    Capitol building?

13    A.    Yes.

14    Q.    And in your experience, do those cameras produce a fair

15    and accurate representation of what -- of the events that are

16    within the camera's field of view?

17    A.    Yes.

18    Q.    Meaning there's generally no glitching?

19    A.    Correct.

20    Q.    And do the department's cameras also record the time and

21    date at which the events that are recorded take place?

22    A.    Yes.

23    Q.    And have you found those time stamps to be generally

24    accurate in your work?

25    A.    Yes.

1      Q.   Do you rely on those time stamps in, say, investigations

2      for the Capitol Police?

3      A.   Yes.

4      Q.   Do those security cameras include sound, audio?

5      A.   No.

6      Q.   Before coming to court, did you have an opportunity to

7      review CCTV footage from January 6?

8      A.   Yes.

9      Q.   In particular, did you review the footage that has been

10     marked for this trial as Exhibits 101, 102, 103, 104, 105,

11     106, and 303?

12     A.   Yes.

13     Q.   And do you know that those exhibits contain accurate

14     copies of the CCTV footage as it's kept by the Capitol Police?

15     A.   Yes.

16     Q.   And all of those recordings are from January 6 and in

17     part January 7, 2021?

18     A.   Yes.

19         MR. VALENTINI:  The government moves to admit Exhibits

20     101, 102, 103, 104, 105, 106, and 303 into evidence.

21         MR. ROOTS:  Well, we don't have an objection with

22     regard to that representation, but we haven't teed up each

23     one.  So we would reserve possible future objections

24     individually on some of these.

25         THE COURT:  So no objection as to authenticity and the

1    general admissibility, but you're attempting to reserve

2    objections as to particular portions of the videos as they

3    are displayed?

4          MR. ROOTS:  Correct.

5          THE COURT:  All right.  They'll be admitted with that

6    reservation.

7                              (Government Exhibit Nos. 101-106

8                               received into evidence.)

9                              (Government Exhibit No. 303

10                              received into evidence.)

11         THE COURT:  It's 101, 102, 103, 104, 105, 106, and 303,

12    you said?

13         MR. VALENTINI:  Yes.

14         THE COURT:  All right.  They're admitted.

15    BY MR. VALENTINI:

16    Q.   And before coming to court, did you also review Exhibits

17    101A, 102A, 103A, 104A and 105A?

18    A.   Yes.

19    Q.   Are these essentially still images, screen grabs, if you

20    will, from the footage in the corresponding exhibits?

21    A.   Yes.

22    Q.   Now, some of these exhibits that I just listed also

23    include some circles and graphics.  Right?

24    A.   Correct.

25    Q.   But the images in these exhibits otherwise capture what

1    was captured by CCTV cameras?

2    A.    Correct.

3         MR. VALENTINI:  So the government would move to admit

4    Exhibits 101A, 102A, 103A, 104A, and 105A into evidence.

5         MR. ROOTS:  No objection with those reservations

6    already expressed.

7         THE COURT:  All right.  101A, 102A, 103A, 104A, and

8    105A will be admitted.  I guess the reservation can be

9    reserved, although there's no mystery as to these.  You've

10   been able to review them.  But they will be admitted at this

11   time.

12                         (Government Exhibit Nos. 101A-105A

13                           received into evidence.)

14   BY MR. VALENTINI:

15   Q.    Okay.  Let's pull up the first frame of Exhibit 106,

16   please.  Having seen the first frame of this video, Captain

17   Summers, are you familiar with what this video is?

18   A.    Yes.

19   Q.    And this is not a continuous recording of CCTV footage,

20   is it?

21   A.    No, it is not.

22   Q.    What is it?

23   A.    It's a compilation.

24   Q.    And it's a compilation of CCTV footage and aerial images

25   from above?

1    A.    Yes.

2    Q.    And on what day were these recordings made?

3    A.    January 6, 2021.

4    Q.    Now, are you able to see approximately how long this

5    video is total?

6    A.    This one looks like 8 minutes and 41 seconds.

7    Q.    Okay.  If I could ask Ms. Roberts to please start playing

8    the video.  And as we play it, I will ask you some questions.

9    A.    Yes, sir.

10   Q.    We're first going to play this video until run time 15

11   seconds into the exhibit.

12         (Video played.)

13         Can stop here.

14         What area of the Capitol is depicted at this point in the

15   exhibit?

16   A.    This is First Street between the Pennsylvania Avenue

17   walkway and the Peace Circle memorial.

18   Q.    If we could please pull up Exhibit 501 very briefly that

19   is already in evidence.

20         Could you please orient the jury by circling the area

21   that we were just seeing in the video in Exhibit 106 on

22   Exhibit 501.

23   A.    Yes.

24   Q.    Very good.  I will remove the markings.  If we could go

25   back to Exhibit 106, please.

1          Compared to what you see on a regular day -- compared

2     to what you see on a regular day, is there something unusual

3     about this recording from January 6?

4     A.    Just that we have a large crowd that has assembled on

5     First Street.

6     Q.    But at this point on the recording the crowd that you

7     just identified is still outside the security perimeter that

8     we discussed before.

9     A.    Yes.

10    Q.    And could you please tell what the time stamp at this

11    point in the exhibit is?

12    A.    It's 12:51:03 p.m.

13    Q.    If we could continue playing this exhibit until run time

14    50 seconds into the exhibit, please.

15         (Video played.)

16         Do you still see the Peace Circle area in this exhibit?

17    A.    Yes.

18    Q.    And could you please circle it for the jury?

19         (Witness complies.)

20         This is a different angle on the Peace Circle from the

21    angle that we saw last time we stopped the exhibit at 15

22    seconds into the exhibit.

23    A.    Yes.

24    Q.    So which point of view is captured at this point in the

25    exhibit?

 1    A.   So, looking at this, this looks like one of what we call

 2    our dome cameras which are affixed to the dome, just kind of

 3    looking down.  We're pointing west.

 4    Q.   It's essentially looking down from the Capitol building

 5    west.

 6    A.   Yes.

 7    Q.   Do you recognize the building with the round corner

 8    structure on the back of the exhibit?

 9    A.   Yes.

10    Q.   What is it?

11    A.   This building.

12    Q.   Where this courthouse is?

13    A.   Yes.

14    Q.   I will remove the markings.

15         And if you could please tell the jury what time stamp you

16    see at this point in the exhibit?

17    A.   12:57:24 p.m.

18    Q.   Do you see a crowd in the foreground of the exhibit?

19    A.   Yes.

20    Q.   What has happened to that crowd compared to the last

21    point where we stopped the exhibit?

22    A.   It continues to get larger, and they have breached our

23    perimeter.

24    Q.   And if you could please use the touch screen to identify

25    where the perimeter was on January 6.

1          (Witness complies.)

2          And to be clear, the perimeter also continued through the

3     two segments that you have marked on the touch screen.

4     A.   Yes.  There were some bike racks and stuff here in this

5     area.

6     Q.   Can we continue playing the exhibit?  We're going to stop

7     about 1 minute and 10 seconds into the exhibit.

8          (Video played.)

9          We stopped playing the exhibit at 1 minute and 10 seconds

10    1:10 into the exhibit.  What time is reflected or displayed in

11    the exhibit?

12    A.   12:58:37 p.m.

13    Q.   Do you recognize the area that is captured, depicted at

14    this point in the exhibit?

15    A.   Yes.

16    Q.   What area is it?

17    A.   We're looking at a portion of the inaugural stage and the

18    Lower West Terrace.

19    Q.   And if I could ask Ms. Roberts to please pull up Exhibit

20    506, already in evidence.

21         And could you please circle for the jury the area, if

22    you see it in this rendering that's captured on Exhibit 106,

23    at 1 minute and 10 seconds into the exhibit.

24    A.   Yes.  This is the Lower West Terrace.

25    Q.   So if we can switch back to Exhibit 106.

1      And is this area at time marked 1 minute and 10 seconds

2   into the exhibit already within the restricted perimeter?

3   A.   Yes.

4   Q.   Is this area entirely within the restricted perimeter?

5   A.   Yes.

6   Q.   Now, if I may direct your attention to the back of the

7   exhibit, I have circled an area in the back of the exhibit.

8   Do you know what that is?

9   A.   Yes.

10  Q.   What is it?

11  A.   That is a portion of the snow fencing and signage that

12  we had in place for an additional perimeter.

13  Q.   You said additional perimeter.

14  A.   Yes.

15  Q.   That perimeter that is now circled in Exhibit 106, is

16  that the outer perimeter of the restricted area?

17  A.   No.  This is like the inner perimeter.  This is the one

18  that was in place in early fall that had that area closed for

19  construction.

20  Q.   The same inner perimeter that we saw from the outside in

21  a previous exhibit.

22  A.   Yes.

23  Q.   Now, at this point, at 12:58:37 on January 6, the crowd

24  appears, is it already past the inner security perimeter?

25  A.   Yes.

1    Q.   Let's pull up Exhibit 502 very briefly.

2         Can you please tell the jury by using the touch screen

3    where that crowd that we just saw in Exhibit 106 was amassed

4    at this point?

5         (Witness complies.)

6         And if we can pull down the exhibit and switch back to

7    106.

8         Do you see a line of police officers at this point at

9    12:58:37 p.m. on the Lower West Terrace?

10   A.   Yes.

11   Q.   Could you please circle that line for the jury?

12        (Witness complies.)

13   A.   There's some more over here.

14   Q.   Is it your understanding of the events of January 6

15   that that police line held through the day on January 6?

16   A.   We attempted to hold it the entire day.

17   Q.   Was the Capitol Police successful at holding that line?

18   A.   No.

19   Q.   So at some point the crowd made it past that police line?

20   A.   Yes.

21   Q.   If we could please keep playing the exhibit until 1

22   minute and 22 seconds into the exhibit.

23        (Video played.)

24        MR. ROOTS:  And, Your Honor, we would just object to

25   some of this as irrelevant with regard to these defendants,

1    and misleading.

2           THE COURT:  The objection is overruled.

3    BY MR. VALENTINI:

4    Q.   Captain Summers, what has happened -- what happened after

5    the crowd breached that police line that you just identified

6    on the Lower West Terrace?

7    A.   Some of the demonstrators are now making their way up

8    the stairs on the Senate side up to the Upper West Terrace.

9    Q.   If we can switch to Exhibit 506, please, Ms. Roberts.

10          You just referenced some stairs.  Can you identify on

11   this rendering in Exhibit 506 what stairs you're referencing?

12   A.   Yes.  The stairs are right along here.  It's a little

13   hard to see because a portion of the stage is kind of on those

14   stairs.

15   Q.   If we could please switch back to Exhibit 106.  If we

16   could please continue playing the exhibit until 1 minute and

17   39 seconds into the exhibit.

18          (Video played.)

19          What area of the Capitol is depicted at this point at 1

20   minute and 39 seconds into the exhibit?

21   A.   This is now the Upper West Terrace on the Senate side.

22   Q.   At what time was this recording made?

23   A.   Looks like 2:11:50 p.m.

24   Q.   You said Upper West Terrace.  That is the area above the

25   Lower West Terrace?

1    A.    Yes.

2    Q.    And it's connected to the -- strike that.  And is the

3    Upper West Terrace connected to the Lower West Terrace through

4    the stair we saw in the exhibit a minute ago?

5    A.    Yes.

6    Q.    Please switch to Exhibit 506.

7          If you could please tell the jury where the Upper West

8    Terrace is and where that image -- what the image that we just

9    saw in Exhibit 106 depicts.

10   A.    Okay.  I'm going to circle here.  Essentially, you make

11   your way up the stairs here, and this is -- where I've circled

12   is considered the Upper West Terrace.

13   Q.    And so the building that we just saw in Exhibit 106, that

14   would be the area that I just highlighted with a blue marking?

15   A.    Yes.

16   Q.    Thank you.  And if we could please switch back to Exhibit

17   106.

18         At this point, what, if anything -- strike that.

19         Do you see members of a crowd in the foreground of

20   Exhibit 106 at this point?

21   A.    Yes.

22   Q.    These are not Capitol Police officers?

23   A.    No.

24   Q.    Based on your experience, do they appear to be members

25   of Congress?

1    A.    No.

2    Q.    Staffers?

3    A.    No.

4    Q.    Rioters?

5    A.    Yes.

6    Q.    And at this point in Exhibit 106, what stands between

7    this crowd of rioters and the Capitol building?

8    A.    Windows and doors at this point.

9    Q.    And that area -- let me circle an area in the back here.

10   What is that -- is there a door there?

11   A.    Yes.

12   Q.    Is there a name to that door?

13   A.    Yes.  It's the Senate Wing door.

14   Q.    Where does it give access to?

15   A.    The first floor of the Senate Wing.

16   Q.    Let's please continue playing Exhibit 106 until 2 minutes

17   and 26 seconds into the exhibit.

18        (Video played.)

19        What part of the Capitol are we seeing, Captain Summers?

20   A.    This is the first floor of the Senate Wing, the

21   connecting corridor between the center of the building and the

22   chambers, the chambers side of the building.

23   Q.    How does the image at this point in the exhibit compare

24   to the image -- to the area that was depicted last time we

25   stopped this video exhibit?

1    A.   This is an interior view right outside of that door.

2    Q.   Let's pull up Exhibit 507.  This exhibit is a floor plan

3    of the first floor of the Capitol building.  Right?

4    A.   Yes.

5    Q.   And I believe before did you -- you testified that the

6    Senate Wing door is on the first floor of the Capitol

7    building?

8    A.   Yes.

9    Q.   Could you please circle the Senate Wing door area for the

10   jury on this exhibit.

11        (Witness complies.)

12        And if you could please switch back to Exhibit 106.

13        Let me ask you about the Senate Wing door.  Is that door

14   ever used to let people into the building?

15   A.   No.

16   Q.   Not even members of Congress?

17   A.   No.

18   Q.   Staffers?

19   A.   No.

20   Q.   What is it used for?

21   A.   It is an emergency egress only door, so in case there is

22   an emergency where we need to evacuate the building quickly,

23   that is one of the exits that can be used.

24   Q.   So let's talk for a minute about the Senate chamber.

25   Which floor is the Senate chamber on?

1    A.   Second floor.

2    Q.   Now, before you testified that the Senate Wing door is on

3    the first floor of the Capitol.

4    A.   Yes.

5    Q.   How long would it take a regular speed walker to walk

6    from the Senate Wing door to the Senate chamber?

7    A.   Not very long.  Two to five minutes, because it's just a

8    walk down the hall and up one set of stairs.

9    Q.   And what is the time stamp at this point at 2 minutes and

10   26 seconds into the exhibit?

11   A.   2:12:15 p.m.

12   Q.   Let's play from here, just a few seconds in, till 2:30.

13       (Video played.)

14       What, if anything, did you see happen right outside the

15   window on the right-hand side of the Senate Wing door?

16   A.   One of the rioters has banged on the window and has

17   broken the glass.

18   Q.   Now let's play from here and stop at 3 minutes and 16

19   seconds into the exhibit.

20       (Video played.)

21       What did you observe happen since the last time we

22   stopped the exhibit?

23   A.   Rioters have now breached the building by breaking one

24   of the windows with a board, and the first person has entered

25   inside.

1    Q.   What is the time stamp at this point?

2    A.   This is 2:13:05 p.m.

3    Q.   Do you know if 2:13, approximately, was the first breach

4    of the Capitol building on January 6?

5    A.   I believe it was.

6    Q.   Were other entry points into the Capitol building

7    breached after 2:13 p.m.?

8    A.   Yes.

9    Q.   Let's continue playing the exhibit until 4 minutes and

10   17 seconds into the exhibit.

11        (Video played.)

12        What area of the Capitol are we seeing at this point in

13   the exhibit?

14   A.   This is the Crypt.

15   Q.   You may have said this before, but which floor is the

16   Crypt on within the Capitol?

17   A.   The first floor.

18   Q.   And if we can quickly, briefly pull up Exhibit 507,

19   please.

20        If you could just identify the Crypt on 507, please?

21        (Witness complies.)

22        If we could please go back to 106.

23        How far is the Crypt, that's depicted at this point in

24   Exhibit 106, from the Senate Wing door that we were looking

25   at a minute ago?

1  A.   It's right down the hall, maybe about a two-minute walk,

2  if that.  It's right down the hall.

3  Q.   Fair to say that by 2:25 p.m. the mob had taken control

4  of the Crypt?

5  A.   Yes.

6  Q.   If we could continue playing the exhibit until 5 minutes

7  and 34 seconds into the exhibit.

8       (Video played.)

9       Actually, let's stop briefly here, if you can pause the

10  exhibit.

11       Is it your understanding of the events of January 6 that

12  rioters, after they entered through the Senate Wing door, were

13  they able to get to other doors and open them from the inside?

14  A.   Yes.

15  Q.   We can continue playing.

16       (Video played.)

17       MR. ROOTS:  Again, we'll just offer a continuing

18  objection as irrelevant.

19       THE COURT:  So noted.

20    (Video played.)

21  BY MR. VALENTINI:

22  Q.   We'll stop the exhibit at 5 minutes and 34 seconds into

23  the exhibit.  Which area of the Capitol are we seeing at this

24  point in the exhibit?

25  A.   We're still on the first floor right outside of the

1    Crypt.  Now it looks like we're on the House side.

2    Q.   You said right outside of the Crypt.  How long would

3    you estimate it would take to walk from the Crypt to the area

4    that's depicted at this point?

5    A.   Just a few seconds.

6    Q.   Let's pull up Exhibit 507.  If you could please identify

7    the area that we were just seeing in Exhibit 106 on the floor

8    plan of the Capitol.

9        (Witness complies.)

10       Is it fair to say that over the course of Exhibit 106

11   that we just looked at we saw rioters move in from the Senate

12   Wing door, walk into the Crypt and over to the Memorial Door?

13   A.   Yes.

14   Q.   Let me remove the markings, and if we could go back to

15   Exhibit 106.

16       What is the time stamp at 5 minutes and 34 seconds into

17   the exhibit?

18   A.   2:26:19 p.m.

19   Q.   If we could continue playing the exhibit until 6 minutes

20   and 3 seconds.

21       (Video played.)

22       And what area of the Capitol are we seeing at this point

23   in the exhibit?

24   A.   We're still on the first floor but we're now in the House

25   Wing at the House Wing door.

1    Q.    How far is this House Wing area from the Crypt?

2    A.    Not far, just down the hall.  Maybe a two-minute walk,

3    if that.

4    Q.    How about from the Senate Wing door?

5    A.    Still not far.  I've made it myself from one end to the

6    other in five minutes.  So it's not far.

7    Q.    Is it fair to say that the House Wing door that we're

8    seeing at this point in the exhibit is essentially the mirror

9    image of the Senate Wing door, just on the south side of the

10   building?

11   A.    Yes.

12   Q.    And what is the time stamp at this point in the exhibit?

13   A.    2:28:39 p.m.

14   Q.    Do you see a line of Capitol Police officers at this

15   point in the exhibit?

16   A.    Yes.

17   Q.    Do you also see rioters?

18   A.    Yes.

19   Q.    How many rioters compared to police officers would you

20   estimate are in this image?

21   A.    Only thing I can say is there are way more rioters than

22   Capitol Police.  We were extremely overwhelmed that day.

23   Q.    Let's continue playing the exhibit until run time 6

24   minutes and 29 seconds.

25           (Video played.)

1    What area of the Capitol is depicted at this point in

2    the exhibit?

3    A.   We're now on the second floor on the House side of the

4    building, right outside of the House chamber.

5    Q.   How long does it take a normal person, a person walking

6    at a regular speed, to walk from the House Wing door area that

7    we saw before to the second floor House chamber area that

8    we're seeing at this point in this exhibit?

9    A.   Not very long.  It's just down the hall and up one flight

10   of stairs.  So like I said, two minutes or so, maybe.

11   Q.   Let's continue playing the exhibit, please.

12       (Video played.)

13       We can stop at 6:52.

14       What area of the Capitol are we seeing at this point in

15   the exhibit?

16   A.   Senate Wing, first floor.  This is another Senate Wing

17   door but also known as the Parliamentarian Door.

18   Q.   Is this door -- well, let's pull up Exhibit 507.

19       Could you identify on the floor plan of the first floor

20   of the Capitol where the Parliamentarian Door is.

21       (Witness complies.)

22       It's right around the corner from the Senate Wing door.

23   Is that fair?

24   A.   Yes.

25   Q.   If we can switch back to Exhibit 106.  And if we could

1    continue playing until 7 minutes and 22 seconds into the

2    exhibit.

3         (Video played.)

4         Are we back to this -- which area are we seeing at this

5    point in the exhibit?

6    A.   The first floor, Senate side of the building.  We're at

7    the Senate Wing door again.

8    Q.   What is the time stamp at this point?

9    A.   2:48:11 p.m.

10   Q.   The last time we were looking at this area, the area had

11   significantly more rioters than at this point.

12   A.   Yes.

13   Q.   So did there come a time when the Capitol Police was able

14   to at least momentarily clear this area from rioters?

15   A.   Yes.  We attempted in several areas to clear rioters.

16   Q.   And the time stamp at this point you said is 2:48 p.m.?

17   A.   Yes.

18   Q.   And was that attempt to clear the Senate Wing door area

19   of rioters successful?

20   A.   No.

21   Q.   Not at that point?

22   A.   No.

23   Q.   If you can continue playing the exhibit.

24        (Video played.)

25        So we have skipped some time at this point in the

1    exhibit.  What is the time stamp at this point?

2    A.    3:39:21 p.m.

3    Q.    What do you see happening at this point at the Senate

4    Wing door?

5    A.    We've gotten more officers to the area, looks like we've

6    attempted to barricade the broken windows on one side, and

7    we're still attempting to stop the flow of rioters from coming

8    in the door.

9    Q.    If we can continue playing the exhibit, please, stopping

10   at 8:29.

11        (Video played.)

12        Could you please explain to the jury which area of the

13   Capitol we're seeing at this point in the exhibit?

14   A.    Yes.  This is the Upper West Terrace.

15   Q.    Where is the Senate Wing door compared to this image,

16   if you are able to identify it?

17   A.    It's a little hard to identify from this angle.

18   Q.    And what is the time stamp at this point?

19   A.    4:30:08 p.m.

20   Q.    What do you see happening at this point?

21   A.    By this time we've gotten some reinforcements.  This is

22   Metropolitan Police Department that we see here in the

23   footage, and they are helping us clear rioters from the Upper

24   West Terrace.

25   Q.    Could you go ahead and finish playing the exhibit.

1          (Video played.)

2          Captain Summers, I want to switch gears and talk a little

3    bit about the proceeding in Congress that day.  You testified

4    before that one of the reasons that the Capitol was closed to

5    the public on January 6 is that there was going to be a

6    proceeding.

7    A.    Yes.

8    Q.    There was going to be -- I believe you testified it was

9    going to be a joint session of Congress?

10   A.    Yes.

11   Q.    Do you know if the House actually convened, started a

12   proceeding that day?

13   A.    They did.

14   Q.    So did the Senate?

15   A.    Yes.

16   Q.    And the two chambers also got together at some point that

17   day?

18   A.    Yes.

19   Q.    And do you know if the chambers were evacuated at some

20   point that day?

21   A.    Yes.

22   Q.    And what happened to the joint session of Congress that

23   was supposed to take place when the chambers were evacuated?

24   A.    The House went into recess while we sorted out what was

25   going on.

1    Q.   How about the Senate?

2    A.   Same thing.

3    Q.   Let's pull up and show you what has been marked as

4    Exhibit 407, please.  If we can scroll through it -- well,

5    first of all, did you have an opportunity to review Exhibit

6    407 before coming to court?

7    A.   Yes.

8    Q.   We can scroll through it very quickly.

9         And if we can now pull up Exhibit 408.

10        And Captain Summers, you also had an opportunity to

11   review Exhibit 408 before coming to court?

12   A.   Yes.

13   Q.   And are these two exhibits, 407, 408, excerpts from

14   the congressional record on January 6?

15   A.   Yes.

16   Q.   Do you know what the congressional record is?

17   A.   Yes.

18   Q.   What is it?

19   A.   So basically it's a play by play of everything that has

20   gone on -- that went on on the floor that day.  So the

21   congressional record would have everything that is said,

22   everything that is done during the course of a session.

23        MR. VALENTINI:  Government moves to admit Exhibits

24   407 and 408 into evidence.

25        MR. ROOTS:  Objection, just relevance.

1          THE COURT:  Overruled.  407, 408 are admitted, may be

2    published.

3                              (Government Exhibit Nos. 407, 408

4                               received into evidence.)

5    BY MR. VALENTINI:

6    Q.   If we could please scroll through Exhibit 408, just the

7    first couple of pages.  Is this what the congressional record

8    looks like?

9    A.   Yes.

10   Q.   If we could pull up 407, please.

11        And 408 is for the House.  You see the House?

12   A.   Yes.

13   Q.   The reference to the House at the top of the page?

14        In the interest of efficiency, I think we can probably

15   move on.

16        Do you know if the Senate chamber has its own video

17   recording system?

18   A.   Yes.

19   Q.   And there is cameras inside the Senate chamber?

20   A.   Yes.

21   Q.   Does the Capitol Police operate those cameras?

22   A.   No, we do not.

23   Q.   Do you know who does?

24   A.   C-SPAN.

25   Q.   Do you know if the House chamber has its own recording

1    system?

2    A.    Yes.

3    Q.    And do you know who operates that system?

4    A.    Same thing, C-SPAN.

5    Q.    Let me put up what has been marked as Exhibit 404.

6         MR. VALENTINI:  I'd ask for a minute of the Court's

7    indulgence.

8         THE COURT:  Well, we're four minutes short of the noon

9    break, the lunch break.  Does it make sense to take the lunch

10    break so we can straighten out the technology?

11         MR. VALENTINI:  Absolutely from the government's

12    perspective and Ms. Roberts's perspective, I'm sure.

13         THE COURT:  So why don't we take our lunch break a

14    little early, and we'll resume at 1:35.  Have a nice lunch,

15    ladies and gentlemen, and we'll see you at 1:35.

16      (Jury out at 12:27 p.m.)

17         THE COURT:  See you then.  Thank you.

18      (Recess from 12:28 p.m. to 1:35 p.m.)

19         THE COURT:  Welcome back, members of the jury.  I hope

20    you had a nice lunch.

21      Captain Summers, I remind you you're still under oath.

22      Mr. Valentini.

23    BY MR. VALENTINI:

24    Q.    Good afternoon, Captain Summers.

25    A.    Good afternoon.

1    Q.   Before we broke for lunch, we were looking at two

2    exhibits, Exhibits 407 and 408.  Let me pull up what has been

3    marked Exhibit 404 at this point.

4         Now, prior to coming to court today, did you have an

5    opportunity to review the video that is marked as Exhibit 404?

6    A.   Yes.

7    Q.   And what is it, generally speaking?

8    A.   A compilation video again, I believe.

9    Q.   It's a compilation video of the congressional record and

10   the recordings from inside the Senate chamber and the House

11   chamber?

12   A.   Yes.

13        MR. VALENTI:  And as a summary exhibit, the government

14   moves for the admission of Exhibit 404 into evidence.

15        MR. ROOTS:  Just objections, relevance and misleading.

16        THE COURT:  The objection is overruled.  404 is

17   admitted and may be published.

18                              (Government Exhibit No. 404

19                               received into evidence.)

20   BY MR. VALENTINI:

21   Q.   If you could please go ahead and skip to 1 minute and 41

22   seconds into Exhibit 404.  And before we start playing,

23   Captain Summers, I'm going to ask you a couple of questions.

24        This video is a compilation of the congressional

25   record --

 1    A.    Yes.

 2    Q.    -- and C-SPAN footage?

 3    A.    Yes.

 4    Q.    Congressional record being in lay terms the journal of

 5    what happened in the House and the Senate that day?

 6    A.    Correct.

 7    Q.    So if we're now at 1 minute and 41 seconds into the

 8    exhibit, and if I can ask Ms. Roberts to please start playing

 9    the exhibit.

10          (Video played.)

11          If you could stop for one second?

12          Captain Summers, could you please read the first five

13    lines of the congressional record portion of this exhibit?

14    A.    "Counting Electoral Votes Joint Session of the House and

15    Senate Held Pursuant to the Provisions of Senate Concurrent

16    Resolution 1."

17    Q.    These are the events of January 6, 2021?

18    A.    Yes.

19    Q.    If you could start playing.

20          (Video played.)

21          Captain Summers, do you have an understanding of where

22    the sessions are held physically when there's a joint session

23    of Congress?

24    A.    Yes.

25    Q.    Is it in the House chamber or the Senate chamber?

```
 1    A.    Always in the House.

 2    Q.    Why is that?

 3    A.    Because it's a larger chamber.

 4    Q.    Do you have an understanding of what we are seeing now at

 5    this point in the exhibit?

 6    A.    Yes.  So basically the Senate has now, has walked over

 7    from the Senate side of the building and they are now entering

 8    the House chamber.

 9    Q.    Thank you.  Continue playing.

10          (Video played.)

11          Captain Summers, do you have an understanding as to

12    whether the joint session at one point broke into two separate

13    sessions of the House and the Senate --

14    A.    Yes.

15    Q.    -- on January 6?  And do you recall why that is?

16    A.    I think it had something to do that they weren't able to

17    agree on something so they had to go to their respective

18    chambers to work it out.

19    Q.    To discuss objections?

20    A.    Yeah.

21    Q.    Can we continue playing the exhibit?

22          (Video played.)

23          If you could stop the exhibit at this point.  Could you

24    please read the first sentence on the congressional record

25    text at 4 minutes and 11 seconds into the exhibit?
```

1    A.    "The vice president:  Pursuant to Senate Congressional

2    Resolution 1 and Section 17, Title III, U.S. Code, when the

3    two houses withdraw from the joint session to count the

4    electoral vote for separate consideration of an objection, a

5    senator may speak to the objection for 5 minutes and shall not

6    more than once.  Debate shall not exceed 2 hours, after which

7    the Chair will put the question:  Shall the objection be

8    sustained?"

9    Q.    So this is the process you were just talking about when

10   the two chambers separated out for separate proceedings to

11   discuss objections.

12   A.    Yes.

13   Q.    You can continue playing the exhibit, please.

14        (Video played.)

15        Do you have an understanding of who presided over the

16   joint session of Congress on January 6?

17   A.    For the joint session it was the Speaker and the vice

18   president.

19   Q.    And when the Senate broke out for a separate session,

20   do you have an understanding of who presided over the Senate

21   session?

22   A.    Yes.  That would be the vice president.

23   Q.    Thank you.

24        (Video played.)

25        Could we stop the exhibit at this point at 4 minutes and

1    56 seconds into the exhibit.  Could you please read for the

2    jury the time stamp at this time?

3    A.    1:29 p.m.

4    Q.    Do you recall from your prior testimony at what time

5    approximately the Senate Wing door was first breached?

6    A.    I don't recall off the top of my head.  I've looked at

7    so much video.

8    Q.    And continue.

9         (Video played.)

10         Did there come a time when the Senate recessed its

11    separate proceeding?

12    A.    Yes.

13    Q.    What time do you see on the screen at this point?

14    A.    2:13 p.m.

15    Q.    If we could go back to -- we're now at time track 5:22.

16    Run time 5:22 on the exhibit, yes.  You may not see that.

17    If we could go back to Exhibit 106 for a second, please?

18    Run time, skip forward to 2:26.  So if we could do 3:16?

19         (Video played.)

20      Having looked again at Exhibit 106, does this refresh your

21    memory as to when the Senate Wing door was first breached?

22    A.    Yes.  2:13:07 p.m.

23    Q.    And if we could skip back to Exhibit 404, please, and we

24    were at 5:22.  Thank you.

25         And at what time did the Senate go into a recess?

1    A.    At 2:13 p.m.

2    Q.    If you could continue playing the exhibit, please.

3          I would ask you to pay attention to the back of the

4    exhibit, the image on the right-hand side, please.

5          (Video played.)

6          What do you see happening to the person who acted as the

7    Speaker at that point?

8    A.    That was acting as the presiding officer over the Senate,

9    he is evacuated.

10   Q.    You can continue playing the exhibit.

11         (Video played.)

12         Could we skip to 6:55?  Thank you.

13         Could you please read the text from the congressional

14   record at this point in the exhibit?

15   A.    "The Speaker pro tempore (Mr. McGovern):  Pursuant to

16   clause 12(b) of Rule I the Chair declares the House in recess

17   subject to the call of the Chair.

18         "Accordingly (at 2 o'clock and 18 minutes p.m.) the House

19   stood in recess."

20   Q.    So by 2:18 the House had gone into a recess as well.

21   A.    Yes.

22   Q.    Could we continue playing the exhibit.

23         (Video played.)

24         We see at 7 :22 into the exhibit, what is the time stamp?

25   A.    2:26 p.m.

1    Q.   Does it appear that at 2:26 the House went back into

2    session at that point?

3    A.   Yes.

4    Q.   If we can continue playing the exhibit.

5         (Video played.)

6         Pause the exhibit again at 7:40.  The time now is?

7    A.   2:29 p.m.

8    Q.   So that's only three minutes after the House went back

9    into session.

10   A.   Correct.

11   Q.   Could you please read the text of the congressional

12   record on the exhibit at this point?

13   A.   "The Speaker Pro Tempore:  Pursuant to clause 12(b) of

14   Rule I, the Chair declares the House in recess subject to the

15   call of the Chair.

16        "Accordingly (at 2 o'clock and 29 minutes p.m.), the

17   House stood in recess."

18   Q.   Could we resume playing the exhibit?

19        (Video played.)

20        And so at this point, by 2:29, both the House and the

21   Senate were in recess.

22   A.   Correct.

23   Q.   Do you know how long the two chambers were in recess for

24   on the afternoon of January 6?

25   A.   I do not.  I just know that they resumed much later in

1    the evening.

2    Q.   Do you have an understanding of why the two chambers went

3    into recess on the afternoon of January 6?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Because the rioters had breached the building.

7    Q.   Okay.  Can we continue playing the exhibit.

8         (Video played.)

9         Let's stop for just one second at 8:06 run time into the

10   exhibit.  What is the time at that point into the exhibit?

11   A.   It says 8:06 p.m.

12   Q.   Okay.  Can we resume playing.

13        (Video played.)

14        You can pause the exhibit for a second.  So it appears

15   that at 8:06 in the evening the Senate reconvened to continue

16   its proceeding?

17   A.   Yes.

18   Q.   Is that consistent with your memory of the timing of the

19   events of January 6?

20   A.   Yes.

21   Q.   Thank you.

22        Can we continue?

23        (Video played.)

24        Pause for a second.

25        We've paused at 8:21 into the exhibit, and what is the

1    time at that point?

2    A.    9:02 p.m.

3    Q.    Do you have a -- what's your understanding of when the

4    House reconvened its proceedings on January 6?

5    A.    It was, again, late into the evening.  They had been in

6    recess since the afternoon.

7    Q.    Could you please read the text from the congressional

8    record?

9    A.    "The recess having expired, the House was called to order

10   by the Speaker at 9 o'clock and 2 minutes p.m."

11   Q.    Thank you.  If we could continue playing the exhibit.

12         (Video played.)

13         Do you have an understanding of when the joint session of

14   Congress ended to certify the results of the 2020 presidential

15   election?

16   A.    Yes.  It was in the very early morning hours of the next

17   day.

18   Q.    Thank you.  Okay.  You can finish the exhibit.

19         (Video played.)

20         We can please take down the exhibit.

21         Let me shift gears now and go back to the Senate Wing

22   door.  If we could pull up the first frame of Exhibit 101,

23   which is already in evidence.

24         Captain Summers -- well, first, you talked about this

25   area of the Capitol before.  Could you just identify this area

1    of the Capitol for the jury again?

2    A.    Yes.    This is the first floor of the Senate Wing, Senate

3    Wing door.

4    Q.    And let's just do this very briefly.    If we can please

5    pull up Exhibit 507.    If you could please circle the Senate

6    Wing door for the jury on Exhibit 507.

7         (Witness complies.)

8         Thank you.    I'm going to remove the markings, and if we

9    can go back to Exhibit 101, the video.    And what is the time

10   stamp at this point in the exhibit?

11   A.    3:08 p.m.

12   Q.    I would ask Ms. Roberts if we could please skip about 1

13   minute and 12 seconds into the exhibit.

14        We're now at run time 1 minute and 12 seconds into the

15   exhibit, which has a time stamp of?

16   A.    3:09:12 p.m.

17   Q.    And I'm going to start playing this exhibit at this

18   point, and I'm going to ask you to pay attention specifically

19   to the door and the flow of individuals around that door and

20   through that door.

21   A.    Yes.

22        (Video played.)

23   Q.    We can stop at 1:42.

24        Captain Summers, are the majority of individuals in the

25   Senate Wing door area at this point law enforcement officers?

1    A.    No.

2    Q.    Members of Congress?

3    A.    No.

4    Q.    Do they appear to be staffers?

5    A.    No.

6    Q.    Who are the majority of individuals in the Senate Wing

7    door area at this point?

8    A.    Rioters.

9    Q.    And having paid attention to the door area, what is the

10    flow of individuals at this point?  Is there a flow of

11    individuals into the Senate Wing door area or out of the

12    Senate Wing door area?

13    A.    The flow is coming into the building.

14    Q.    And at this point, do you see any law enforcement

15    officers in this frame?

16    A.    Yes.  I see a few.

17    Q.    Where do you see them for the most part?

18    A.    The bottom -- the bottom right.

19    Q.    Are there more law enforcement officers or more rioters

20    at this point?

21    A.    More rioters.

22    Q.    I'm going to zoom in on the door -- the door area.

23    And I'm going to zoom in on three individuals in this area.

24    I am first going to circle one individual.  I've circled an

25    individual who appears to be wearing a white baseball cap, a

1    white turtleneck and a dark jacket.  Do you see that individual?

2    A.   Yes.

3    Q.   And at this point in the exhibit -- if you could move

4    over so we can see the time stamp for a second -- what is the

5    time stamp at this point?

6    A.   3:09:42 p.m.

7    Q.   And let me clear the circle.  Let's go back to the door

8    area.  Let me circle this individual again.

9         Is that individual inside or outside the Capitol building

10   at this point?

11   A.   Inside.

12   Q.   And was that one of the individuals who walked through

13   that door from outside the Capitol building into the Capitol

14   building in the few seconds immediately preceding this frame?

15   A.   Yes.

16   Q.   Let me clear the markings.  Let me circle a second

17   individual.  I have circled an individual with a beard and

18   wearing a red beanie style hat and a black jacket.  Do you

19   see that individual?

20   A.   Yes.

21   Q.   Same question as before:  Is that individual at this

22   point in the exhibit inside the Capitol building or outside

23   the Capitol building?

24   A.   Inside.

25   Q.   And how does this individual move in the last few seconds

1     of the exhibit immediately preceding this point at time mark

2     1:42?

3     A.   He comes from outside to inside.

4     Q.   Now let me circle -- let me ask you another question.

5     What, if anything, does the individual in the red beanie

6     appear to be holding in his hand?

7     A.   Looks like a cell phone.

8     Q.   Is that consistent with recording on a cell phone?

9     A.   It looks like it.

10    Q.   Let me circle a third individual at this point in the

11    exhibit.  And I've now circled an individual with a blue and

12    white baseball cap, a hooded jacket and sunglasses.  Do you

13    see that individual?

14    A.   Yes.

15    Q.   And where is he located compared to the individual in

16    the red hat?

17    A.   He too is inside of the Capitol building.

18    Q.   Same question as before:  In the last few seconds

19    preceding this frame, what did you see that individual do?

20    A.   Come from outside to inside the building.

21    Q.   And what, if anything, does that individual appear to be

22    holding in his hand?

23    A.   It appears to be a cell phone.

24    Q.   And again, is that consistent with recording on a cell

25    phone?

```
 1    A.   It appears, yes.
 2    Q.   Let me ask a few more questions about these individuals.
 3    Based on your experience -- how long have you worked at the
 4    Capitol again?
 5    A.   I've worked for Capitol Police 24 years.
 6    Q.   Based on your experience, do these individuals appear to
 7    be law enforcement officers?
 8    A.   No.
 9    Q.   Congressional staffers?
10    A.   No.
11    Q.   Members of Congress?
12    A.   No.
13    Q.   And before you talked a little bit about the Senate Wing
14    door and how it is used.  Is there members of the public
15    allowed to enter the Capitol through the Senate Wing door?
16    A.   No.
17    Q.   They were not allowed on January 6?
18    A.   No.
19    Q.   How about at other times?
20    A.   Never.
21    Q.   That's because it's only an egress point as you called
22    it?
23    A.   Emergency egress only.
24    Q.   Emergency.
25    A.   Yes.
```

1    Q.   And at this point in the exhibit, if we can go back and

2    look very quickly at the time stamp at 3:09:42 on January 6,

3    was there already a -- if we can return to the door, please --

4    was there already a large crowd inside the Senate Wing lobby?

5    A.   Yes.

6    Q.   Was the crowd visible to someone walking through that

7    door?

8    A.   Yes.

9    Q.   Was the crowd large enough to outnumber the officers in

10   that area at this point?

11   A.   Yes.

12   Q.   I'm going to continue playing the exhibit, and I would

13   ask that you please follow the pattern of travel of the three

14   individuals that we just circled on this exhibit.  And just

15   for clarity, we're going to keep the frame zoomed in.

16        (Video played.)

17        Could you please let me know when you no longer see these

18   individuals in the frame.

19        Actually, stop on the exhibit now.  Do you still see them

20   in the frame?

21   A.   Yes.

22   Q.   Could you please circle them.

23        (Witness complies.)

24        Thank you.

25        Now, if we could go back on this exhibit for just a few

1    seconds to 3:09:46, which will be 1 minute and 46 seconds into

2    the exhibit, and if we could focus on the door.  If we could

3    go a couple of frames forward.  A few more frames.  Maybe one

4    more?  Two more?

5         Before making a right into the Capitol, these individuals

6    turned to their left.

7    A.    Yes.

8    Q.    And if we can zoom out for a second, can we see what is

9    at the end of that frame on the left-hand side of these three

10   individuals?  What is visible?

11   A.    Officers.

12   Q.    What are those officers wearing?

13   A.    Riot gear.  Helmets.

14   Q.    Do you have an understanding of why those officers were

15   wearing helmets and riot gear at that point?

16   A.    Yes.  Because there were projectiles being thrown at

17   officers and other things, so the helmets were to protect

18   them.

19   Q.    Okay.  We can continue playing the exhibit.

20        (Video played.)

21        Can you still see the three individuals at the far south

22   end of the picture?

23   A.    Yes.

24   Q.    Could you please circle them.

25        (Witness complies.)

1      So in the last few seconds of the exhibit, these three

2    individuals have traveled from which direction, north to south

3    or south to north?

4    A.   They've come in and now they're moving south.

5    Q.   Is that towards or away from the officer in riot gear?

6    A.   Away.

7    Q.   So after turning to the officer in riot gear, these three

8    individuals went south deeper into the Capitol building?

9    A.   Yes.

10   Q.   Did you see them turn around and exit the building upon

11   seeing the police officers in riot gear?

12   A.   No.

13   Q.   Let's resume playing the exhibit.  Again, please keep

14   track on the exhibit and let me know when you can no longer

15   see them.

16        (Video played.)

17   A.   I start to lose them there.

18   Q.   And the time of this time in the exhibit is?

19   A.   3:10:24 p.m.

20   Q.   So at this point the three individuals have essentially

21   disappeared on the south end of the frame?

22   A.   Yes.

23   Q.   What is in that direction within the Capitol?

24   A.   The Crypt.

25   Q.   That's the pattern of travel we talked about before when

1    we were reviewing Exhibit 106.

2    A.   Yes.

3    Q.   Let me pull up Exhibit 101A, which is already in

4    evidence.  And these are still images from the video exhibit

5    that we just reviewed.

6    A.   Yes.

7    Q.   And do you see the three individuals that we just

8    discussed circled in a red circle in this exhibit?

9    A.   Yes.

10   Q.   And to be clear, the circle was added in preparation for

11   this trial.

12   A.   Correct.

13   Q.   That was not part of the Capitol Police footage.

14   A.   Correct.

15   Q.   If you could scroll down.

16        Same here.  The individuals are traveling south.

17   A.   Yes.

18   Q.   Thank you.  You can scroll down.

19        Let me pull up Exhibit 127, which is not yet in evidence.

20   And let's stop it at the first frame and for now remove the

21   volume.

22        So before coming to court today, did you review the

23   exhibit, the video exhibit that's been marked as Exhibit 127?

24   A.   Yes.

25   Q.   Now, this is not Capitol Police footage?

1    A.    No.

2    Q.    But based on the events depicted, are you able to say

3    when this video was recorded?

4    A.    Yes.

5    Q.    When was it recorded?

6    A.    On January 6, 2021.

7    Q.    Do you have an understanding of approximately at what

8    time it was recorded?

9    A.    Sometime -- it looks close to the screenshots we were

10   looking at, so I'm saying about three o'clock-ish.

11   Q.    And where within the Capitol building was the video

12   recorded?

13   A.    This is the Senate Wing, Senate Wing door.

14   Q.    And does this video appear to be a fair and accurate

15   representation of the events at the Senate Wing door at

16   approximately 3:09 p.m. on January 6?

17   A.    Yes.

18         MR. VALENTINI:  The government moves to admit Exhibit

19   127 into evidence.

20         MR. ROOTS:  No objection.

21         THE COURT:  Without objection, Government's 127 is

22   admitted and may be published.

23                              (Government Exhibit No. 127

24                               received into evidence.)

25

1    BY MR. VALENTINI:

2    Q.   Let's play the first five seconds of the exhibit with

3    sound.

4         (Video played.)

5         So let me circle a group of law enforcement officers sort

6    of in the middle of the frame.

7         Captain Summers, is this the same line of police officers

8    that we saw in Exhibit 101?

9    A.   Yes.

10   Q.   Police officers in riot gear.  Right?

11   A.   Yes.

12   Q.   Let's keep playing the exhibit until 10 seconds into the

13   exhibit.

14        (Video played.)

15        Do you see a gentleman wearing a blue and white baseball

16   cap, sunglasses and a hooded jacket?

17   A.   Yes.

18   Q.   Could you please circle him for the jury.

19        (Witness complies.)

20        Same blue cap, same sunglasses and same hooded sweater as

21   the gentleman in Exhibit 101?

22   A.   Yes.

23   Q.   Do you also see what, if anything, that gentleman is

24   holding in his hand?

25   A.   Looks like a cell phone.

1    Q.   Do you see a gentleman, another gentleman with a red hat

2    and a black jacket immediately ahead of the gentleman whom you

3    just circled?

4    A.   Yes.

5    Q.   Is that the same red hat and black jacket as the man that

6    we saw in Exhibit 101?

7    A.   Yes.

8    Q.   Could you please circle him for the jury?

9       (Witness complies.)

10       What, if anything, does he appear to be holding in his

11    hand?

12    A.   A cell phone.

13    Q.   Just like the gentleman in the red hat and black jacket

14    that we saw in Exhibit 101?

15    A.   Yes.

16    Q.   Do you also see an individual from the back who's wearing

17    what appears to be a white baseball-type cap?

18    A.   Yes.

19    Q.   Does that appear to be the same white baseball cap as the

20    gentleman in Exhibit 101?

21    A.   It does.

22    Q.   And he's immediately ahead of the man in the red hat and

23    black jacket?

24    A.   Yes.

25    Q.   Could you please circle him for the jury.

1           (Witness complies.)

2           I'm going to play seven more seconds of the exhibit, and

3      I'm going to ask you to please pay attention to the direction

4      of travel as well as the sound, if any, that you hear at this

5      point in this exhibit.

6           (Video played.)

7           So do the three gentlemen that you just circled travel in

8      the same direction as the gentlemen in Exhibit 101?

9      A.   Yes.

10     Q.   Now, in this exhibit at this point did you hear any

11     sound?

12     A.   Yes.

13     Q.   What sound did you hear?

14     A.   The high-pitched sound of the door alarm going off.

15     Q.   So that sound -- how would you describe that sound?

16     A.   It's a very high-pitched, annoying sound.

17     Q.   Oh, high-pitched you said?

18     A.   Yes.

19     Q.   And you said that's produced by the door being opened at

20     that location?

21     A.   Yes.

22     Q.   Let me pull up the first frame of Exhibit 102, which is

23     now in evidence -- which is already in evidence.

24          Captain Summers, what area of the Capitol is depicted in

25     this exhibit?

 1    A.    This is the Crypt.

 2    Q.    And could you explain why the field of view is not quite

 3    flat?

 4    A.    It's the type of camera -- we call them fishbowl type

 5    cameras.  They tend to put these types of cameras in any room

 6    that has a round configuration.

 7    Q.    And does the Crypt have a round configuration?

 8    A.    Yes.

 9    Q.    And the perspective of this camera, does it look from

10    north to south, south to north, east to west?

11    A.    With this camera, it's a little hard to tell because

12    everything looks -- but I think they're from -- it looks north

13    to south, I think.  But it's kind of hard to tell the way

14    these cameras are configured.

15    Q.    Okay.  Well, let's see.  If one is -- assuming it's north

16    to south as you just said, if one is walking from the Senate

17    in the direction of the House, would you expect them to appear

18    in this frame from the right to the left or from the left to

19    the right?

20    A.    The right to the left, I believe.  Like I say, it's hard

21    to tell with this camera.

22    Q.    Understood.  Okay.  So let's try to zoom in on the area

23    on the right-hand side of this frame.  Right.  Perfect.

24          And let me skip to approximately 3:10:30 p.m., which will

25    be run time 2:30 on the exhibit.

1          So let's see if you were right.  And if you see the three

2     gentlemen whom you circled in the previous exhibit, just let

3     me know by raising your hand.

4          (Video played.)

5          (Witness complies.)

6          You can stop the exhibit.  Captain Summers, I see that

7     you have raised your hand.  So were you able to see the three

8     individuals who you had previously identified appear in this

9     frame?

10    A.   Yes.

11    Q.   Could you please circle them?

12         (Witness complies.)

13         And that location, is it consistent with those three

14    individuals walking from the Senate side of the building and

15    marching towards the House side of the building?

16    A.   Yes.

17    Q.   Let's resume playing this exhibit, and I'm going to --

18    I would ask Ms. Roberts if you could zoom in and follow the

19    individuals, and please let me know which direction these

20    individuals are marching.

21         (Video played.)

22         And let me know when you can no longer see them.

23    A.   Yeah, they're still headed like south.

24    Q.   Can you still see them?

25    A.   No, not anymore.

1    Q.   You can stop the -- pause the exhibit.  And let me pull

2    up the first frame of the next exhibit, which is 103.  And

3    what area of the Capitol are we seeing now?

4    A.   It's still the Crypt.

5    Q.   It's from a different angle, though, isn't it?

6    A.   Yes.

7    Q.   Which direction is this camera looking --

8    A.   It's facing north, I believe.

9    Q.   From south to north?

10   A.   Yeah.  Again, these round cameras are weird.

11   Q.   So if one is walking from the Senate side -- if this

12   camera is facing north and someone is walking from the Senate

13   side to the House side, which direction would you expect to

14   see them enter this frame?

15   A.   On the left side.

16   Q.   And the time stamp at this point in the exhibit is?

17   A.   3:08 p.m.

18   Q.   Okay.  Let's skip to 3:11:30, which will be 3 minutes

19   and 30 seconds into the exhibit.  Let's zoom in for clarity

20   on the mid-section or left mid-section of the exhibit, and

21   let me know by please raising your hand if you see these three

22   individuals that we just discussed enter this frame.

23        (Video played.)

24   A.   I think I see one at least.

25   Q.   Oh.  I see you raised your hand.  I'm sorry.

1    A.   No, that's okay.  Again, it's the camera.

2    Q.   Let's give it a few more seconds.

3         (Video played.)

4         Let's stop now.  Do you see a gentleman wearing a

5    white baseball-style cap at this point in the exhibit?

6    A.   Yes.

7    Q.   Could you please circle him for the jury.

8         (Witness complies.)

9         Do you also see a gentleman wearing a red beanie

10   traveling along with the gentleman with the white baseball

11   cap?

12   A.   Yes.

13   Q.   Could you circle him for the jury too?

14        (Witness complies.)

15   A.   Terrible circles.  Sorry.

16   Q.   Better than my circling.

17        Okay.  Let's play a few more frames.

18        (Video played.)

19        Stop here.

20        Do you see a third gentleman behind the gentleman with

21   the red hat?

22   A.   Yes.

23   Q.   Appears to be wearing a blue hat?

24   A.   Yes.

25   Q.   Blue cap, rather?

1    A.    Yes.  He's very close behind the gentleman with the red

2    cap.

3    Q.    Okay.  Let's play this exhibit for a few more seconds.

4        (Video played.)

5        And we can stop here.  Do you still see -- I've stopped

6    the exhibit at 4 minutes and 12 seconds into it.  Do you still

7    see these three gentleman at this point in the exhibit?

8    A.    No.  They've left the frame.

9    Q.    Are you able to tell us in which geographic direction

10   they've left the frame?

11   A.    They're going south.

12   Q.    And what's immediately to the south of the Crypt?

13   A.    The House side of the building.

14   Q.    Okay.  And is an area sometimes called the Memorial Door

15   area in that general vicinity?

16   A.    Yes.  It's close.  Yes.

17   Q.    And does the Capitol Police have any cameras in that

18   area?

19   A.    Yes.

20   Q.    Let's pull up Exhibit 104.

21       Before we move on, the time stamp where we left off the

22   prior exhibit was approximately 3:12:05 p.m.?

23   A.    Yes.

24   Q.    Okay.  We now have Exhibit 104 on the screen.  Is the

25   frame depicted here in Exhibit 104 the Memorial Door?

1    A.   Yes.

2    Q.   Okay.  Let's skip forward to 3:12:10 p.m., which is

3    approximately where we left off from the previous camera.

4    That will be 7 minutes and 10 seconds into the exhibit.  We're

5    going to start playing the exhibit, and again I would ask you

6    to please raise your hand if you see the three gentlemen that

7    we were tracking in the prior exhibits.

8    A.   Okay.

9         (Video played.)

10        (Witness complies.)

11   Q.   I see you've raised your hand, Captain Summers.  Could

12   you please circle the three individuals that we were tracking?

13        (Witness complies.)

14        In which direction are these three individuals traveling

15   at this point in the exhibit?

16   A.   Still south.

17   Q.   North to south?

18   A.   Yes.

19   Q.   Senate to House?

20   A.   Yes.

21   Q.   Let's continue playing the exhibit, and let me know when

22   they exit the field of view.

23        (Video played.)

24   A.   They're gone.

25   Q.   Very well.  Let me pull up the first frame of Exhibit

1    105, which is already in evidence.

2         Captain Summers, what is immediately to the south of the

3    Memorial Door area?

4    A.    The House Wing.

5    Q.    And that would be this frame that is now on the screen

6    in Exhibit 105?

7    A.    Yes.  This is the House Wing door.

8    Q.    So let's start -- correct me if I'm wrong.  I believe we

9    left off the prior exhibit about 3:12:20 p.m.?

10   A.    Yes.

11   Q.    Okay.  So let's skip forward to about 3:12:20 p.m.,

12   which is run time 4 minutes and 20 seconds into the exhibit.

13   And please let me know if you see the three individuals at

14   issue.

15        (Video played.)

16        Oh, I see you've raised your hand.

17        Let's play a few more seconds.

18        (Video played.)

19        Can we stop the exhibit?  Thank you.

20        So we've now stopped the exhibit, at 4 minutes and 53

21   seconds into the exhibit, and what is the time stamp at this

22   point?

23   A.    3:12:53 p.m.

24   Q.    So only a few seconds after the exhibit that we were

25   looking at before in Exhibit 104?

1    A.    Yes.

2    Q.    And could you please circle the three individuals whom

3    you've previously circled if you see them in this exhibit.

4          (Witness complies.)

5          And which direction are they going?

6    A.    Still south.

7    Q.    Still towards the House?

8    A.    Yes.

9    Q.    I will again resume playing the exhibit, and please let

10   me know at what point you no longer see them in this frame.

11         (Video played.)

12   A.    They're gone.

13   Q.    Thank you.  So let's pull up Exhibit 507, which is

14   already in evidence.

15         Using the touch screen, could you please draw on this

16   screen, on this floor plan of the first floor of the Capitol,

17   the pattern of travel that these three individuals followed

18   from approximately 3:09 p.m. to 3:13 p.m.

19   A.    Started here, traveled down to here.

20   Q.    And for the record, you drew a line that goes from the

21   Senate Wing door through the Crypt, the Memorial Door, the

22   House Wing door.

23   A.    Correct.

24   Q.    I will remove the markings from the touch screen, and

25   let me pull up Exhibit 105 again.  This still is the House

1      Wing door?

2      A.    Yes.

3      Q.    So based on your own -- on your review of these videos,

4      did there come a time when these three individuals reappear

5      in this camera view?

6      A.    Yes.

7      Q.    Just walking in the same direction or the opposite

8      direction?

9      A.    They turn around and go back.

10     Q.    Okay.  So let me skip forward to 3:13 p.m.  So we're

11     going to start playing from run time 5 minutes into the

12     exhibit.  Thank you.

13          Please let me know if you see these three individuals

14     appear from the south end of the camera field.  Thank you.

15          (Video played.)

16          I see you've raised your hand.  Could you please circle

17     these three individuals?

18     A.    I see one really well.

19     Q.    Okay.  Let's start with that one.  So that's the

20     gentleman in the white cap?

21     A.    Yes.

22     Q.    Do you see a gentleman immediately in front of him,

23     slightly to the right?

24     A.    Yes.

25     Q.    And I've circled a gentleman who appears to be wearing

1    a hooded sweater?

2    A.    Yes.

3    Q.    Do you see a gentleman in front of him?

4    A.    With the red cap, yes.

5    Q.    Could you please circle him.

6          (Witness complies.)

7          And the time stamp at this point is?

8    A.    3:13:34 p.m.

9    Q.    Let's move on to Exhibit 104.  And let's go look at time

10   stamp at approximately 3:13:50 p.m.  That's approximately the

11   time where we left off in the prior exhibit, right?

12   A.    Yes.

13   Q.    Okay.  And again, just let me know if you see -- well,

14   assuming -- if someone is walking from the south to the north,

15   what side of this field of view would you expect to see them?

16   A.    They're going to go right to left.

17   Q.    And let me know -- I'm going to start playing the exhibit

18   and let me know if you see them.

19         (Video played.)

20   A.    There they go.  Red hat, white hat.

21   Q.    Could you very briefly circle them for the jury, please.

22         (Witness complies.)

23   A.    There's the blue hat.

24   Q.    Thank you.  What's the time stamp at this point in the

25   exhibit?

1    A.    3:14:14 p.m.

2    Q.    If we could play a few more seconds of this exhibit.

3          (Video played.)

4          You can stop at 3:14:20.  Captain Summers, do you still

5    see these three individuals in the frame at this point?

6    A.    No.  They've gone off frame now.

7    Q.    Okay.  So let's pull up Exhibit 103.  And let's skip to

8    approximately 3:14:10 where we left off the prior exhibit.

9    Let's zoom in for clarity on the left-hand side of the

10   exhibit.  On the left-hand side.  And let's start playing the

11   exhibit for the next 15 seconds or so.

12         (Video played.)

13         We can stop here.

14         Captain Summers, do you see these three individuals at

15   this point at -- well, strike that.

16         Could we move the frame so we can see the time stamp at

17   this point in the exhibit?

18         So what is the time at this point in the exhibit?

19   A.    3:14:24 p.m.

20   Q.    Can you see the three individuals that we've been

21   following at this point in the exhibit?

22   A.    Yes.

23   Q.    Could you please circle them.

24         (Witness complies.)

25         In which direction are they traveling?

1    A.    They're now headed north.

2    Q.    Let's continue playing the exhibit.  Let me know when you

3    can no longer see them, please.

4         (Video played.)

5    A.    They're now out of frame.  I can't see them anymore.

6    Q.    Can we stop and if we could check the time stamp at this

7    point.

8    A.    3:14:38 p.m.

9    Q.    Okay.  So let's switch to Exhibit 102.  We can skip

10   forward to 3:15 p.m., about where we left off with the prior

11   exhibit, and let's zoom in on the mid-section of the exhibit.

12        So this is Exhibit 102, Captain Summers.  This is the

13   opposite camera angle as Exhibit 103?

14   A.    Yes.

15   Q.    Okay.  Let's start playing the exhibit and let me know if

16   you see them enter the frame.

17        (Video played.)

18   A.    Right there.

19   Q.    Could you please circle the individuals for the jury?

20        (Witness complies.)

21        So they're now on the right-hand side of the camera?

22   A.    Yes.

23   Q.    Facing from north to south.

24   A.    From south to north.  They're going toward the Senate

25   now.

1    Q.   They're going toward the Senate?

2    A.   Yes.

3    Q.   They're walking south to north.

4    A.   Yes.

5    Q.   The camera face north to south.

6    A.   Yes.

7         THE COURT:  Just so you don't throw a left to right

8    in there.

9    BY MR. VALENTINI:

10   Q.   Let's continue playing the exhibit from here.

11        (Video played.)

12        Let's pause for a second.  Do you still see the

13   individuals in the frame?

14   A.   I can only see one clearly.

15   Q.   Would you please circle him.

16        (Witness complies.)

17        Let's continue tracking these individuals.

18        (Video played.)

19        Let's stop for a second.  Could you please circle any of

20   these individuals if you can see them.

21        (Witness complies.)

22        How many of them do you see?

23   A.   Three.

24   Q.   So this is -- if we can see the time stamp for just one

25   second?  What is the time stamp at this point?

1    A.   3:16:31 p.m.

2    Q.   So that's approximately two minutes after these

3    individuals entered the Crypt on their way back from the House

4    side?

5    A.   Yes.

6    Q.   Okay.  We can go back to these individuals.  Let's

7    continue playing the exhibit.

8         (Video played.)

9         You can pause the exhibit at this point.  So if you can

10   move up a touch and see what the time stamp is at this point.

11   A.   3:17:20 p.m.

12   Q.   So it's now about 3 minutes since these individuals

13   entered the Crypt?

14   A.   Yes.

15   Q.   Have you observed anything to suggest any urgency or

16   attempt to leave this area by these three individuals?

17   A.   No.

18   Q.   They're still part of the mob in the Crypt?

19   A.   Yeah.  They're just kind of wandering around.

20   Q.   In fact, over the last few seconds, if we can go back to

21   the bottom of the exhibit, in which direction did they move?

22   A.   It looked like they turned back around again --

23   Q.   To go back --

24   A.   -- to go back, like they're going south again.

25   Q.   Okay.  Let's continue playing the exhibit.

1           (Video played.)

2           You can stop the exhibit at this point.

3           What did you observe, what did you see these individuals

4     do over the last minute or so of this exhibit?

5     A.   They headed south, then they turned back around to go

6     north again.

7     Q.   At this point are all three of these individuals still in

8     this frame?

9     A.   I think one just went out the frame.  I see two.  One is

10    just slightly out of the frame.

11    Q.   The one that's out of the frame is the one with the white

12    baseball cap?

13    A.   Yes.

14    Q.   I would ask Ms. Roberts to please resume playing the

15    exhibit.  And I would ask you, Captain Summers, to please pay

16    attention to the gentleman in the red hat and the gentleman in

17    the blue hat.

18          (Video played.)

19          Let's pause the exhibit for a second at 10:15.  Could you

20    please circle them.

21          (Witness complies.)

22          And let's keep playing the exhibit.

23          (Video played.)

24          Can we stop the exhibit?

25          Over the last several seconds, did you see these

1    individuals attempting to leave the Crypt?

2    A.    No.

3    Q.    What did you see them do?

4    A.    They're sitting there looking at one of -- the guy in the

5    red hat's phone.

6    Q.    Did they also make any motions that you recognize with

7    their hands?

8    A.    Probably recording.  It's just hard to tell.

9    Q.    Can we try and move back a few seconds, maybe to 10:30?

10   Let's play from here and let me know what, if anything, you

11   see them do.

12        (Video played.)

13   A.    They high-fived.

14   Q.    Let's pull up what has been marked as Exhibit 129, which

15   is not yet in evidence.  Before coming to court today, Captain

16   Summers, did you have an opportunity to review this video

17   that's been marked as Exhibit 129?

18   A.    Yes.

19   Q.    And this is not Capitol Police footage?

20   A.    No.

21   Q.    But based on the events that are depicted in this video,

22   are you able to tell when it was recorded?

23   A.    Yes.  January 6.

24   Q.    Are you able to tell where it was recorded?

25   A.    Sort of.  I know first floor.  I'd probably have to look

1    at it really well in order to tell you exactly where.

2    Q.   Okay.  Well, let's start big picture.  Is it recorded

3    inside the Capitol building?

4    A.   Yes, it is.

5    Q.   And does the video appear to be a fair and accurate

6    representation of the events inside the Capitol on January 6?

7    A.   Yes.

8         MR. VALENTINI:  Government moves to admit Exhibit 129

9    into evidence.

10        MR. ROOTS:  No objection.

11        THE COURT:  Without objection, the fair and accurate

12   representation of a place that she's not sure where it is at a

13   time that she doesn't know when it is I guess will be

14   admitted.

15        MR. VALENTINI:  Inside the Capitol.

16        THE WITNESS:  I do know that part.

17        THE COURT:  Well, inside the Capitol, but you don't

18   know where inside the Capitol.

19        THE WITNESS:  Yes.  I can tell you it's in the Capitol,

20   but exactly where, no.

21        THE COURT:  Okay.  Well, without objection, I'll admit

22   it.

23                        (Government Exhibit No. 129

24                         received into evidence.)

25

1    BY MR. VALENTINI:

2    Q.   If we can start playing the exhibit with volume.

3         (Video played.)

4         Let's stop here.  I've played 10 seconds of this video.

5    Are you now able to tell us where within the Capitol these

6    events are taking place?

7    A.   Yeah.  It's right down the hall from the Crypt.  I could

8    see the Crypt from there.  But it is first floor.  I did know

9    that much, right outside of the Crypt.

10   Q.   Let's keep playing from here.

11        (Video played.)

12        Let's stop here at 35 seconds into the video.  What part

13   of the Capitol is being depicted at this point, 36 seconds

14   into the exhibit?

15   A.   This is still first floor of the Capitol.  This is the

16   Crypt area.

17   Q.   Let's play a few more seconds until 43 seconds into this

18   exhibit.

19        (Video played.)

20        Do you see an individual wearing a red hat and a black

21   jacket?

22   A.   Yes.

23   Q.   Could you please circle him.

24        (Witness complies.)

25        Same appearance as one of the three individuals that we

1    were tracing in the prior exhibits?

2    A.    Yes.

3    Q.    Thank you.  If we could continue playing until 3 minutes

4    and 4 seconds into the exhibit.

5         (Video played.)

6         Why don't we pause the exhibit and we can skip to 3

7    minutes into the exhibit.  Let's start playing from here, and

8    let's play about five seconds of the exhibit.

9         (Video played.)

10        Do you see three individuals who match the description of

11   the individuals -- the appearance of the individuals whom we

12   were tracing in the prior exhibits?

13   A.    Yes.

14   Q.    Could you please circle them for the jury.

15        (Witness complies.)

16        Let's continue till 3:20.

17        (Video played.)

18        Same question:  Do you see any of the individuals whom we

19   were tracing before?

20   A.    Two.

21   Q.    Could you please circle them.

22        (Witness complies.)

23        And where are they?

24   A.    Still in the Crypt.

25   Q.    Okay.  Let's keep playing.

1        (Video played.)

2        Stop now.  Do you see the three individuals whom we were

3    tracing before at this point in the frame?

4    A.   Yes.

5    Q.   Could you please circle them for the jury.

6        (Witness complies.)

7        And where are they?

8    A.   Still in the Crypt.

9    Q.   What, if anything, did you see them do in the few seconds

10   before this image?

11   A.   Just walking around, looking like they had their phones

12   up.  Well, one has his phone in his hand.  They're just kind

13   of milling around.

14   Q.   Let's keep playing the exhibit.

15       (Video played.)

16       We can stop the exhibit.  Did you hear some people

17   chanting at this point in the exhibit?

18   A.   Yes.

19   Q.   What was the chant?

20   A.   "Our House."

21   Q.   Was there a leading question to that?  "Whose House?"

22   A.   Probably.  I'm sorry.  It still kind of makes me...

23   Q.   I understand.  Let's continue playing and let me know if

24   you -- well, actually, do you see any of the individuals we've

25   been tracing at this point in the exhibit?  Do you see an

1    individual with a red beanie?

2    A.    Oh, yeah.  I do see it now.

3    Q.    Do you see an individual with a blue cap?

4    A.    Yes.  Right behind him.

5    Q.    Thank you.  Could you please circle them.

6          (Witness complies.)

7          And are they still in the Crypt?

8    A.    Yes.

9    Q.    And that is as the chant "Whose house?  Our house!" is

10   ongoing in the Crypt?

11   A.    Yes.

12   Q.    Let me switch to Exhibit 101.  Let me skip forward to

13   3:18 p.m., which will be 10 minutes into the exhibit, and I'm

14   going to ask you to let me know if you see the individual with

15   the white baseball cap that we've been following enter this

16   frame.

17         (Video played.)

18         I see you've raised your hand.  Could you please circle

19   this individual?

20         (Witness complies.)

21         Could you please explain what you see the officers in the

22   foreground at this point in the exhibit do.  What are the

23   officers doing?

24   A.    Trying to -- because people are still trying to enter

25   that door, we were trying to get more officers to that area to

1    start filtering people out of the door.

2    Q.   Sort of creating a channel to funnel people who are not

3    allowed to be in the building out of the building?

4    A.   Yes.

5    Q.   I'm going to continue playing the exhibit, and I'm going

6    to ask you to just pay attention and try to follow this

7    individual that you have just circled.

8         (Video played.)

9         Let's pause the exhibit for a second.  Do you see the

10    individual at this point?

11    A.   Yes.  I think I circled the wrong one initially.

12    I see him now.

13    Q.   Could you please circle him?

14    A.   The other one didn't have the earmuffs.  You see the

15    earmuffs now.

16    Q.   Okay.  Could you please circle him at this point?

17    A.   Yes.

18         (Witness complies.)

19    Q.   Thank you.  Let's continue playing the exhibit.

20         (Video played.)

21         All right.  You can pause the exhibit at this point.

22    Has the individual with the white baseball cap essentially

23    exited the building at this point?

24    A.   Yes.  He's going out of the door.

25    Q.   And what is the time at this point?

1    A.   3:20:12 p.m.

2    Q.   By this point, have you seen the other two individuals

3    who we're following exit the building?

4    A.   No.

5    Q.   Okay.  Let's continue playing the exhibit.  In fact,

6    let's skip forward to 3:24:10, almost 10 minutes forward ahead

7    in the exhibit.  And let's play the exhibit from this point.

8         (Video played.)

9         Let's pause it for a second.  Let me circle an area of

10   the exhibit.  I've marked a portion of the exhibit with a

11   circle.  Do you see the two individuals whom we were following

12   on the exhibit at this point?

13   A.   Yes.

14   Q.   Which direction are they traveling?

15   A.   They're going now westbound.  They're leaving out of the

16   door.

17   Q.   Okay.  They're moving in the direction of the door?

18   A.   Yes.

19   Q.   They're still inside the Senate Wing door at this point?

20   A.   Yes.

21   Q.   And what is the time at this point?

22   A.   3:24:23 p.m.

23   Q.   All right.  Let's continue playing the exhibit.

24        (Video played.)

25        All right.  Let's pause the exhibit.  And do you still

1    see the two individuals at this point?

2    A.    No.

3    Q.    Are they still inside the Capitol building?

4    A.    Looks like they've gone now.

5    Q.    What is the time at this point in the exhibit?

6    A.    3:24:56 p.m.

7    Q.    Let's pull down Exhibit 101 and let's pull up Exhibit

8    126, which is not in evidence, stopping at the first frame.

9    In fact, let's just pull up 131.  Let's play a few seconds

10   of the exhibit.

11          (Video played.)

12          And we can stop now.

13          Captain Summers, before coming to court today, did you

14   have an opportunity to review this video which has been marked

15   as Exhibit 131?

16   A.    Yes.

17   Q.    And, again, this is not Capitol Police footage?

18   A.    No.

19   Q.    But based on the events depicted, are you able to say

20   where the video was recorded?

21   A.    Yes.

22   Q.    What general area was it recorded in?

23   A.    Still looks like the Upper West Terrace.  Yeah, Upper

24   West Terrace of the Capitol.

25   Q.    And on what day was it recorded?

1    A.    January 6, 2021.

2    Q.    And does the video appear to be a fair and accurate

3    representation of the events on the Upper West Terrace on

4    January 6, 2021?

5    A.    Yes.

6         MR. VALENTINI:  Government moves to admit Exhibit 131

7    into evidence.

8         MR. ROOTS:  No objection.

9         THE COURT:  131 is admitted without objection.

10                        (Government Exhibit No. 131

11                          received into evidence.)

12   BY MR. VALENTINI:

13   Q.    And if we can start playing the exhibit for the jury,

14   the first nine seconds of the exhibit.

15        (Video played.)

16        So based on this first nine seconds of the exhibit,

17   how can you tell where this footage was recorded?

18   A.    Just by looking at it, the side of the building, I'm

19   looking at the light posts.  Those are the ones consistent

20   with being up on the terrace.  Where Metropolitan Police is

21   positioned.

22   Q.    You mentioned where Metropolitan Police is positioned.

23   Where is Metropolitan Police positioned at this point?

24        MR. VALENTINI:  For the record, the witness has

25   identified the position of the Metropolitan Police platoon

1    by circling the touch screen.

2    BY MR. VALENTINI:

3    Q.   And based on the position of this police force, are you

4    able to determine -- to infer whether this video was recorded

5    early in the afternoon of January 6 or later in the afternoon

6    of January 6?

7    A.   If Metropolitan is there, later in the afternoon.

8    Q.   Let's keep playing Exhibit 131, stopping at 29 seconds

9    into the exhibit.

10       (Video played.)

11       Okay.  And if we can maybe go forward a couple more

12   frames?  Okay.  Let's go backwards to 28.  Let's proceed

13   frame by frame from here.

14       Captain Summers, are you able to see the three

15   individuals that we've been tracking at this frame of 28

16   seconds into the exhibit?

17   A.   Yes.

18   Q.   Could you please circle them for the jury.

19       (Witness complies.)

20       Now, before you talked about the position of MPD police

21   force.  Based on your knowledge of the grounds, of the Capitol

22   grounds, how far do you think these three individuals are at

23   this point from the MPD police force?

24   A.   Not very far, maybe 20 yards or so.

25   Q.   Let's play the exhibit to the end.

1          (Video played.)

2          We can take down the exhibit and we can pull up Exhibit

3     132, which is also not in evidence.

4          Let me play a few seconds of the exhibit for you.

5          (Video played.)

6          We can stop playing the exhibit.  Again, Exhibit 132 is a

7     Capitol Police video?

8     A.   No.

9     Q.   But based on the events depicted, are you able to

10    determine when it was recorded?

11    A.   Yes.  January 6, 2021.

12    Q.   What general area?

13    A.   Upper West Terrace.

14    Q.   Do you have, based on the events that you see, a general

15    understanding of when on January 6 the video was recorded?

16    A.   Yes.

17    Q.   Early in the afternoon or later in the afternoon?

18    A.   Later in the afternoon.

19          MR. VALENTINI:  The government moves to admit Exhibit

20    132 into evidence.

21          MR. ROOTS:  No objection.

22          THE COURT:  Without objection, 132 is admitted and may

23    be published.

24                              (Government Exhibit No. 132

25                                  received into evidence.)

1    BY MR. VALENTINI:

2    Q.   Let's start from the beginning and then we can turn on

3    the volume and start playing the exhibit until 13 seconds

4    into the exhibit.

5         (Video played.)

6         Do you see any of the individuals we've been tracing?

7    A.   Yes.

8    Q.   Could you please circle them.

9         (Witness complies.)

10        Thank you.  And you said before that these events were

11   recorded on the Upper West Terrace of the Capitol.

12   A.   Yes.

13   Q.   And to be clear, everything in this frame that you can

14   see in this exhibit is within the restricted perimeter that

15   was --

16             MR. ROOTS:  Objection.

17             THE COURT:  Sustained.  Because it's leading.

18   BY MR. VALENTINI:

19   Q.   Were any members of -- do you have an understanding

20   whether members of the public were permitted to be in the

21   area where this frame was recorded?

22   A.   They were not.  That area is always closed to the public.

23   Q.   Was it closed on January 6?

24   A.   Yes.

25   Q.   Okay.  Move forward to after January 6.  And we can pull

1    down the exhibit.

2        Do you have an understanding whether additional fencing

3    was put in place around the Capitol after January 6?

4    A.   Yes.

5    Q.   Why was additional fencing put up after January 6?

6    A.   We, of course, were getting ready to prepare for

7    inauguration.  Intel reports, just general security.

8    Q.   And what type of fencing was put in place after January 6

9    around the Capitol?

10   A.   This time we put up our global -- what we call global

11   fencing.

12   Q.   Could you describe for the jury what global fencing

13   consists of?

14   A.   Global fencing, it's probably about 4 foot wide, 8 foot

15   tall metal fencing that has -- it's hard to kind of describe.

16   The holes in the fencing are small enough where you can't

17   stick your fingers through or put your feet in.  It makes it

18   very hard to scale the fence to get over.  You can still see

19   through the fence but it's nearly impossible to scale.

20   Q.   Let me pull up what has been marked as Exhibit 221, which

21   is not in evidence.  This is a very short, one-second video.

22        Before coming to court today, did you have an opportunity

23   to review the video that's been marked as Exhibit 121?

24   A.   Yes.

25   Q.   This video is not Capitol Police footage?

1    A.    No.

2    Q.    But based on what is depicted, are you able to say

3    whether the video was recorded before or after January 6?

4    A.    Yes.

5    Q.    And are you able to say whether the video was recorded

6    in an area close to the Capitol?

7    A.    Yes.

8    Q.    And does the video appear to be a fair and accurate

9    representation of the area around the Capitol shortly after

10   January 6?

11   A.    Yes.

12          MR. VALENTINI:  Government moves to admit 221 into

13   evidence.

14          MR. ROOTS:  Objection, irrelevant if it's after

15   January 6.

16          MR. VALENTINI:  Your Honor, may we approach or get

17   on the phones?

18          THE COURT:  On the phone.

19      (Bench conference.)

20          MR. VALENTINI:  Your Honor, this is the short video --

21   and there's three of them.  I plan to introduce only one of

22   them into evidence at this point.  This is a short video that

23   depicts the unscalable fencing that was put up after

24   January 6.  We discussed this matter today before court,

25   before the presentation of the evidence, and at this point the

1    only testimony that I need from this witness is to identify

2    this fencing as the fencing that was put up after January 6.

3    A different witness will establish that this video was

4    extracted from the iCloud account of one of the defendants.

5             THE COURT:  I understand that, but the objection is to

6    the relevance of it.  If you're trying to admit it now, I will

7    need to deal with the relevance question and you need to

8    address that for the record.

9             MR. VALENTINI:  But I would like to have it admitted

10   conditionally subject to establish the relevance once a

11   different witness will be able to establish that the video was

12   extracted from one of the defendants' phone -- iCloud

13   accounts, I'm sorry.

14            THE COURT:  Well, we won't admit it.  You've

15   established this with respect to this exhibit, but it won't

16   be admitted at this time.  We'll -- I don't want to admit

17   something if it turns out not to be relevant, and I'm going to

18   not -- and if I'm going to decide it's not relevant, then it

19   shouldn't have been admitted.  I don't want to have to strike

20   it.  So we won't admit it at this time.

21            MR. VALENTINI:  Understood.  Just for next steps, we --

22   so we will not be allowed to show it to the jury at this

23   point.

24            THE COURT:  That is correct.

25            MR. VALENTINI:  Thank you.

1          (End of bench conference.)

2              THE COURT:  The exhibit is not going to be shown to

3      you.  It will come up again perhaps later in the testimony of

4      another witness, and we'll determine whether it will be

5      admitted and shown to you at that point.  But some record has

6      been established with respect to it now.

7      BY MR. VALENTINI:

8      Q.   And the record, just to be clear, is that the exhibit --

9      the video that's been marked as Exhibit 221, you see a

10     depiction of fencing around the Capitol?

11     A.   Yes.

12     Q.   Fencing that was put in place after January 6?

13     A.   Yes.

14     Q.   Fencing that was not already in place before January 6?

15     A.   Correct.

16     Q.   Thank you.

17             MR. VALENTINI:  Brief indulgence?

18             THE COURT:  Certainly.

19         (Government conferring.)

20             MR. VALENTINI:  No further questions.  Thank you.

21             THE COURT:  All right.  We'll resume at 3:30 with

22     cross-examination.

23         (Recess from 3:17 p.m. to 3:37 p.m.)

24             THE COURT:  Welcome back, members of the jury.

25         Captain Summers, I remind you you're still under oath.

1          Mr. Roots.

2                          CROSS-EXAMINATION

3     BY MR. ROOTS:

4     Q.   Thank you, Captain Summers.  My name is Roger Roots.

5     I'm one of two attorneys representing these three defendants,

6     Jim Cusick, Casey Cusick, and David Lesperance.  My co-counsel

7     here is Mr. John Pierce.  Thank you for coming.

8     A.   Thank you, sir.

9     Q.   I would like to pull up Government Exhibit 502, which was

10    shown previously.

11         Okay.  Do you see this on the screen?

12    A.   Yes.

13    Q.   And you testified that this was some kind of a secure

14    perimeter on January 6.

15    A.   Yes.

16    Q.   These red lines you testified represented some kind of

17    continuous perimeter around this area.

18    A.   Correct.

19    Q.   But it wasn't completely continuous, was it?

20    A.   Meaning?

21    Q.   Well, let me ask you, was it completely continuous?

22    A.   To our security standards, I would say yes.

23    Q.   Now, what do you mean by that?  Was there fencing and --

24    fencing all the way around where these red lines are?

25    A.   So there was a combination of things.  There were bike

1    racks, snow fencing, officers.  We also have some permanent

2    security perimeters that are always in place which are

3    bollards and so forth that are around that perimeter.

4    Q.    I guess I'd like to zoom in to a couple areas.  Let's

5    just zoom in to an area at the bottom of the screen here, if

6    we could zoom in to that.  And this is Exhibit 502.  We have

7    zoomed in to the very bottom.  Do you see that on your screen

8    there?

9    A.    Yes.

10   Q.    Okay.  I'm going to circle an area here.  Do you see,

11   does it look like cars are parked there?

12   A.    Yes.

13   Q.    Cars are able to drive in and out of this red line.

14   Correct?

15   A.    Certain vehicles that are authorized, yes.

16   Q.    Okay.  Well, let me just say, is it possible to drive in

17   there if you were not authorized?

18   A.    No.

19   Q.    So you would authorize every single vehicle that's --

20   A.    No, we wouldn't.  You have to be authorized in order to

21   come through that area, either to drive through or to park.

22   Q.    Is there a fence, a barrier, some kind of physical

23   barrier?

24   A.    On the side there are some bollards to prevent vehicles

25   from coming off of Independence Avenue up onto the grounds.

1    In various locations in order to get to that location you have

2    to drive through a barricade, which is lowered and raised and

3    inground.  And at the south barricade you would engage with

4    officers before you come into that barricade in order to get

5    to that area where you would either drive through or park.

6    Q.   Okay.  You talked about snow fencing, which you testified

7    was a mesh?  Is that what you said?

8    A.   Yes.

9    Q.   A mesh --

10   A.   Like a plastic mesh, yes.

11   Q.   And you said that was a perimeter barrier?

12   A.   Yes.  We do use that to indicate barriers, yes.

13   Q.   And was that all the way around the Capitol?

14   A.   Not to my knowledge.  There were some areas where a bike

15   rack was used instead.

16   Q.   Are you familiar with rehabbing the grass on the Capitol

17   grounds?

18   A.   It happens occasionally, yes.

19   Q.   And they use that snow fencing, don't they, to surround

20   an area of the grass?

21   A.   Sometimes they do, yes.

22   Q.   To keep people from walking on the grass.

23   A.   Yes.

24   Q.   On January 6, this snow fence was never across any of the

25   sidewalk areas, was it?

1    A.    Not to my knowledge.  Usually the sidewalk area would be

2    covered with or blocked by bike rack.

3    Q.    And some of the snow fencing was along the sidewalk,

4    would you say?

5    A.    Yes.

6    Q.    And that would direct people to stay off the grass.

7    A.    If that's what was set up that day, then yes.

8    Q.    Now, you talked about these bike rack segments.  You said

9    they were higher -- you said -- how tall did you say they

10   were?

11   A.    I would say maybe about four feet or a little bit taller.

12   They come above my -- I'm about five foot five but they come

13   above my waist.

14   Q.    And you indicated they're heavy.

15   A.    They are.  I've had to move them before, yes.

16   Q.    You're able to lift one?

17   A.    Barely, but yeah, I can.

18   Q.    You indicated they're very difficult to move?

19   A.    They're not very difficult to move, they're just -- for

20   me, they're heavy.  One of my colleagues that might be a

21   little stronger, maybe not so much, but they can be hard to

22   move.

23   Q.    Do people always know that they're never to move such

24   barriers?

25          MR. VALENTINI:  Objection.

1          MR. ROOTS:  I'll rephrase the question.

2          THE COURT:  Okay.

3     BY MR. ROOTS:

4     Q.   Do members of the public ever move these barriers?

5     A.   On occasion we've had people to disregard them, yes.

6     Q.   You testified that you got to work at 6 a.m. that

7     morning, January 6?

8     A.   Yes, sir.

9     Q.   Are you familiar with radio channels, a radio that the

10    Capitol Police uses?

11    A.   Yes.

12    Q.   Would you have had a radio on your person that morning?

13    A.   Yes.  And I was also sitting in the radio room on

14    communications that day.

15    Q.   Do you recall a radio communication that came out early

16    that morning indicating that joggers had moved some of the

17    bike rack barriers?

18    A.   No, sir.

19    Q.   I'd like to play Defense Exhibit 130.  Actually, if we

20    could just give a snippet of that to build a foundation.

21         THE COURT:  Defense Exhibit 1 -- wait a minute.  Don't

22    play it yet.

23         MR. VALENTINI:  Objection.

24         THE COURT:  Defense Exhibit 130?

25         MR. ROOTS:  Defense 130.

1          THE COURT:  The exhibit list that I have, which was

2     represented to me as the final exhibit list of the defense,

3     runs through No. 129.  Do I not have the right list?

4          MR. ROOTS:  I believe -- I was told it was emailed

5     to the government very recently.

6          THE COURT:  What was emailed to the government?

7     The list or the exhibit?

8          MR. VALENTINI:  Can we get on the phone?

9          THE COURT:  Let's get on the phone.

10          (Bench conference.)

11          MR. VALENTINI:  Your Honor, as I was conducting the

12     direct examination of Captain Summers, we did receive an

13     email.  I have not had an opportunity to review the

14     attachments to that email.  It is possible this particular

15     audio file is one of the things I just received.  Without

16     further explanation, I'm just not in a position to have any

17     idea what they sent.

18          THE COURT:  Mr. Roots, the question I have for you

19     is we have what was represented to me as the defense trial

20     exhibit list, and it runs through the number 129.  So it

21     doesn't have this exhibit on it.  Is this an exhibit you are

22     trying to add that has not previously been identified to the

23     government?

24          MR. ROOTS:  I believe it was recently added, but the

25     government has had it during the entirety of this direct

1      examination.

2                THE COURT:  Recently added?  What does recently mean?

3                MR. ROOTS:  Over lunch.

4                THE COURT:  I'm not going to allow you to add exhibits

5      during the course of a witness's testimony.  The entire

6      purpose of the pretrial -- and we went through this two or

7      three times already -- was to get a final defense list of

8      exhibits and actually to produce those exhibits to the

9      government.  Doing so during the middle of a witness's

10     examination is not permissible and unacceptable.  You cannot

11     use what you have identified as 130.

12           (End of bench conference.)

13     BY MR. ROOTS:

14     Q.   Okay.  Let me ask you, with regard to the placement of

15     these bike racks, is there any process in terms of where to

16     place those?

17     A.   Yes.  Capitol Police, along with AOC, Architect of the

18     Capitol, along with the House of Representatives Sergeant at

19     Arms and Senate Sergeant at Arms, when perimeters need to be

20     established they get together and they work on that

21     collectively.

22     Q.   Let me ask you, do Capitol Police officers sometimes move

23     those barriers without any instructions?

24     A.   Yes.

25     Q.   But your testimony is that it's very difficult to move

1    those barriers?

2    A.    They can be.  It depends on the strength.  Me myself, it

3    is very difficult for me to move them.  A male that might work

4    out, pretty strong, it may not be so much.  But they're not

5    very light weight.  I would say that.

6         For me they are hard to move.  I can drag it.  I'm not

7    going to be able to pick it up, but I can definitely drag it

8    to a position if I need to move it.

9    Q.    There was discussion where you indicated that -- there

10   was some examination by the federal prosecutor where he asked

11   you if that's what things looked like on January 6, and you

12   admitted that earlier in the day it looked like that.  Recall

13   that?

14        THE COURT:  Objection's overruled.  The witness can

15   handle this question.

16   BY MR. ROOTS:

17   Q.    Do you recall that discussion?

18   A.    I'm sorry.  Can you repeat it one more time?

19   Q.    There was discussion of barriers that were in place

20   earlier in the day.

21   A.    Yes.

22   Q.    And you admitted that in fact later in the day some of

23   those barriers were not in place.

24   A.    Correct.

25   Q.    And I think you said that pictures that were shown -- you

1    were asked what time of the day, and you were able to identify

2    what time of the day by the barriers being in place.  Correct?

3    A.    Correct.  I could say whether it was earlier in the day

4    or later in the day.  An exact time, no.

5    Q.    So if someone came through after let's say 2:30 in the

6    afternoon onto the Capitol grounds, you would agree those

7    barriers were not in place?

8    A.    Some of them, correct.

9    Q.    Many of them had been moved.

10   A.    Yes.

11   Q.    And some had been moved by officers.  Correct?

12   A.    Possibly.

13   Q.    And some had been moved by protesters.

14   A.    Correct.

15   Q.    I'd like to pull up very quickly Government Exhibit 501

16   which was shown.

17          THE COURT:  It's in evidence.

18   BY MR. ROOTS:

19   Q.    And do you recognize this photo?

20   A.    Yes.

21   Q.    This is an aerial photo taken from above the Capitol?

22   A.    Yes.

23   Q.    And doesn't it look like there are grassy areas that

24   appear to be maybe in a state of dirtiness or maybe in need of

25   rehabilitation there?

1    A.   Sure.  Yes.

2    Q.   If I could just circle some of those.  And is it common

3    for some of that what you called snow fencing to be placed

4    around those areas to protect the grass?

5    A.   It depends.  If grass rehab is being done or what has

6    already been -- because I don't know exactly when this

7    photograph was taken.  This could have been right after one of

8    our concerts, our summer concerts.  This could have been

9    during the wintertime when they were getting ready to --

10   because it looks like the trees look a little naked there, so

11   it could be in the wintertime when the grass kind of dies off

12   or when they're getting ready to put the Christmas tree up.

13   It just depends.

14   Q.   January 6 was in the wintertime.  Correct?

15   A.   Yes.

16   Q.   Now, you testified a little bit about these Area Closed

17   signs.  Let's look at one of those exhibits.  503.  Let's look

18   at 503.

19        Okay.  Do you see this on the screen?  Do you see the

20   Area Closed sign?

21   A.   Yes.

22   Q.   And I believe you testified that these signs were every

23   five feet.  Do you recall testifying to that?

24   A.   Yes.  Along snow fencing and bike rack.

25   Q.   That's snow fencing there.  Correct?

1    A.    Yes.

2    Q.    It's hung on some snow fencing?

3    A.    Yes.

4    Q.    Your testimony is that the distance between the edge of

5    the sign here and the edge of the screen here is no more than

6    five feet?

7    A.    I suppose.  But normally when we post them they're every

8    five feet.

9    Q.    That looks like it's eight feet or more.  Would you

10   agree?

11   A.    Possibly.

12   Q.    Now, from this vantage point here, you'd agree that not

13   all the protesters that came onto the Capitol grounds on

14   January 6 would have seen this.

15   A.    Possibly.

16   Q.    It was -- and actually maybe you can just tell the jury

17   where -- where is this location in comparison to let's say

18   that Peace Monument area.

19   A.    It's across from the Peace Monument area, probably --

20   I'm very bad with distances, but it's literally like across

21   the street, I would say.  Because that's along First Street.

22   The picture right there, it's being taken from the sidewalk.

23   That's along First Street, the street that's behind there,

24   and then the circle and then the Peace Memorial is right there

25   behind that.

1    Q.   How far away from -- I guess I'll call it a sidewalk

2    entryway -- would this be?

3    A.   It's kind of hard to tell from the position.  Maybe 10,

4    20 feet or more.  I'm not sure.  It's hard to tell.

5    Q.   Now, you did testify that things deteriorated over the

6    day and later in the day there weren't this set of

7    restrictions or postings.

8    A.   Correct.

9    Q.   This particular sign, do you have any knowledge of this

10   particular sign?

11   A.   No, I don't.

12   Q.   How about this individual here that's next -- that's

13   right here?  Do you recognize -- do you have any knowledge

14   of this individual?

15   A.   No, I do not.

16   Q.   I'd like to bring up Exhibit 131.  That's Defense Exhibit

17   131, which is not in evidence.

18            THE COURT:  Is this falling in the same category as 130

19   since it's not on the list of your exhibits?  Is there

20   anything that distinguishes this from 130?  If there isn't,

21   then the same ruling with respect to --

22   BY MR. ROOTS:

23   Q.   Well, let me just ask.  Are you familiar with this

24   individual here?

25   A.   I am not.

1              THE COURT:  Well, wait a minute.  Is this that exhibit?

2       What are we showing the witness?

3              MR. ROOTS:  Well, let me ask.  Hold on.

4          (Defense conferring.)

5       BY MR. ROOTS:

6       Q.   Okay.  Let me ask a couple of other questions.  To your

7       knowledge, on January 6, were people rolling up snow fence?

8       A.   I'm not sure.

9       Q.   If you arrived and didn't know anything about the Capitol

10      grounds and saw someone rolling up snow fence, what would you

11      think?

12             MR. VALENTINI:  Objection.  Calls for speculation.

13             THE COURT:  Sustained.

14      BY MR. ROOTS:

15      Q.   You would agree that after that initial breach point, an

16      hour after that, the barriers and fencing were largely down.

17      Correct?

18      A.   A good portion, yes.

19      Q.   I will bring up 504, which was shown.  Government's 504.

20             THE COURT:  It is in evidence.

21      BY MR. ROOTS:

22      Q.   This is that breach scene.

23             Okay.  Do you recognize this image?

24      A.   Yes.

25      Q.   This is one of the breaches of the barricades?

1    A.   Yes.

2    Q.   And this happened sometime between twelve o'clock and

3    maybe one o'clock that day?

4    A.   Yes.

5    Q.   First of all, very quickly, you see this Area Closed

6    sign?

7    A.   Yes.

8    Q.   Now, you said these were five feet apart?

9    A.   Generally, yes.

10   Q.   You would agree that five feet apart would be, you know,

11   there should be another sign over here and there isn't.

12   Correct?

13   A.   It may have been.  It may be gone at this point, but I

14   can't tell you.

15   Q.   Okay.  And you indicated, you said that these were hard

16   to lift --

17   A.   For me, yes.  They are hard to lift.

18   Q.   Okay.  Go ahead and take that down.

19        Leading up to January 6, the Capitol Police were

20   preparing for January 6, weren't they?

21   A.   Yes.

22   Q.   And you're aware of plans that the Capitol Police wrote

23   up to prepare for January 6.  Correct?

24   A.   Some of them, yes.

25   Q.   Are you aware of something called the CDU plan?

```
1    A.    Yes.

2    Q.    That was written just before January 6?

3    A.    Yes, by the CDU commander, yes.

4    Q.    And what is the CDU?

5    A.    That's our Civil Disturbance Unit.

6    Q.    Did you read that plan?

7    A.    I don't remember if I read the CDU plan, because I was

8    not assigned to CDU that day.

9    Q.    Are you familiar with the basic parts of the plan?

10   A.    CDU plan normally gives the details on how many CDU

11   platoons we have, where they may be staged, transportation,

12   things of that nature.  I have a general knowledge of it.

13   Did I study it that day?  No, because again, CDU was not my

14   assignment that day.

15   Q.    Capitol Police were planning for large numbers of

16   demonstrators or protesters on the Capitol grounds.  Correct?

17   A.    Yes and no.  Did we think we might have protesters?  Yes.

18   Were we expecting the large crowd that we received?  No.

19   Q.    I'd like to bring up that CDU plan, if we could, which is

20   exhibit --

21          THE COURT:  Is this an exhibit?

22          MR. ROOTS:  It's Exhibit No. -- Defense Exhibit No. 2.

23          THE COURT:  Okay.

24   BY MR. ROOTS:

25   Q.    And you testified you were familiar with the plan but
```

1    maybe hadn't read it?

2    A.    Correct.

3    Q.    Was this a plan that was circulated among the Capitol

4    Police?

5    A.    This one doesn't look familiar to me.  But we have

6    several different formats under which certain things go out at

7    different levels.

8    Q.    Does this look like a fair representation of the plan

9    that was --

10    A.    I did not see this one.

11    Q.    Does this look like a fair representation of the plans

12    that you've seen?

13    A.    Sort of.  Like I said, it depends on what level the plan

14    goes out or what part of the plan it is.  But this one does

15    not look familiar to me.

16    Q.    Were you briefed at all on this plan?

17    A.    I would say no.  Because again, I wasn't assigned to CDU.

18    My assignment for the day was communications.  So anything

19    that had to do with communications is what I focused on that

20    day, to ensure that my folks were ready for the day.

21    Q.    Was there discussion of this plan amongst the Capitol

22    Police?

23    A.    Probably, yes.

24          MR. ROOTS:  I would like to offer this for admission at

25    this time.

1          MR. VALENTINI:  Objection, Your Honor.

2          THE COURT:  This witness doesn't have any knowledge of

3   this particular plan, so I don't think you could admit it

4   through her.  So the objection is sustained.

5   BY MR. ROOTS:

6   Q.   Okay.  Now, you talked about these CCTV cameras around

7   the Capitol.  Do you recall that?

8   A.   Yes.

9   Q.   And I believe you said they're generally no glitching.

10  Do you recall saying that?

11  A.   Generally.

12  Q.   They do not glitch.

13  A.   Generally.

14  Q.   And they're accurate regarding time and date, etc.?

15  A.   Yes.

16  Q.   Are you familiar with claims among January 6 defendants

17  that there are gaps and glitches in some of these videos?

18  A.   No, sir, I was not aware of that.

19  Q.   Missing videos, for example, in the Oath Keeper trial?

20  A.   I know nothing of the Oath Keeper trial, sir.

21  Q.   The Ray Epps, some of the glitchy -- you're familiar with

22  the Ray Epps --

23  A.   I'm sorry?

24  Q.   Are you familiar with a man named Ray Epps?

25  A.   No, sir.

1    Q.   You're familiar with claims in the Proud Boy trial that

2    there were glitchy videos that seemed to have gaps in them?

3              MR. VALENTINI:  Objection, Your Honor.

4              THE COURT:  I'll let her answer this question.  Are you

5    familiar with that?

6              THE WITNESS:  No, sir, I am not.

7              THE COURT:  All right.  We're not going to pursue it

8    anymore.  She's not familiar with it.

9    BY MR. ROOTS:

10   Q.   Now, there was a lot of discussion about breaches at the

11   Capitol, and I believe the first window was broken I think you

12   said 2:13 that day?

13   A.   According to the time stamp, yes, sir.

14   Q.   And that was after people had already breached various

15   perimeters of the Capitol grounds?

16   A.   Yes.

17   Q.   There was a -- I believe you said there was a breach

18   around 12:58-ish?

19   A.   That was down at the Peace Circle, I believe.

20   Q.   So that would have been that breach where the people were

21   pushing those barricades?

22   A.   Correct.

23   Q.   12:58 p.m.?

24   A.   Somewhere in that time, yes, sir.

25   Q.   The Trump rally, the Trump rally went until 1:30 that

1      day.  Correct?

2      A.    I am not sure.  I do remember watching some of it on the

3      television, but then it got a little busy so I had -- no, I

4      didn't pay any more attention to it.

5      Q.    You're aware Trump was giving a big speech, maybe half a

6      mile away at a place called the Ellipse?

7      A.    Yes.

8      Q.    So if someone was to watch that Trump speech and leave

9      after the Trump speech, they would not have got to the Capitol

10     grounds until well after that breach of that perimeter.

11     Correct?

12     A.    Yeah.  If you put that together, yes.

13     Q.    Over half an hour later.

14     A.    Yes.

15     Q.    Could be an hour later?

16     A.    Could be.  Depending on what mode of transportation they

17     used, whether they walked or drove.

18     Q.    Now, there was a little bit of discussion about the vice

19     president of the United States being inside of the Capitol.

20     A.    Yes.

21     Q.    Isn't it true that the vice president actually is the

22     president of the Senate?

23     A.    Yes, he is.

24     Q.    And that he actually has an office inside the Capitol?

25     A.    Yes, he does.

1    Q.   And the vice president is frequently in the Capitol.

2    A.   No, sir.

3    Q.   How frequently would you say --

4    A.   Normally, the vice president shows up when there is a

5    vote that's going to result in a tie.  The vice president

6    will respond in, in order to break that tie vote if needed.

7    Occasionally they may come to -- whatever party is in power,

8    they may come to a luncheon, but it's not every day.  And

9    usually the vice president's office that he has is more of a

10   ceremonial office.  It is not a used office.

11   Q.   Okay.  And so there is some interfacing with the Secret

12   Service and the Capitol Police?

13   A.   Yes.

14   Q.   Does the Secret Service prescribe these perimeters that

15   you've been discussing?

16   A.   No.

17   Q.   Do they have any role to play in these perimeters?

18   A.   No.

19   Q.   They didn't play any role on January 6 in these

20   perimeters.

21   A.   Not in putting the perimeters together.  That is Capitol

22   Police, the House Sergeant at Arms, the Senate Sergeant at

23   Arms, and the Architect of the Capitol.

24   Q.   You indicated you've been there at the Capitol Police for

25   over 20 years?  How many years?

```
1    A.   Twenty-three, sir.

2    Q.   Twenty-three years.  Have you seen other protests at the

3    Capitol?

4    A.   Yes.

5    Q.   Have you seen other protesters enter the Capitol?

6    A.   Yes.

7    Q.   I'd like to bring up Defense Exhibit 12.

8         And to your knowledge, do members of Congress sometimes

9    participate in these protests?

10   A.   Yes.

11   Q.   And in fact, it's true on January 6 there were some

12   members of Congress who were supporting objections to the

13   certification of the election.

14   A.   Correct.

15   Q.   Are you aware of members of Congress being scheduled to

16   be speakers at permitted events on the Capitol grounds that

17   day?

18   A.   I am not.

19   Q.   And staffers inside the Capitol sometimes engage in some

20   protests.  Correct?

21   A.   Yes.

22   Q.   I'd like to show this on the screen.  Are you familiar

23   with this protest depicted in this picture?

24   A.   Probably, but I see a lot of them.  They all kind of run

25   together after 20 years.
```

1    Q.   This was a protest back in 2014?

2    A.   Okay.  That's what the date says.  It probably occurred.

3    Q.   If you could just -- that's a large number of people

4    protesting on the Capitol --

5         THE COURT:  We can't have substantive testimony about

6    the exhibit without the exhibit being in evidence.  It's not

7    in evidence right now.

8         MR. ROOTS:  I'd like to move for admission of this

9    exhibit.  This was Exhibit Defense 12.

10        MR. VALENTINI:  Objection.  The defendant [sic] has

11   made clear she does not know the content of this exhibit.

12        THE COURT:  Ask one or two more questions so we have

13   the foundation clearer.  If she has any familiarity with this

14   particular event that's depicted in the --

15   BY MR. ROOTS:

16   Q.   Are you familiar with episodes where staffers actually

17   protested and had a strike and refused -- basically had a

18   sit-in strike on the steps of the Capitol in 2014?

19   A.   Maybe.  Again, there have been many, and they all kind of

20   run together.  It is not uncommon for staff to participate or

21   members to participate.  But again, there have been many -- as

22   the years have gone on, they've gotten more and more frequent.

23   Q.   And you would agree that when that happens that disrupts

24   the -- well, actually, let me just move for admission one more

25   time of this exhibit.

 1              MR. VALENTINI:  Same objection.

 2              THE COURT:  Is the exhibit only going to be this cover,

 3       or is it a document that has substance to it?

 4              MR. ROOTS:  No.  Just this picture, really.

 5              THE COURT:  I'll overrule the objection.  You can go

 6       ahead and admit Defense Exhibit 12.

 7                                   (Defendant Exhibit No. 12

 8                                    received into evidence.)

 9              MR. ROOTS:  And I'd like to show this to the jury.

10              THE COURT:  Go ahead.

11       BY MR. ROOTS:

12       Q.   And these kinds of protests you would agree are somewhat

13       disruptive of the events in the Capitol?

14       A.   Just somewhat.  Usually events such as this are known to

15       us in advance so that the Capitol Police can plan for them,

16       especially if members are involved.  They don't come up as a

17       surprise.  We normally would know what the substance is, how

18       many people are going to be there, if people are going to

19       choose to be arrested or not, so that we can plan accordingly

20       to ensure that First Amendment activity can take place safely.

21       Q.   And it's not unusual for hundreds of people to be inside

22       the Capitol on any given day.

23       A.   Not uncommon.

24       Q.   I'm sorry.  I didn't hear you.

25       A.   It is not uncommon for hundreds of people to be in the

1   building on a regular day.

2   Q.   And that by itself does not necessarily require Congress

3   shut down.

4   A.   No.

5   Q.   Well, let's pull up -- we watched a lot of video with you

6   going over interior imagery of the Capitol.  Let's go ahead

7   and pull up 127, Government's 127.

8        THE COURT:  Government's 127.

9        MR. ROOTS:  Yes.

10       THE COURT:  I believe it is in evidence.  It is.

11   BY MR. ROOTS:

12   Q.   Okay.  We'll just play that and stop this.  Do you recall

13   this video?

14   A.   Yes.

15   Q.   This was one of many videos that you reviewed inside the

16   Capitol following people -- these three individuals with hats

17   on going around.  Do you recall those?

18   A.   Yes, sir.

19   Q.   Very quickly, just a couple questions here.  A lot of

20   people were wearing winter-type stocking hats that day.

21   Correct?

22   A.   Yes, sir.

23   Q.   You would agree it was cold outside?

24   A.   Yes, sir.

25   Q.   It was warmer inside.

1    A.    Yes.

2    Q.    At one point, I believe right here in this video, there's

3    this group of officers there maybe in the background.

4    Do you see them?

5    A.    Yes.

6    Q.    And I think you described that as a, quote, line of

7    officers.  Do you recall that?

8    A.    Yes.

9    Q.    The three individuals walking around with their hats on

10   for that period of time, they never went through any line of

11   officers, did they?

12   A.    Not that line.  No, sir.

13   Q.    Not that line.  You're suggesting they went through some

14   police line?

15   A.    I am not suggesting.  I'm only going on the picture here.

16   They did not go through that line.

17   Q.    So breaching a line of officers would be consistent with

18   violent entry of a restricted area.

19         MR. VALENTINI:  Objection, Your Honor.

20         THE COURT:  What's the one-word description of the

21   grounds?

22         MR. VALENTINI:  Legal conclusion.

23         MR. ROOTS:  I can ask it in a different way.

24         THE COURT:  Rephrase it.

25

1    BY MR. ROOTS:

2    Q.   If there's a line of officers and you try to move past

3    that line of officers, that would be trying to get into a

4    restricted area.  Right?

5    A.   Yes.

6    Q.   And so if you see a line of officers, what you describe

7    as a line of officers, and you don't do that, or maybe you go

8    the other way or something, you're not necessarily breaching

9    a restricted area where the officers are.

10    A.   On January 6 the entire building was restricted.  So

11    whether they went through the line of officers or went in the

12    opposite direction, they were in violation of the perimeter.

13    Q.   Okay.  Let's probe this a little bit.  In this video, are

14    there any signs on the wall indicating this?

15    A.   No.

16    Q.   Are there any signs on the wall in the Capitol that say

17    restricted area, trespassing?

18    A.   Yes, there are.  Depending on where you go, there are

19    signs that say that the area's -- either access is restricted,

20    staff only, members only, things of that nature throughout the

21    building, depending on where you go.

22    Q.   Are there any signs telling you where to walk, which

23    direction to move?

24    A.   No.

25    Q.   You're telling me there are such signs inside the Capitol

1     that say trespassing.

2     A.   There are signs that say Staff Only.  There are signs

3     that say Restricted Area.  There are signs that say Members

4     Only.  They're not attached to walls and such.  They are

5     freestanding signs that are posted in various areas throughout

6     the building.

7     Q.   Okay.  This area here, for example -- well, we talked

8     about areas where we discussed these people with the -- the

9     three individuals with hats that you circled frequently.

10    They were in hallways.  Correct?

11    A.   Yes.

12    Q.   They were in an area that's called the Crypt?

13    A.   Yes.

14    Q.   Are those areas posted "Unauthorized"?

15    A.   No, because the Crypt is an area that the public can

16    visit when the building is open to the public.

17    Q.   And a sign that it would be closed to the public would

18    be, what, a locked door?

19    A.   Yes.

20    Q.   And if you came in an open door, what then?

21    A.   Just to my knowledge, most government buildings require

22    you to go through some sort of security in order to enter

23    them.

24    Q.   To your knowledge, most government buildings.  Okay.

25    Well, let's just say on January 6, many people came into the

1    Capitol and they did not see such signs.  Correct?

2    A.   Some, yes.

3         MR. VALENTINI:  Move to strike.  Calls for speculation.

4         THE COURT:  Your witness is giving answers,

5    Mr. Valentini.  Too late.

6         MR. VALENTINI:  Move to strike.

7         THE COURT:  The motion to strike is denied.

8    BY MR. ROOTS:

9    Q.   Now, I think I already asked this, and I apologize.

10   Are there any signs directing you which way to go inside the

11   Capitol?

12   A.   No.

13   Q.   Safe to say many visitors who come from far away get lost

14   in the Capitol?

15   A.   Not so much anymore.  I would say many years ago when we

16   allowed self-guided tours, people did get lost in the

17   building.  But now that we have the Visitor Center, we have

18   guided tours and we have more stringent security measures,

19   people don't get lost so much anymore.

20   Q.   Those three individuals that you kept pointing out, did

21   they appear to be -- were they holding any signs?

22   A.   No.

23   Q.   Any flags?

24   A.   No.

25   Q.   Did they appear to be picketing in any way?

```
 1    A.    No.

 2    Q.    Were they chanting or yelling?

 3    A.    Not that I could see.

 4    Q.    You're familiar with the concept of disorderly conduct?

 5    A.    I am.

 6    Q.    Disorderly conduct might be jumping up and down or

 7    something?

 8              MR. VALENTINI:  Objection.  Calls for legal conclusion.

 9              THE COURT:  You can ask the question in a general way

10    that does not employ language of the particular statutes that

11    these individuals are charged with.

12    BY MR. ROOTS:

13    Q.    Is standing or walking particularly disorderly?

14    A.    No.

15    Q.    At one point you mentioned the phrase "milling around."

16    It seemed to be a lot of people were, quote, "milling around"?

17    A.    Yes.  Just walking around.

18    Q.    Would you call that disorderly conduct?

19    A.    No, however, they were in the building --

20    Q.    Well, let me just stop you there.  Thank you for that

21    answer.

22              MR. VALENTINI:  Objection.  The witness should be

23    allowed to finish her answer.

24              MR. ROOTS:  It was a yes or no question.

25              THE COURT:  She's not adding something.  It's the same
```

 1     sentence, and so I'm going to allow her to complete her

 2     answer.  You may complete your answer.

 3         MR. ROOTS:  Well, let me just, if I could -- I set up

 4     the question with:  "Is milling around disorderly conduct?"

 5     The witness said "No," and then wanted to say other things?

 6     Go ahead.

 7         THE WITNESS:  Yes.  I would say -- I'd say, no, milling

 8     around in general is not disorderly.  However, being inside of

 9     our closed perimeter in our closed building is being

10     disorderly.

11     BY MR. ROOTS:

12     Q.   So wait, wait, wait, wait, wait.  You're saying that

13     merely being there is disorderly conduct.

14         MR. VALENTINI:  Objection, Your Honor.  This is a legal

15     discussion that the defense is trying to start here with this

16     witness.  It's argumentative, and it's outside of the proper

17     bound of cross-examination.

18         THE COURT:  I'll let the -- is there a question

19     pending, Mr. Roots?

20     BY MR. ROOTS:

21     Q.   You're saying that merely being there is disorderly

22     conduct.

23     A.   The building is closed.  They're not allowed to be there.

24     They've come through our perimeter.  They haven't gone through

25     any security.  I would say yes.

1    Q.   Well, so if someone's charged with four crimes, one of

2    which is being there, and other crimes, one of which might be

3    disorderly conduct, you're suggesting that it's all -- that

4    that's both crimes?

5              MR. VALENTINI:   Objection, Your Honor.   This is

6    argumentative.

7              THE COURT:   At this point we're going to cut it off.

8    It's a legal argument with the witness.   The objection's

9    sustained.

10   BY MR. ROOTS:

11   Q.   In all the videos that you've seen of those three

12   individuals that you kept circling, did you see them at any

13   time jump up and down?

14   A.   No.

15   Q.   Did you see them jostle anyone?

16   A.   No.

17   Q.   Did you see them push anyone?

18   A.   No.

19   Q.   In all the videos that you've seen, did you see them

20   yell?

21   A.   I did not see them yelling, no.

22   Q.   Did you see them in any confrontations?

23   A.   No.

24             MR. ROOTS:   I think I'll stop right there.   Thank you

25   so much.

1          THE COURT:  Mr. Valentini.  Redirect.

2                    REDIRECT EXAMINATION

3     BY MR. VALENTINI:

4     Q.   Good afternoon, Captain Summers.

5     A.   Yes, sir.

6     Q.   So you were asked some questions -- well, let me begin

7     where Mr. Roots ended.  You were asked whether standing or

8     walking around is itself necessarily disorderly?

9     A.   Yes.  He did ask me that question.

10    Q.   He also asked you whether milling around was in and of

11    itself necessarily disorderly?

12    A.   Correct.

13    Q.   But is standing around when joining a mob within a

14    restricted area disorderly?

15    A.   Yes.

16         MR. ROOTS:  Objection.

17    BY MR. VALENTINI:

18    Q.   And is milling around when there is a mob within a

19    restricted area disorderly?

20         MR. ROOTS:  Objection.  Calls for a conclusion that

21    depends on the actions of other people.

22         THE COURT:  I'm going to sustain the objection based

23    on it being leading.  You'll have to rephrase the question.

24    BY MR. VALENTINI:

25    Q.   You testified that standing around is not necessarily

1    disorderly?

2    A.   I did.

3    Q.   Is standing around as part of a large mob disorderly?

4    A.   Yes.

5    Q.   You also testified that milling around is not in and of

6    itself --

7         MR. ROOTS:  Objection.  Legal conclusion and it

8    actually misstates the law.

9         THE COURT:  You've objected in the middle of a question.

10   State the question.  Don't give an answer yet.  Let me hear

11   the question, and if you have an objection, make it.

12   BY MR. VALENTINI:

13   Q.   Can milling around disrupt the government function within

14   the Capitol?

15   A.   I'm sorry.  Can you repeat that?  I'm sorry.  I didn't

16   hear it all.

17   Q.   Is it possible that the presence of individuals together

18   with a large number of individuals disrupts the government

19   function within the Capitol?

20        THE COURT:  Don't answer.

21      Is there an objection to that?

22        MR. ROOTS:  Yes.  Legal conclusion.

23        THE COURT:  Overruled.  You may answer.

24        THE WITNESS:  I'm sorry.  One more time.

25        MR. ROOTS:  Also, we would object to the

1    characterization of the term "mob."

2         THE COURT:  That part is overruled.  You may ask the

3    question again.

4    BY MR. VALENTINI:

5    Q.   Is the fact that individuals mill around within the

6    Capitol at a time when there is a large number of other people

7    engaging in other activities within the Capitol, can that

8    activity disrupt the orderly conduct of government business

9    within the Capitol?

10   A.   Yes.

11   Q.   And did --

12   A.   Yes.

13   Q.   -- the presence -- did the presence of individuals as

14   part of a mob on January 6 disrupt the conduct of government

15   functions within the Capitol?

16   A.   Yes.

17   Q.   And is that because a mob requires numbers?

18   A.   Yes.

19        THE COURT:  Is that a leading question?

20        MR. VALENTINI:  Yes.

21   BY MR. VALENTINI:

22   Q.   Captain Summers, you were asked whether after 2:30 some

23   barriers had been removed from the outer perimeter of the

24   restricted area?

25   A.   Yes.

1    Q.   And you testified that in fact some barriers were removed

2    at that point.

3    A.   Yes.

4    Q.   Were all barriers removed from the outer perimeter of

5    the restricted area at that point?

6    A.   No.

7    Q.   And why were some barriers removed -- what was the reason

8    why some barriers were removed from the outer perimeters of

9    the restricted area?

10   A.   A good portion were removed by rioters.

11   Q.   So after 2:30 p.m., rioters had started breaching the

12   Senate Wing door of the Capitol?

13   A.   I'm sorry?

14   Q.   As of 2:13 p.m., I believe you testified that's when the

15   Senate Wing door was first breached?

16   A.   Yes.

17   Q.   And after that point rioters started breaching the

18   Capitol through that door?

19   A.   Yes.

20   Q.   And you testified that that door is a point of egress

21   only?

22   A.   Emergency egress.  Yes.

23   Q.   So what happens when that door is opened?

24   A.   If that door is breached, a alarm goes off, an audible

25   alarm that you can hear while you're standing there at that

385

1    door.  It also sends a signal to communications letting us

2    know that the door has been breached.

3    Q.   In fact, let's pull up Exhibit 127, which is in evidence.

4         (Video played.)

5         And we can stop here.  Do you see the individuals that

6    we've been tracing throughout your direct examination at this

7    point?

8    A.   Yes.

9    Q.   And could you hear at this point in the exhibit that

10   piercing, high-pitched sound as you described it before, of

11   the alarm door of the Senate Wing door?

12   A.   Yes.

13   Q.   So even after -- and this is, I believe you testified

14   before, at around 3:09 p.m.?

15   A.   Yes.

16   Q.   So after 2:30, even if some barricades out at the outer

17   perimeter had been removed, the blaring sound of this alarm

18   was still ringing in the Senate Wing door?

19   A.   Yes.

20   Q.   And that is where the three individuals that we've been

21   tracing entered the Capitol on January 6.

22   A.   Yes.

23   Q.   You were also asked some questions about protocols with

24   respect to signage.  Do you recall?

25   A.   Yes.

1    Q.   And you were asked whether -- I believe it was your

2    testimony that typically the protocol is to post these signs

3    at approximately five feet apart?

4    A.   Yes.

5    Q.   And in some cases that signage can be a little bit more

6    than five feet apart?

7    A.   It's possible.

8    Q.   And in some cases is it a little bit less than five feet

9    apart?

10   A.   Possibly, yes.

11          MR. ROOTS:   Objection.   Leading.

12          THE COURT:   Overruled.

13   BY MR. VALENTINI:

14   Q.   You were also asked about the Secret Service

15   participation in determining the restricted perimeter on

16   January 6.

17   A.   Yes.

18   Q.   Now, do you work for the Secret Service?

19   A.   No.

20   Q.   Do you know of all communications between the Secret

21   Service and Capitol Police about the restricted area?

22   A.   No.

23   Q.   Do you know or are you responsible to know whether

24   there's coordination between the Secret Service and the

25   Capitol Police in determining the restricted area around the

1    Capitol for special events?

2    A.   No.  Above my pay grade.

3    Q.   And so do you know if there is an understanding based on

4    a course of business over the years or on any other basis

5    between the Secret Service and the Capitol Police as to the

6    delineation of a restricted area?

7    A.   Not to my knowledge.

8    Q.   So you don't know one way or the other.

9    A.   I'm sorry?

10   Q.   You don't know one way or the other if the Secret Service

11   and the Capitol Police coordinated.

12   A.   We coordinate on certain things.  They notify us if the

13   vice president or the president are going to come up, and we

14   tell them which route to take.

15   Q.   You were also asked about protests sometimes happening or

16   demonstrations within Capitol grounds that involve staffers?

17   A.   Yes.

18   Q.   Was January 6 a protest organized by or involving

19   staffers?

20   A.   Not to my knowledge.

21        MR. VALENTINI:  No further questions, Your Honor.

22        THE COURT:  All right.  Captain, thank you very much

23   for coming.  We appreciate it, Captain Summers.  You may step

24   down.

25        THE WITNESS:  Thank you, sir.

 1          (Witness steps down.)

 2               THE COURT:  Next witness, please.

 3               MS. MURPHY:  Your Honor, prosecution calls Special

 4     Agent Elizabeth Glavey.  If you'll give us just one moment.

 5          ELIZABETH GLAVEY, WITNESS FOR THE GOVERNMENT, SWORN

 6                         DIRECT EXAMINATION

 7     BY MS. MURPHY:

 8     Q.   Good afternoon.  Would you please state your name for the

 9     record, spelling your last name?

10     A.   Elizabeth Glavey, G-L-A-V-E-Y.

11     Q.   And Ms. Glavey, where do you work?

12     A.   The United States Secret Service.

13     Q.   What is your title within the United States Secret

14     Service?

15     A.   Special agent.

16     Q.   Special Agent Glavey, how long have you worked for the

17     U.S. Secret Service?

18     A.   Next week will make 14 years.

19     Q.   And what is the mission of the Secret Service?

20     A.   It's a dual mission agency.  We do protection and

21     investigations.

22     Q.   And who do you protect?

23     A.   The president, vice president, and their immediate

24     families.

25     Q.   Is the Secret Service a part -- is it part of an

1    executive agency of the United States government?

2    A.    Yes.

3    Q.    What agency is that?

4    A.    The Department of Homeland Security.

5    Q.    Special Agent Glavey, what is your current position

6    within the Secret Service?

7    A.    Currently I'm an instructor at our training center in

8    Maryland.

9    Q.    And what was your position in January of 2021?

10   A.    I was an agent on the vice president's detail.

11   Q.    And how long had you been on the vice president's detail

12   before January 2021?

13   A.    At that time three years.

14   Q.    Can you share with the jury what your duties and

15   responsibilities would have been as a member of the VP's

16   detail in January of 2021?

17   A.    Sure.  As an agent on the detail, I was responsible for

18   the protection of the vice president and his immediate family.

19   For the best way to describe it, you would act as the

20   bodyguard for the family members, and then you were also

21   responsible for advance work.  So when the vice president

22   would go to a town, he would send out an advance team to that

23   location and you would design a security plan.

24   Q.    Now, I'd like to shift your attention, if it's okay, to

25   the events of January 6.  Can you tell us what -- or when you

1    began to prepare for January 6?

2    A.   I prepared for that on January 5.

3    Q.   And what did you do to prepare for the vice president's

4    day on January 5?

5    A.   My preparation for that was to be in contact with my

6    liaison counterpart.  They are at the Capitol.  I was

7    preparing by telling them who would be in attendance on

8    January 6 and providing the information for the various points

9    of contact that would be needed, and just the basics as far as

10   vehicle information and providing motorcade information.

11   Q.   Do you remember who your liaison contact was at the

12   Capitol?

13   A.   Yes.  It was Inspector Lanelle Hawa.

14   Q.   Can you tell the jury a little bit about what Ms. Hawa's

15   role is or what the liaison department does at the Capitol?

16   A.   Yes.  The liaison counterpart is a person who is an agent

17   with the Secret Service.  Their place of duty is at the

18   Capitol and they basically are the subject matter expert at

19   the Capitol.  We often have instances where our protectees can

20   do a short notice trip to the Capitol.  So we rely on them to

21   know the inner workings of the Capitol, the locations and the

22   procedures to get us in there, rather than conducting a

23   week-long advance.

24   Q.   Are you familiar with the term "site agent"?

25   A.   Yes, I am.

1    Q.   Would you share with the jury what a site agent is?

2    A.   A site agent is a person who is responsible for creating

3    the security plan at a particular site.  So in this case it

4    would be the Capitol.  Or if you travel to a town, it could be

5    a hotel.  And you come up with a security plan for the

6    protectee as well as for facilitating the public coming.

7    Q.   And who was the vice president's site agent for January

8    6, 2021?

9    A.   I was, for the vice president's detail.

10   Q.   And as the site agent, what type of information did you

11   need to communicate to the liaison department at the Capitol

12   in advance of the vice president's visit?

13   A.   The basics as far as the vice president's arrival time,

14   who would be joining him, where the motorcade would be

15   arriving to, our planned movements throughout the Capitol,

16   which they already would typically know, but just to reaffirm.

17   And then the movements of any of the guests that were coming.

18   Q.   And do you know whether the liaison division then shares

19   that information with anyone else within the Capitol?

20   A.   Yes.  The liaison division will create a Head of State

21   Notification, and they will provide it to those that need to

22   know it on the vice president's detail as well as throughout

23   the Capitol.

24   Q.   Ms. Roberts, if you would pull up Government Exhibit

25   No. 301, which has not yet been admitted into evidence.

1          Special Agent Glavey, if I ask you to look at Government

2     Exhibit 301, please, are you familiar with this document?

3     A.    Yes.

4          MS. MURPHY:  Your Honor, permission to admit and

5     publish the document to the jury?

6          MR. ROOTS:  Objection.  Hearsay.

7          MS. MURPHY:  If I'm able to ask a few more questions,

8     Your Honor, I can lay a foundation for it.

9          THE COURT:  Please do so.

10    BY MS. MURPHY:

11    Q.    You're looking at the document, Special Agent Glavey.

12    You just mentioned a moment ago a head of state worksheet

13    being prepared --

14    A.    Yes.

15    Q.    -- by the liaison department in advance of the VP's

16    detail.  Does this -- the document that you're looking at, is

17    that consistent with what you described as being related to

18    the Head of State Notification?

19    A.    Yes.  It's the email that was provided by the liaison

20    division, and then it should have an attachment of the actual

21    notification worksheet.

22    Q.    And in your experience as a site agent on a VP's detail,

23    is this the type of email that would have been sent over in

24    advance of a visit by the vice president to the Capitol?

25    A.    Yes, it would.

1          MS. MURPHY:  Your Honor, permission to admit and

2     publish the exhibit, please.

3          MR. ROOTS:  I guess no objection.  Business record.

4          THE COURT:  Without objection, I think properly without

5     an objection given the rules of evidence, it will be admitted.

6     That is 301 is admitted and may be published.

7                              (Government Exhibit No. 301

8                               received into evidence.)

9     BY MS. MURPHY:

10    Q.   Now looking at Exhibit 301, could you tell the jury what

11    this is?

12    A.   It's the email from my liaison counterpart, Lanelle Hawa,

13    regarding the Head of State Notification for the visit of the

14    vice president and his family for January 6, 2021.

15    Q.   And I see a bunch of redacted names in the "to" line of

16    the email, but can you look at that and tell us basically in

17    which department this email would have been sent to?

18    A.   The Capitol Police and the Senate Sergeant at Arms.

19    Q.   And can you read the subject line of the email for us,

20    please?

21    A.   "Head of State Notification, visit of Vice President

22    Michael Pence, Mrs. Pence, and Charlotte Pence, to the U.S.

23    Capitol, S-214, House and Senate floors, on Wednesday, January

24    6, 2021."

25    Q.   Can you tell the jury who Charlotte Pence is?

1    A.    The vice president's daughter.

2    Q.    Is the vice president's daughter also what would be

3    considered a protectee of the Secret Service?

4    A.    Yes.

5    Q.    Could we pull up Exhibit 302, please, which has not yet

6    been admitted.

7          Special Agent Glavey, is this the head of state worksheet

8    that you just mentioned that's prepared in advance of a visit

9    by the vice president to the Capitol?

10   A.    Yes, it is.

11   Q.    And this type of worksheet is prepared regularly in the

12   conduct of business in terms of when the vice president is

13   visiting the Capitol?

14   A.    Yes, if we have enough notice to complete it prior to the

15   visit.

16         MS. MURPHY:  Your Honor, we move Exhibit 302 into

17   evidence, please.

18         MR. ROOTS:  No objection at this time.

19         THE COURT:  Without objection, Government 302 is

20   admitted and may be published.

21                              (Government Exhibit No. 302

22                                received into evidence.)

23   BY MS. MURPHY:

24   Q.    Looking at Exhibit 302, could you tell the jury what this

25   is, please?

1    A.    The whole document?

2    Q.    We could start at the beginning, the title.

3    A.    It's the head of state worksheet prepared by the liaison

4    division of the U.S. Secret Service, and it is notifying the

5    date of the visit, which was Wednesday, January 6, 2021.  Then

6    it lists the visitors' names, which in this case was the vice

7    president, Michael Pence, Mrs. Pence, and Charlotte Pence.

8    Q.    And do you see your name listed on this document at all?

9    A.    Yes, I do.

10   Q.    And what are you listed as?

11   A.    Around the middle of the document I'm listed as the USSS

12   VPD lead agent.

13   Q.    What does USSS VPD stand for?

14   A.    The vice president's detail lead agent.

15   Q.    Is that the same as a site agent?

16   A.    That's correct.  I was the main point of contact at the

17   Capitol for the detail.

18   Q.    If you would focus your attention then toward the bottom

19   of the page, looking at the itinerary, can you tell us what

20   time the vice president was supposed to arrive at the Capitol

21   on January 6?

22   A.    12:30 p.m.

23   Q.    And do you know how the vice president was supposed to

24   arrive?

25   A.    Via motorcade to Senate carriage entrance.

1    Q.   Do you know that because the MC here in that first column

2    stands for --

3    A.   Stands for motorcade.   Correct.

4    Q.   And do you know where the vice president was supposed to

5    go when he arrived at the Capitol on January 6?

6    A.   To S-214, which was his office.

7    Q.   And are you familiar with the vice president's office at

8    the Capitol?

9    A.   I'm familiar with outside of it.   I'm not allowed inside

10   his office.

11   Q.   Do you know whether it's considered a ceremonial office?

12   A.   It's his office.

13   Q.   And can you tell us where the vice president was supposed

14   to go after leaving room 214, his office at the Capitol?

15   A.   He was supposed to walk over to the House chamber.

16   Q.   And is it your understanding that he did walk over to the

17   House chamber that day?

18   A.   Yes, he did.

19   Q.   And do you know what the itinerary had occurring next?

20   A.   After he walked to the House chamber?

21   Q.   Yes.

22   A.   They would proceed with certifying the vote and they

23   would continue until there was an objection.

24   Q.   So according to the itinerary, the vice president was to

25   go over to the House chamber and then to proceed until there

1    was an objection.  And then what would happen if there was an

2    objection?

3    A.    They would proceed back to the Senate floor and both the

4    House and Senate would deliberate for several hours and then

5    they would reconvene in the House chamber.

6    Q.    So is that why -- or can you tell us why the times go to

7    TBD after -- I believe the exhibit went away from me.  But on

8    the itinerary, we see after about 12:55, we go to TBD.  Can

9    you explain why there are no times listed there?

10   A.    There are no times listed because we anticipated several

11   objections throughout the certification.  So we knew we would

12   make several movements between the House and Senate chambers.

13   Q.    Can you focus on the red text that's at the very bottom

14   of the page, please?  Can you read that red text for us?

15   A.    "Please anticipate multiple movements by the vice

16   president between the House chamber, S-214, and the Senate

17   chamber prior to departure."

18   Q.    So was the vice president supposed to go anywhere else

19   besides the House chamber, his office and the Senate chamber

20   on January 6?

21   A.    No.

22   Q.    And to be clear, who was responsible for the vice

23   president, Mrs. Pence's and Charlotte Pence's safety while

24   they were at the Capitol building?

25   A.    The Secret Service.

1    Q.    I'd like to turn your attention, if I can, then to the

2    events of the day on January 6.  Do you remember what time you

3    started your workday?

4    A.    I believe I started around eight o'clock at the Naval

5    Observatory, which is the vice president's residence.

6    Q.    And about how long did you stay at the vice president's

7    residence?

8    A.    I would say an hour, hour and a half.

9    Q.    And where did you go next?

10   A.    Then I went to the Capitol.

11   Q.    Do you remember approximately what time you would have

12   arrived at the Capitol on January 6?

13   A.    I would estimate ten o'clock.

14   Q.    And where did you go when you arrived at the Capitol?

15   A.    I went I believe to the Senate entrance and met with my

16   liaison counterpart to conduct a walk-through.

17   Q.    And what is the purpose of conducting a walk-through?

18   A.    The purpose of conducting the walk-through was my liaison

19   counterpart knows the procedures that would take place for the

20   certification.  It's a very formal process.  And they also

21   know the routes that we would be taking.  So as the VP lead I

22   would need to know all of those routes, and all the

23   procedures, so I could also brief the supervisors.  So we

24   walked the routes and we also walked the emergency route if

25   needed.

1    Q.    I was just going to ask, was there an emergency plan in

2    case it was needed?

3    A.    Yes, there was.

4    Q.    And is there always an emergency plan when the vice

5    president is attending something like an event at the Capitol?

6    A.    Yes.

7    Q.    What time did the vice president arrive at the Capitol on

8    January 6?

9    A.    A little after 12.

10   Q.    And did you meet him upon arrival?

11   A.    Yes, I did.

12   Q.    And what did you do when he arrived?

13   A.    When the vice president arrived, I immediately handed out

14   the visitor passes to the supervisors and the shift agents

15   that would be entering the Capitol.

16   Q.    And once you handed out the badges to everyone, do you

17   remember where you all went next?

18   A.    We proceeded to the second floor where the vice

19   president's office was.

20   Q.    And did you accompany the vice president there?

21   A.    I did, but I stopped at the stairwell.  I didn't enter

22   where the vice president's actual office is.

23   Q.    So you didn't go inside of his office but you stood

24   outside.

25   A.    Correct.

1    Q.    Do you recall where the vice president went next?

2    A.    He went to the chamber.

3    Q.    And did you escort him to the chamber?

4    A.    No.   It's through a lobby area that again I'm not allowed

5    to access.   The supervisor did.   I went to the doorway outside

6    the chamber.

7    Q.    And at some point did the proceedings in the chamber

8    adjourn?

9    A.    They did.   And they proceeded -- they did the procession

10   from the Senate to the House chamber.

11   Q.    Right.   Okay.   And at some point in the House chamber did

12   that session end and the vice president returned to the Senate

13   side?

14   A.    Yes.   I believe Arizona objected, and we proceeded back

15   to the Senate and they deliberated.

16   Q.    And when you accompanied the vice president back to the

17   Senate side, do you recall what, if anything, happened next?

18   A.    At that point the vice president was in the chamber.   I

19   was outside of the chamber, and I just recalled hearing noise

20   of public that were making their way towards the Capitol.   And

21   I just walked over to the window and looked out to see the

22   crowd and then I walked back to my supervisor.

23   Q.    So you testified that you walked to a window and looked

24   out.   Can you tell us what you saw when you looked out of the

25   window?

A.   I saw large crowds at a distance.

Q.   And so what did you do next?

A.   I walked back to my supervisor, and by the time I walked

back to my supervisor, the decisions were being made to

relocate our motorcade.  So at that point the supervisor asked

that I walk the route in case we had to evacuate.

Q.   And so what did you do next?

A.   So I walked our emergency route and verified that it was

both clear and that I knew the way without any error.  And

then shortly after, I walked back.  And when I was coming back

from walking the route, as I was coming up a stairwell I heard

the glass smash and then I started to see people entering the

building.

     So I went to the stairwell and at that point one of the

supervisors was making their way down the stairwell, and at

that point I just started to communicate to the supervisor

what I was seeing on the floor that I was on and providing

information that would be needed in the event we evacuated.

Q.   Given that you were responsible for the vice president's

safety that day, what was going through your mind as you heard

glass break and began to see people entering the Capitol?

A.   I knew that these people did not belong in the Capitol,

that they obviously did not go through a screening process,

and I knew they were in close proximity to where our protectee

was and would be in close proximity to where we would need to

1    go if we relocated him.

2    Q.   So at some point did you determine that it was safe to

3    relocate the vice president?

4    A.   Yes.

5    Q.   Could we pull up Exhibit 303, please.  Government's

6    Exhibit 303.

7            THE COURT:  It's in evidence.

8            MS. MURPHY:  Your Honor, I don't believe this one is in

9    evidence --

10       (Government conferring.)

11           THE COURT:  I think it was admitted.

12           MS. MURPHY:  It was.  Thank you.  I stand corrected.

13       We can publish it, then.  Can we just play the first 13

14    seconds of the video, please?

15       (Video played.)

16    BY MS. MURPHY:

17    Q.   Special Agent Glavey, can you tell us what this video

18    depicts?

19    A.   This depicts the vice president and his family being

20    relocated.

21    Q.   Do you see the vice president in this still?

22    A.   Yes, I do.

23    Q.   Can you identify him?  You can actually draw on the

24    screen.

25    A.   Sure.

1    Q.   And who's directly in front of the vice president?

2    A.   His daughter, Charlotte Pence.

3    Q.   Will you draw her as well?

4         (Witness complies.)

5         And who is directly in front of Charlotte Pence?

6    A.   The second lady, Karen Pence.

7    Q.   Can you draw her as well?

8         (Witness complies.)

9         Now, will you explain to us where you would have been

10   standing during the course of this time period right here?

11   A.   I was all the way at the bottom of that stairwell.

12   Q.   So did eventually you meet up with the vice president

13   and his family as they came down the steps?

14   A.   Yes, I did.

15   Q.   Where did you go next?

16   A.   We relocated to a secure location within the Capitol.

17   Q.   And did you accompany the vice president to the secure

18   location?

19   A.   Yes, I did.

20   Q.   And do you recall how long you remained in the secure

21   location?

22   A.   Several hours.

23   Q.   Did you stay with the vice president the entire time?

24   A.   Yes, I did.

25   Q.   And is the secure location, did you testify that it was

1    within the Capitol?

2    A.   Within the Capitol.

3    Q.   At some point did the vice president return to the House

4    chamber?  Are you aware?

5    A.   Yes, he did.

6    Q.   And approximately what time was that?

7    A.   I would say approximately eight o'clock, in that range

8    I think it was.

9    Q.   And did the Secret Service at some point bring in

10   additional agents for the vice president's protection?

11   A.   Yes.  To help clear the building.

12   Q.   To help clear the building as well?  Around what time

13   was that, do you know?

14   A.   I don't know.

15   Q.   And do you recall what time the vice president left

16   the Capitol that evening?

17   A.   Sometime between 3:00, 4:00 in the morning.

18   Q.   What time did you leave the Capitol that evening?

19   A.   When he did.

20   Q.   As you testified, as of January 6 you'd been on the VP's

21   detail for three years?

22   A.   Yes.

23   Q.   In your 14 years of experience with Secret Service,

24   had your protectee ever come this close to danger as Vice

25   President Pence did that day?

1           MR. ROOTS:  Objection with regard to characterization

2      of danger.

3      BY MS. MURPHY:

4      Q.   Can you tell us, in your 14 years of experience with

5      the Secret Service, how the events of January 6 compared

6      or related in your experience with caring for and being

7      responsible for the safety of a protectee?

8      A.   In my 14 years of experience this was the first time I've

9      had a site breached by protesters.

10     Q.   And as the site agent assigned to the VP's detail that

11     day, how did you feel about the VP's safety and about your

12     safety when the breach occurred?

13     A.   I was concerned for his safety, but I knew what our plan

14     was, as well as our supervisor, so I was confident that we

15     could get him to safety.  But it certainly was a compromising

16     position we didn't want to be in.

17           MS. MURPHY:  Thank you, Special Agent Glavey.  I don't

18     have any further questions at this time.  I pass the witness.

19           THE COURT:  Mr. Roots.

20                        CROSS-EXAMINATION

21     BY MR. ROOTS:

22     Q.   Thank you, Special Agent Glavey.  My name is Roger Roots.

23     I'm representing these three defendants Jim Cusick, Casey

24     Cusick, and David Lesperance, along with my co-counsel, John

25     Pierce.  Thank you for coming.

1        So the Secret Service protects the president and the vice

2    president and their families?

3    A.    Correct.

4    Q.    What about others?

5    A.    Yes.  There are other protectees that can be designated

6    to have protection.  I usually try and just limit to vice

7    president, president, their immediate families, for not making

8    it confusing.

9    Q.    Okay.  So the process of designating a place to be

10   restricted, this process where the Secret Service can restrict

11   an area, sort of what we're talking about today in this

12   trial --

13        MS. MURPHY:  Objection, Your Honor.  That's outside the

14   scope of her testimony.

15        THE COURT:  I don't think she's testified to the

16   restrictions that were in place at the Capitol in terms of a

17   restricted area.  So I'll sustain the objection.

18   BY MR. ROOTS:

19   Q.    Okay.  So for the purposes of protecting a protectee, the

20   Secret Service can just send out an email and a place becomes

21   restricted?

22   A.    We can restrict when we know that a visit is going to

23   take place, and it would be restricted for the day of the

24   visit.  In the case of the Capitol, that is basically a mutual

25   agreement we have with the Capitol.  So for restricting the

1    Capitol, they would come up with a security plan.  The vice

2    president's detail did not enforce -- we did not have our

3    agents posted up at the Capitol.  It was Capitol Police that

4    was enacting the security plan and restricting access to the

5    public.

6    Q.    Okay.  You'd agree the U.S. Capitol is one of America's

7    largest public buildings.

8    A.    Correct.

9    Q.    It's several football fields long?

10   A.    Sure.  I don't know how long a football field is, but

11   yes, it's large.

12   Q.    So realistically, is it always necessary to close -- let

13   me just strike that.

14   A.    Okay.

15        MS. MURPHY:  Your Honor, I object to this entire line

16   of questioning.

17        THE COURT:  Let's see what the next question is.

18   BY MR. ROOTS:

19   Q.    Here's the question.  It isn't necessary to close a huge

20   building the size of the Capitol just to protect a protectee

21   at one end of the building, is it?

22        MS. MURPHY:  Objection, Your Honor.  Relevance and

23   outside the scope of her direct testimony.

24        THE COURT:  It is outside the scope, so I will sustain

25   the objection.  She has not testified and was not asked on

1    direct examination about the scope of restrictions in terms of

2    the buildings.

3         MR. ROOTS:  Okay.

4    BY MR. ROOTS:

5    Q.   Let's bring up Government's 302.

6         Okay.  This is a document you just testified about?

7    A.   Correct.  The Head of State Notification.

8    Q.   And you did testify about those -- the fact that the

9    agenda began at 12:30 or 12:55 and there was scheduled to be

10   events until 12:45, you recall that?

11   A.   No.  The events would take longer.  12:45 p.m. was just

12   departing his office, S-214.  So it was expected to arrive at

13   12:30 and then departure time from the Capitol was TBD.

14   Q.   Okay.  And you testified that TBD means what?

15   A.   To be determined.

16   Q.   So, you know, there's a lot of talk about the sanctity of

17   the certification process on January 6.

18        MS. MURPHY:  Objection, Your Honor.

19   Mischaracterization.

20        THE COURT:  A lot of talk.  I don't know what that

21   means, whether it's talk that's occurred here in the

22   courthouse or talk that is occurring on the street.  Let's be

23   more specific with your question.

24        MR. ROOTS:  I'll ask a better question.

25

1    BY MR. ROOTS:

2    Q.    To be determined, so there is no set schedule after

3    12:45 -- or I'm sorry, 12:55 -- 12:55 is the last time

4    specified on that worksheet.  Correct?

5    A.    Correct.  12:45.

6    Q.    And I believe you testified -- and it may be in this

7    small print down at the bottom -- that the Secret Service

8    actually anticipated that there would be challenges and

9    objections.

10    A.    That's correct.

11    Q.    And that those would be objections to the 2020

12    presidential election.

13    A.    Correct.

14    Q.    The Secret Service anticipated there would be objections,

15    didn't know when the process would end.

16    A.    That's correct.

17    Q.    And so, obviously, we all know there was a disruption

18    caused by the -- you could call them rioters, protesters,

19    what have you.  There was a disruption.  Correct?

20    A.    Yes.

21    Q.    And that disruption was somewhere between the hours

22    of about two o'clock or 2:13 and about eight o'clock?

23    A.    Correct.

24    Q.    So it's a six-hour interruption in the process.

25    A.    Yes.

1    Q.   In your experience, is a six-hour interruption in

2    congressional proceedings a bizarre thing?

3    A.   Yes.  It's not normal to have a six-hour interruption.

4    Q.   Congress never goes into recess?

5    A.   They may go into recess, but this wasn't a recess for

6    normal circumstances.

7    Q.   The first recess that was called out by the Secret

8    Service involved claims of pipe bombs in the area.  Correct?

9         MS. MURPHY:  Objection, Your Honor.  Outside the scope

10   of her direct examination and lacks foundation.

11        THE COURT:  I have a different question to ask you,

12   Mr. Roots.  And that is how much longer is your examination of

13   this witness going to take?

14        MR. ROOTS:  I could be finished fairly quickly.

15        THE COURT:  What's "fairly quickly" mean?  Lawyers say

16   that to me all the time.

17        MR. ROOTS:  I think I can be done in five minutes if

18   this witness just gives me what I want, yes-or-no answers.

19      (Laughter.)

20        THE COURT:  Well, I'm not requiring the witness to do

21   that.  But I am going to ask the jury whether, in order to

22   allow the witness to be completed today, you're willing to

23   stay for another five to 10 minutes.

24      All right.  Everybody seems willing to do that, so,

25   Mr. Roots, you may continue.

1          Now, the objection to the question is sustained.

2              MR. ROOTS:  Okay.

3      BY MR. ROOTS:

4      Q.   So bottom line, it was not known when this process was

5      scheduled to end.  It had no schedule for the end.

6      A.   That's correct.  It was to be determined.

7      Q.   Now, occasionally, I believe even in opening statement

8      which you weren't here for, there was the term "evacuation."

9      Congress never evacuated the Capitol on January 6, did they?

10     A.   I can't advise what they did.  I wasn't with Congress.

11     Q.   You mentioned that Vice President Pence was I think

12     relocated?

13     A.   Correct.

14     Q.   To a safe location within the Capitol.

15     A.   That's correct.

16     Q.   And as far as you know, there was never a time when a

17     single member of Congress was even in the same room as a

18     single rioter or protester that day.

19     A.   I can't advise from that day anything that any of the

20     Congress members did with the exception of the vice

21     president's brother.  He was with us.

22     Q.   Okay.  A few questions about the interface between the

23     Secret Service and the Capitol Police.  Is there a plan where

24     these two agencies designate the secure area of the Capitol --

25             MS. MURPHY:  Objection, Your Honor.  Outside the scope.

1      And a similar question was asked and you've already sustained

2      an objection about whether Secret Service coordinated with

3      Capitol Police on the restrictions.  She said --

4           THE COURT:  There's been an answer to that question, so

5      I don't think that outside the scope is an appropriate

6      objection and I will overrule the objection.  You may ask the

7      question and you may answer.

8        Do you remember the question?

9           THE WITNESS:  I don't know if -- were you finished with

10     the question?

11     BY MR. ROOTS:

12     Q.   Is there a written plan of the security plan for when the

13     vice president is there in the Capitol?

14          THE COURT:  For the security plan or the security area?

15          MR. ROOTS:  Security area.

16          THE WITNESS:  That I can't advise on.  I am -- again,

17     I was on the vice president's detail.  Our liaison division

18     may know that, and certainly upper management would know that,

19     but just as a working shift agent on the detail, that's not

20     part of my knowledge base.

21     BY MR. ROOTS:

22     Q.   But all you've provided, at least in this trial thus far,

23     is this email, and this email supposedly restricted the

24     grounds of the Capitol from the public?

25          MS. MURPHY:  Objection.  Inconsistent with her

1    testimony.

2             THE COURT:  Overruled.  You can answer.

3             THE WITNESS:  The email is providing the Head of State

4    Notification which, as you see, is a list of point of contacts

5    and an itinerary.

6    BY MR. ROOTS:

7    Q.   Let me ask you, when the president goes or the vice

8    president to a Washington Nationals game, for example, do

9    they restrict the arena?

10   A.   Yes.

11   Q.   And they do that with an email like this?

12   A.   No.

13   Q.   You said yes, they restrict the arena.  If President

14   Biden goes to watch the Washington Commanders play a game,

15   does that restrict the entire arena for the public?

16   A.   There would be restrictions in place and perimeters set

17   up, and it would likely, given that it's a game, be a ticketed

18   event.  So tickets would be required as well as a screening

19   process.  Then within the facility the restrictions would be

20   even further as far as where the protectee's movements are.

21   We would limit where the public could access.

22   Q.   Okay.  I think I will end right there.  Thank you so

23   much.

24   A.   Thank you.

25             THE COURT:  Ms. Murphy.

1                          REDIRECT EXAMINATION

2     BY MS. MURPHY:

3     Q.   Special Agent Glavey, you testified about the itinerary,

4     and in describing that, you testified that the times were TBD

5     because you anticipated there being some objections.  Can you

6     tell us who you anticipated objections from?

7     A.   Just from several states.  I can't recall which states.

8     Q.   But from members of Congress, correct?

9     A.   Correct.

10    Q.   And not from the public, but from congressional members.

11    A.   Yes.  That's correct.

12          MS. MURPHY:  Thank you.  I have no further questions.

13    Thank you.

14          THE COURT:  All right.  Thank you very much, Special

15    Agent Glavey.  You can step down.  We appreciate you coming.

16          THE WITNESS:  Thank you.

17       (Witness steps down.)

18          THE COURT:  And we will end for the day.  We'll resume

19    tomorrow morning.  Now, ladies and gentlemen, the same

20    instructions that I've given you before about not talking

21    about the case among yourselves or with anyone else still

22    apply.  You need to be bearing that in mind.

23       Also, when you come in the morning, you'll report to the

24    jury room like you did this morning, and please don't start

25    discussing the case now that you've started to hear the

1    evidence in the case.  Just save that for when you begin your

2    deliberations some days from now.  And in the meantime, no

3    research, no investigation, and have a good evening and we'll

4    see you in the morning ready to go at 9:30.  Thank you.

5         (Jury out at 5:08 p.m.)

6         THE COURT:  All right.  From the government's

7    perspective, how's your timing going?  We've only gotten two

8    witnesses in.  You've got a total of seven witnesses, but I'm

9    assuming that the way this case has been presented, Captain

10   Summers was probably the longest of your witnesses.

11        MR. VALENTINI:  Yes.  Captain Summers was and will be

12   our longest witness.  I think we're down to six witnesses

13   because of the resolution of the authentication question with

14   respect to the iCloud account.

15        THE COURT:  Which witness does that take off?

16        MR. VALENTINI:  Robert Blaine Pfannkuch.  And Officer

17   Chih is already off the list.  It's a total of six witnesses.

18        THE COURT:  So there's a total of six witnesses.  We

19   have Officer Cartwright, Special Agent Giardina, Task Force

20   Officer Miyasato, who's here today, and Task Force Officer

21   Strait.

22        MR. VALENTINI:  Exactly.  Yes.

23        THE COURT:  And is your hope that you'll be able to get

24   those remaining four witnesses completed tomorrow?

25        MR. VALENTINI:  Hope and plan.

1          THE COURT:  All right.  Good.  Anything we need to

2     discuss?

3          MR. VALENTINI:  Not from the government's side.

4          THE COURT:  Anything from the defense?

5          MR. PIERCE:  No, Your Honor.

6          THE COURT:  Since their plan is to complete the

7     evidence tomorrow, you need to be prepared to begin the

8     defense case tomorrow.

9          MR. PIERCE:  Yes, Your Honor.

10          THE COURT:  All right.  Good.  See you in the morning,

11     ready to go at 9:30.  Thank you.

12        (Proceedings adjourned at 5:11 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne