```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00575-JDB

v.                                Washington, D.C.
                                  Thursday, October 12, 2023
1- DAVID JOHN LESPERANCE,         10:00 a.m.
2- CASEY CUSICK,
3- JAMES VARNELL CUSICK, JR.,


                   Defendants.
- - - - - - - - - - - - - - - - x
```
_____

                   TRANSCRIPT OF SENTENCING
           HELD BEFORE THE HONORABLE JOHN D. BATES
                  UNITED STATES DISTRICT JUDGE
_____

**APPEARANCES:**

```
For the United States:  Francesco Valentini, Esq.
                        Sonia W. Murphy, Esq.
                        DOJ-CRM
                        Criminal Division, Appellate Section
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530
                        (202) 598-2337

For the Defendants:     John M. Pierce, Esq.
                        JOHN PIERCE LAW P.C.
                        21550 Oxnard Street
                        Suite 3rd Floor OMB #172
                        Woodland Hills, CA 91367
                        (213) 400-0725

                        Roger Roots, Esq.
                        10 Dorrance Street
                        Suite 700 #649
                        Providence, RI 02903
                        (775) 764-9347

Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111
```

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                    **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  We're on the record in Criminal

3     Case 21-575, United States of America v. Defendant 1, David

4     John Lesperance; Defendant 2, Casey Cusick; Defendant 3,

5     James Varnell Cusick, Jr.

6          Starting with Government counsel, may you please

7     approach the podium and state your appearance for the

8     record.

9          MR. VALENTINI:  Good morning, Your Honor.

10    Francesco Valentini for the United States.  Today at counsel

11    table with me are Co-Counsel Sonia Murphy as well as

12    Paralegal Josephine Roberts and Case Agent Walter Giardina.

13    Thank you.

14         THE COURT:  Good morning to all of you.

15         MR. PIERCE:  Good morning, Your Honor.  Nice to

16    see you again.  John Pierce and my co-counsel, Roger Roots,

17    along with --

18         THE COURT:  Oh, he's not counsel in this case, I

19    don't believe, unless he is --

20         MR. PIERCE:  We did -- so --

21         THE COURT:  I guess he is counsel in this case.

22         MR. PIERCE:  Yes, Your Honor.  And we just

23    realized that although you had nicely admitted him pro hac

24    vice at the trial, I was corrected that we didn't -- we

25    hadn't filed a notice of appearance.  So we just did that a

 1    few minutes ago.

 2                 THE COURT:  Okay.

 3                 MR. PIERCE:  So thank you for that.  And our

 4    paralegal Emily Lambert, along with the defendants,

 5    Mr. David Lesperance, Mr. Casey Cusick, and Mr. James

 6    Cusick.

 7                 THE COURT:  All right.  Good morning to all of you

 8    and welcome.  We're here today for sentencing in this matter

 9    following a jury trial.  At that trial, each of the

10    defendants was convicted on four counts.  We'll go over them

11    in a minute.

12                 So let me ask the first set of questions of you,

13    Mr. Pierce, and/or Mr. Roots, and that is whether you've

14    received the presentence report, had a chance to review it

15    with each of the defendants, and other than some issues that

16    have been noted with respect to the guideline calculation on

17    which I'll hear more in a moment, are there any remaining

18    issues in dispute?

19                 MR. PIERCE:  Yes, we have received that, Your

20    Honor, and we did have a chance to review those in detail

21    with each of the defendants.  Mr. Roots is going to,

22    whenever you're ready, address the issue you mentioned.  I'm

23    not aware that we have -- aside from whatever was filed in

24    terms of objections, we have any more issues that we need to

25    raise at this time.

1             THE COURT:  All right.  And same set of questions

2     for the Government.

3             MR. VALENTINI:  Nothing further from the

4     Government.

5             THE COURT:  All right.  I will accept the

6     presentence report as findings of fact on issues that are

7     not in dispute, and that's consistent with Federal Rule of

8     Criminal Procedure 32(i)(3)(A).

9             So as to Counts 1 and 2, the case does fall within

10    the Sentencing Reform Act of 1984 by which the Congress of

11    the United States created the United States Sentencing

12    Commission, and that Commission has issued detailed

13    guidelines --

14             (Noise from the gallery.)

15             THE COURT:  There seems to be some disagreement

16    with what I'm saying.

17             (Laughter.)

18             Just teasing.

19             The Sentencing Commission has issued guidelines

20    for judges such as myself to consider in determining the

21    sentence in a criminal case.  There are sentencing ranges

22    that have been set for specific offenses.  They're all

23    contained in the guidelines manual, but those guidelines are

24    not mandatory.  They are simply advisory, although they must

25    be consulted by the Court in determining the appropriate

1     sentence in this or any other case subject to the

2     guidelines.  And I will do that here.

3              I will assess and determine the proper sentence in

4     this case with respect to Counts 1 and 2 by referring to and

5     considering the sentencing guidelines, along with all other

6     relevant factors pursuant to Title 18 of the U.S. Code

7     Section 3553(a).  But the sentencing guidelines will be

8     treated as advisory, not mandatory, and there's no

9     presumption that a guideline sentence is the correct

10    sentence.

11             With respect to Counts 3 and 4, the guidelines do

12    not apply because those are Class B misdemeanors and we will

13    not be making any guideline calculation with respect to

14    those.

15             So we're here today because each of the

16    defendants, as I said, has been found guilty by a jury

17    following trial on four counts.  Those counts are Count 1,

18    entering and remaining in a restricted building or grounds,

19    in violation of Title 18 of the U.S. Code Section

20    1752(a)(1); Count 2, disorderly and disruptive conduct in a

21    restricted building or grounds, in violation of Title 18 of

22    the U.S. Code Section 1752(a)(2); Count 3, disorderly and

23    disruptive conduct in a Capitol building, in violation of

24    Title 40 of the U.S. Code Section 5104(e)(2)(D); and Count

25    4, parading, demonstrating, or picketing in the Capitol

1     building, in violation of Title 40 of the U.S. Code Section

2     5104(e)(2)(G).

3          So my first obligation is to make a guideline

4     calculation with respect to Counts 1 and 2.  And I do so for

5     each defendant individually, but there's not really a

6     difference as it plays out between the defendants, and that

7     is reflected in the fact that the Probation

8     Office presentence reports for each defendant does the same

9     guideline calculation.  The Government has not suggested a

10    different guideline calculation among the defendants, nor

11    have the defendants suggested that.

12         The 2021 guideline manual applies here and is

13    used, and what I'm going to do is review what the Probation

14    Office calculation is; then I will hear any objections and

15    arguments from counsel before I make my determination.

16         So Counts 1 and 2 are grouped, and what that means

17    is that we -- and they're grouped because they involve a --

18    the same victim and acts or transactions that are connected

19    by some common criminal objective or constituting part of a

20    common scheme or plan or transaction, and that's consistent

21    with Section 3D1.2(b) of the guidelines, and the offense

22    level as it plays out is the level applicable to the most

23    serious of the counts.  In other words, the offense level

24    for the group is the offense level determined under the

25    guidelines for the most serious of the counts, and here

1    that -- as the Probation Office has calculated it, that

2    highest offense level is produced by Count 2.

3            Count 2, the disorderly and disruptive conduct in

4    a restricted building or grounds, in violation of Section

5    1752(a)(2) of Title 18, has a guideline that is found at

6    Section 2A2.4 of the guidelines, which relates to

7    obstructing or limiting officers in the performance of their

8    duties, and the base offense level for that under 2A2.4 is a

9    Level 10.  There are no adjustments to that, either upward

10   or downward, and the reason there's no downward adjustment

11   is because the defendant -- each of the defendants is not --

12   does not get any credit for acceptance of responsibility.

13   They decided, as is their right, to proceed to trial.  They

14   raised factual issues with respect to the charges against

15   them and, on that basis, a defendant is not entitled to a

16   downward adjustment for a clear demonstration of acceptance

17   of responsibility.  And so there's no acceptance of

18   responsibility adjustment.  That means that the total

19   offense level as calculated by the Probation Office is a

20   Level 10.

21           Having said that, I'm now going to turn to first

22   the Government -- I doubt the Government will have much to

23   say -- and then the defense.  And, I guess, then I'll

24   give -- once the defense makes its argument, I'll give the

25   Government a chance to respond and the Probation Office a

1    chance to respond to any argument that the defense has made.

2           Is there anything preliminarily that you wish to

3    say, Mr. Valentini?

4           MR. VALENTINI:  No, Your Honor.  Nothing

5    preliminary.  We agree with the guidelines computation set

6    forth in the final PSR.  Of course, we welcome the

7    opportunity to respond to any argument that is made with

8    respect to the guidelines applicable to Count 2.  Thank you,

9    Your Honor.

10          THE COURT:  All right.  And it will be Mr. Roots?

11   Good morning.

12          MR. ROOTS:  Good morning, Your Honor.  Thank you.

13          Yeah, we do have that objection about the

14   applicable guideline on Count 2.  The Government is -- and

15   the -- I believe the Probation Office are seeking to apply

16   the guideline range that applies to, really, assaults,

17   assaulting officers, opposing, resisting officers.  We

18   believe that the proper guideline is the guideline that

19   applies to trespassing which is most consistent with the

20   facts in this particular case.

21          THE COURT:  Has any judge applied that?  My sense

22   is that almost uniformly -- and perhaps uniformly -- the

23   judges on these 1752(a)(2) counts and the Probation Office

24   as well, obviously, has applied the 2A2.4 guideline.  Is my

25   understanding wrong?

1          MR. ROOTS:  I don't know of -- I honestly don't

2     know the landscape of the cases -- these other cases on that

3     topic.  I have seen that in some other January 6th cases,

4     but I -- that upper guideline, the guideline suggested by

5     the Government, and, as you said -- pointed -- as you

6     pointed out, it is -- has been applied in other cases,

7     really involves as its most emphasized point some conceptual

8     fact of resisting/opposing law enforcement.  The facts in

9     this case simply do not involve that.  These guys mostly

10    were convicted by the jury for being present.  They walked

11    into the Capitol; they were essentially in the wrong place

12    at the wrong time; and, you know, the --

13          THE COURT:  I'm not going to accept the

14    characterization of them being in the wrong place at the

15    wrong time.  They made their choices.

16          MR. ROOTS:  Sure.

17          THE COURT:  But I understand your argument.

18          MR. ROOTS:  Yeah.  There was no fact that was

19    elicited or that came out before the jury indicating that

20    any of these three gentlemen opposed, resisted law

21    enforcement.  They didn't yell at law enforcement.  They had

22    no confrontations with law enforcement.

23          THE COURT:  That is true.  The record does not

24    reflect any active engagement with law enforcement by any of

25    the three defendants.

1          MR. ROOTS:  And so I think the more appropriate

2     guideline is the guideline that applies to trespassing.  The

3     fact that they were there as part of this, sort of, mob,

4     this large, huge demonstration.  At times, it became a riot,

5     but not by these gentlemen.  There were rioters amidst the

6     demonstrators.  And so the guideline range that applies to

7     18 U.S. Code 111, which is assaulting officers, should not

8     apply to a misdemeanor disorderly conduct.  And that's our

9     position.

10          THE COURT:  All right.  And I understand the

11     argument.  Thank you, Mr. Roots.

12          MR. ROOTS:  One other thing that we also object to

13     is this idea of restitution.  The PSR has, you know --

14     somewhere in there, it says statutorily required

15     restitution.  Now --

16          THE COURT:  Well, there are two provisions for

17     restitution.  There's 3663 and 3663A.  One's mandatory;

18     one's discretionary.

19          MR. ROOTS:  Well --

20          THE COURT:  Both -- they both authorize

21     restitution.

22          MR. ROOTS:  Yeah.  We would argue that

23     constitutionally, it would be a violation of due process to

24     issue a restitution order.  These guys damaged no property.

25          THE COURT:  Why is that?

```
 1              MR. ROOTS:  The Due Process Clause.  These guys
 2     damaged no property.  They were involved in the damaging of
 3     no property.  And so --
 4              THE COURT:  But they've gotten process.  They're
 5     getting process here today.  They're getting a hearing,
 6     including consideration of an award of restitution.  How is
 7     there a due process violation?
 8              MR. ROOTS:  Well --
 9              THE COURT:  You're talking about a substantive due
10     process violation?
11              MR. ROOTS:  We're talking about a constitutional
12     violation.  If --
13              THE COURT:  Well, there's procedural due process
14     and substantive due process.  Which is it that you're
15     arguing?
16              MR. ROOTS:  Let me think about that.  I'd have to
17     think about that, Your Honor.  I'd -- we'll rely on the
18     papers on that.  I just have to -- I would have to --
19              THE COURT:  There's nothing --
20              MR. ROOTS:  -- think about it.
21              THE COURT:  -- in the papers --
22              MR. ROOTS:  I think it would be -- it might be a
23     little bit of both, but I'd say procedural.  It might be a
24     little bit of both.
25              THE COURT:  Here's your process.  You're having
```

1      a --

2                  MR. ROOTS:  Well --

3                  THE COURT:  -- hearing.

4                  MR. ROOTS:  Well, then it would be substantive,

5      then.  All right.  You know, bottom line -- I guess what I'm

6      trying to say is that these guys cannot be punished with

7      damage -- an assessment of damage to property that they

8      didn't cause; that they didn't do.  So essentially, any

9      restitution order would be punishing them for the damage

10     caused by other people, and we just believe that's a

11     violation.

12                 THE COURT:  All right.  Thank you, Mr. Roots.

13                 MR. ROOTS:  Thank you.

14                 THE COURT:  Mr. Valentini?

15                 MR. VALENTINI:  Thank you, Your Honor.

16                 I just wanted to briefly respond -- or respond to

17     the argument with respect to the guidelines which is

18     applicable to Count 2.  I don't think I can offer anything

19     that is more succinct or on point than Judge Moss's

20     explanation in *United States v. Vargas Santos* recently.  We

21     have submitted a transcript of that hearing -- sentencing

22     hearing to the Court.

23                 But in a nutshell, the Sentencing Commission made

24     clear that at least some violations of 1752 would implicate

25     the application of the guidelines that Probation Office

1    found applicable in this case, which is 2A2.4.  It's

2    clear -- the parties agree that violations of (a)(1) do not

3    require application of that guidelines because (a)(1) is a

4    trespass violation.  As for the other provisions, they all

5    have in common -- they -- none of them requires the

6    identification of a specific officer who is obstructed, but

7    especially (a)(2) is on point because it does require proof

8    of an intent to disrupt government business or an official

9    government function.  Official government function,

10   official -- obstruction of a government function implies in

11   most cases -- and, certainly, in this case -- the

12   obstruction of a particular officer.

13            I am happy to address any other wrinkle of that

14   argument.  Judge Moss's explanation in *Vargas* is exhaustive,

15   but to the extent the Court has any questions, we welcome

16   the opportunity to respond.

17            THE COURT:  You can go and address restitution.

18            MR. VALENTINI:  Yes.  With respect to restitution,

19   we don't take the position that restitution is mandatory

20   under the mandatory statutory provision, but it is available

21   as a matter of discretion in this case.

22            There's some reference, though it was not repeated

23   here today, to the fact that perhaps restitution -- there's

24   not, you know -- restitution's not available because the

25   causal link is not established in this case, but the United

1    States Supreme Court decision in *Paroline* is on point.

2    There has to be, in fact, causation.  There has to be

3    proximate causation.  But, in fact, causation can be

4    aggregate, in fact, causation and that is precisely what

5    happened in the context here of a mob whose individual

6    components participate and in the aggregate are -- caused --

7    in fact, cause -- even if not every single individual is a

8    but-for cause, in the aggregate they become the, in fact,

9    factual cause of the damage that was suffered.

10          We've actually submitted in this case documentary

11   proof of the damages, support for that estimate in the PSR.

12   We -- I've heard nothing from my friend on the other side

13   about the -- why *Paroline* would not be applicable.

14          And finally, as to any due process violation, I

15   think they're getting due process today, as Your Honor

16   mentioned, and I am not aware of any component of the

17   substantive due process jurisprudence that will be

18   applicable in this case.

19          THE COURT:  All right.  Thank you, Mr. Valentini.

20          MR. VALENTINI:  Thank you.

21          THE COURT:  Does the Probation Office wish to

22   offer anything with respect in particular to the guideline

23   application of 2A2.4 to Count 2?

24          THE PROBATION OFFICER:  Thank you, Your Honor.

25          No, nothing further than what has already been

1    stated in the addendum to the presentence report.

2              THE COURT:   Thank you.

3              All right.   So my calculation mirrors that of the

4    Probation Office that the Government has agreed to, as well.

5    The only issue with respect to the guideline calculation

6    that's been raised here is the application of 2A2.4, and I

7    think that the overwhelming view of the judges of this

8    court, including Judge Moss, supports the use of 2A2.4 and I

9    don't need to add anything further to that series of

10   citations, including citations to my conclusions in other

11   cases.   So I will apply -- on the Count 2 calculation, I

12   will apply 2A2.4, and that means that the base offense level

13   is 10 and results in a total offense level here of 10, as

14   well.

15             I'll save restitution for a little later, but I

16   appreciate the arguments from both sides on it.

17             With respect to criminal history, for -- I'm going

18   to use the following -- well, I'll use the full names.   So

19   James Cusick, no past convictions; no criminal history

20   points; and criminal history category is the lowest

21   category, I.

22             David Lesperance, the same thing.   No past

23   criminal convictions and the lowest category.

24             There is one past conviction, and indeed it was

25   discussed in the trial, with respect to Casey Cusick.   It's

1    reflected in Paragraph 51 of the presentence report relating

2    to Casey Cusick and would assign one criminal history point,

3    although it would still leave Casey Cusick in the lowest

4    criminal history category, Category I.  I've looked at that.

5    It's a serious matter, obviously.  It was discussed at

6    length during the trial both by Mr. Cusick and by his wife,

7    Ruth Cusick.  I've concluded that notwithstanding the fact

8    that it is a very serious matter, a criminal history point

9    should not be assessed because Mr. Cusick did not face --

10   the offense did not result in a sentence greater than 30

11   days of incarceration or one year of probation and it is

12   not, in my view, similar to the instant offense.  The

13   Probation Office concluded that it was similar to the

14   instant offense.  My conclusion is that it is not similar to

15   the instant offense.  And that means that it -- the one

16   point -- one criminal history point is not assigned for that

17   past conviction.

18            And that leaves Mr. Cusick, like the other two

19   defendants, in the lowest criminal history category,

20   Category I, but, really, it doesn't matter because he'd be

21   in that lowest category anyway even with one criminal

22   history point.  I say it doesn't matter.  It matters a

23   little, but it doesn't matter in terms of changing his

24   criminal history category.

25            There was an issue raised somewhere in the papers

1    by the defense with respect to Count 1, the 1752(a)(1)

2    count, a challenge to the use of 2A2.2, but to the extent

3    that that is raised -- and it may not really be raised as

4    things have played out -- it's irrelevant to the guideline

5    calculation.  So I won't address that.

6            Another thing that has been raised is the

7    applicability of what I'll call the new 4C1.1.  For

8    defendants who have no criminal history points, it is not

9    yet applicable.  It has not been -- it's not effective in

10   terms of the passage of that provision.  So it's not

11   applicable today.  Each of the defendants can raise it in

12   the future when the time -- effective date comes if they

13   qualify and it matters.  It may be, as we run through the

14   sentencing here today, that it's not going to matter anyway,

15   but I'm not going to apply it here today because it is not

16   yet applicable and you can raise it -- each of the

17   defendants can raise it at a later date.  And all three are

18   in the same situation, because Mr. Cusick, I have decided --

19   Casey Cusick -- does not have a criminal history point.  So

20   he would be in the same situation as the other two

21   defendants with respect to the applicability in the future

22   of 4C1.1.

23           Where does that leave us?  The guideline range for

24   imprisonment based on a total offense level of 10 and a

25   criminal history category of I is 6 to 12 months.  I will

1    say now for everyone's benefit that even if the offense

2    level here instead of 10 were 6 and, therefore, there was a

3    range for sentencing under the guidelines of 0 to 6 months,

4    I don't think it would make a difference in terms of the

5    sentence that I am going to impose, but I'll save that for

6    when I do impose the sentence.

7          So other than what's already been stated and

8    argued, any objection to my conclusions as to the

9    appropriate offense level, criminal history category, and

10    advisory guideline range under the sentencing guidelines

11    from the Government?

12          MR. VALENTINI:  No, Your Honor.  No objection.  I

13    would note that in the sentencing memoranda, the defendants

14    have also, I think, requested the application of a reduced

15    role or minor role adjustment under 3B1.2.  We oppose the

16    application.  And I understand that from the Court's

17    analysis that that request has been denied, but I just

18    wanted to --

19          THE COURT:  It's not a request that has been

20    fleshed out very much and argued here today.  And indeed

21    you're right, Mr. Valentini.  I am not going to apply any

22    adjustment based on that argument by the defense.  That has

23    been noted in their papers but has not been pursued with any

24    vigor, and I don't think that it is an argument that has any

25    merit.

1          So beyond that, then, to you, Mr. Pierce and

2     Mr. Roots, any objection other than what's already been

3     stated and argued as to the offense level, criminal history

4     category, and advisory guideline range calculations?

5          MR. PIERCE:  No further objection, Your Honor.

6     Thank you.

7          THE COURT:  All right.  As I've said, the

8     sentencing guidelines are advisory with respect to Count 1

9     and Count 2.  They're not applicable at all with respect to

10    Counts 3 and 4.  But they will be considered fully by the

11    Court, along with all other relevant factors.

12         So at this point, I think I will hear further from

13    first the Government as to each defendant; then from the

14    defense as to each defendant; and then if any or all of the

15    defendants, Casey Cusick, James Cusick, David Lesperance,

16    wish to address the Court, I'll be happy to hear from them.

17         So we'll start with you, Mr. Valentini.

18         MR. VALENTINI:  Thank you, Your Honor.  And I will

19    note that I will allocute on behalf of the Government with

20    respect to Mr. Lesperance first and then Ms. Murphy will

21    allocute briefly with respect to the other defendants, if

22    that is agreeable to the Court.

23         THE COURT:  I'll allow you to do that.

24         MR. VALENTINI:  Thank you, Your Honor.

25         The Government recommends a sentence of seven

1  months of imprisonment and one year of supervised release in

2  this case.  This is a substantial sentence, we recognize,

3  but is well within the guidelines range computed by the

4  Court in this case.  And it is, in fact, very near the

5  bottom of the sentencing range of 6 to 12 months that the

6  Court has computed and found applicable in this case.

7          As we explained in our sentencing memoranda,

8  Mr. Lesperance's conduct on January 6th was serious.  It was

9  not -- contrary to what the defense argues -- quote, the

10  least culpable -- among the least culpable of all January

11  6th defendants.  This case could have easily been charged,

12  based on what has transpired at trial, as a violation of 18

13  U.S.C. 1512, which is a felony, and it warrants a

14  substantial sentence.

15          The Court presided --

16          THE COURT:  Might have easily been charged with

17  that.  I'm not so sure it would have easily resulted in a

18  conviction for that.  But go ahead.

19          MR. VALENTINI:  The Court has presided over the

20  trial, and I -- we're not going to play, again, all the

21  videos that were offered into evidence, and the Court has

22  listened to those videos, has watched those videos, but I do

23  want to highlight some key points.  And the first key point

24  goes back to the comment that Your Honor just made with

25  respect to other offenses that could have been but have not

1    been present in this case and there's been no conviction and

2    no finding of guilt as to that -- as to those.

3         The first factor is that -- is Mr. Lesperance's

4    true intent, his knowledge and his motive on January 6th.

5    We now know, based on what Mr. Lesperance said on

6    cross-examination at trial, that on January 6th, he engaged

7    in disorderly conduct at the Capitol, but he didn't do so

8    aimlessly.  He knew full well at the time that the

9    certification of the Electoral College was going to take

10   place at that point, at that time, and at that place, and

11   that is the heart -- and that goes back to the point I made

12   before with respect to other charges were not pursued -- but

13   that is the heart of a charge under 1512, which was not --

14   again, not pursued in this case, but --

15        THE COURT:  Most of the 1512 charges that I've

16   seen involve more than just knowledge that the certification

17   was going to take place, but evidence of an intent to

18   interfere with that certification.  There's very little in

19   terms of social media here that shows any kind of intent or

20   purpose.  There's no activity on January 6th that would show

21   a real intent to do so.

22        They -- each of them -- Mr. Lesperance and the

23   others -- were in the Capitol for less than 15 minutes.  I

24   think 15 minutes for two of them and 11 minutes for James

25   Cusick.  No violence, no property damage.  It does seem to

 1   me that they're pretty low -- I'm not agreeing with defense

 2   counsel's representation that they were among the least

 3   culpable, but they're pretty low on the scale in terms of

 4   their involvement and there's very little to show that they

 5   were -- there's plenty to show, their own testimony, that

 6   they knew that the certification was to take place.  There's

 7   very little to show before, on, or after January 6th, an

 8   intent to interfere with that.

 9            MR. VALENTINI:  Your Honor, I will push back on

10   that a little bit, and here's why --

11            THE COURT:  That's your job.

12            MR. VALENTINI:  There is evidence -- in fact,

13   conclusive evidence; admissions, as Your Honor noted -- at

14   trial that Mr. Lesperance knew that the certification of the

15   Electoral College was going to happen at that place and that

16   time, and despite that and despite contemporaneous

17   evidence -- seeing people climbing the walls of Congress,

18   unmistakable signals, signs, evidence that there was a riot

19   going on -- they went into the Capitol, and when a rioter

20   knows that a certification is supposed to happen at that one

21   place and at that one time and, nonetheless, decides to --

22   with full volitional, intentional conduct, to go into the

23   Capitol at that very -- on that very day, at that point, at

24   that time, well, then the inference -- the rational

25   inference that a trier of fact can certainly draw is that

1      the intent of that rioter is to interrupt the certification

2      of the Electoral College.

3              The only way in which one could, in theory, not

4      have that intent, if it somehow cannot put two and two

5      together that by participating in a riot at the very place

6      and the very time when the certification of the Electoral

7      College is set to happen, well, that wouldn't get in the way

8      of the certification happening, but that is a far-fetched

9      inference and we think that the better inference is that if

10     a rioter knows and has contemporaneous knowledge of the

11     certification of the Electoral College at that -- was

12     supposed to happen at that place and at that time and

13     decides to go ahead and intentionally enter the Capitol, the

14     rational inference is that the intent of that person is to

15     interfere with that certification.  So that is the first

16     factor that I think --

17              THE COURT:  It is, however, just an inference.

18     There isn't really evidence of the kind that I have been

19     describing.

20              MR. VALENTINI:  Well, as Your Honor instructed the

21     Court [sic] in this case -- and the courts always instruct

22     the juries --

23              THE COURT:  Juries can draw a reasonable --

24              MR. VALENTINI:  Juries can draw inference from --

25     a reasonable inference -- I'm sorry -- from circumstantial

1    evidence.

2          Now, we are sometimes spoiled by the abundance of

3    social media evidence and direct evidence of intent, but

4    there's no requirement that the evidence of intent be direct

5    or someone be on social media to fully support the inference

6    of an intent to interfere.

7          THE COURT:  Mr. Valentini, I think we're just in

8    the situation that one would anticipate, and that is that

9    you're arguing the Government could have brought that case.

10   The Government didn't.  Probably, it didn't for the very

11   reasons that we're discussing here today.  And you,

12   nonetheless, think that the sentencing should take account

13   of the fact that he really participated in conduct that

14   would warrant that kind of charge and conviction.

15          MR. VALENTINI:  Just a slight nuance.  We are just

16   arguing that that should be, at the margin, an aggravating

17   factor.

18          But I do want to move on to other factors that we

19   think are significant, including how -- what Mr. Lesperance

20   did and how he approached the Capitol and what -- every

21   piece of evidence that was before his eyes as he entered the

22   Capitol and what he saw.  He saw rioters, again, climbing

23   the walls of Congress and he kept going.  He saw officers

24   converging on the Capitol Building and he kept going.  He

25   saw shattered glass at the threshold of the Senate wing door

```
1    and he kept going.  He undoubtedly smelled the pepper spray
2    that his co-defendant shouted out about to his dad and he
3    kept going.  He saw a line of police officers inside the
4    Senate wing lobby and he kept going.  So those are all
5    aggravating factors.  This is not someone who happened to
6    enter the Capitol as a place -- if ever there could be such
7    a person on January 6th where, maybe, the evidence was
8    unclear --
9         THE COURT:  Had blinders on and didn't see
10   anything.
11        MR. VALENTINI:  Exactly.
12        The third factor that I did want to highlight
13   today is that Mr. Lesperance also recorded and repeatedly
14   derided what he saw.  Like, I -- again, I'm not going to
15   repeat or I'm not going to play any video evidence.  The
16   Court watched those videos.  It heard that evidence.  But
17   among other things, as Mr. Lesperance approached the
18   Capitol, he shouted out things -- "Do the inauguration in
19   the basement," which, by the way, that, too, comes very
20   close to the certification proceeding and the institutional
21   implications of what was happening that day.  He also said,
22   "Woo-hoo.  All right.  Come on down, an open house."  He
23   said, "Look, ma, your trouble-making son at it again."  And
24   he said, "Now, this is doing it bigly."  Those statements
25   underscore the mental state and sort of the intent of the
```

1    defendant as he approached the Capitol which he ultimately

2    entered unlawfully.

3           The fourth factor is -- the fourth -- another

4    factor that I wanted to highlight today is the fact that

5    Mr. Lesperance, after the fact, deleted or admitted to

6    deleting -- admitted in an interview with the FBI to

7    deleting some videos that he had recorded on January 6th.

8    That, too, is an aggravating factor.

9           And, finally, I wanted to highlight another aspect

10   of his interview with the FBI on January 19th, 2021.  As the

11   Court heard at trial, Mr. Lesperance initially suggested

12   that he got to the threshold of the Capitol and then he saw

13   people going in and out but that -- implying that he didn't

14   go in.  It's only later that he admitted that he actually

15   went in.

16          He also implied that he was going in because he

17   needed to use the restroom, but, in fact, the evidence at

18   trial underscores that he did not use the restroom.  One of

19   the other co-defendants attempted or did use the restroom

20   inside the Capitol.  Mr. Lesperance did not.  And when he

21   exited the Capitol, they stood out there in the January cold

22   weather as, I think, the evidence at trial showed of -- for

23   another -- almost another hour -- not quite another hour,

24   but almost another hour on the upper west terrace.  And,

25   again, the fact -- last fact that I wanted to highlight;

1    that he did stay out there on the upper west terrace until

2    Civil Disturbance Unit cleared the west terrace of all the

3    rioters.

4           In sum, Your Honor, Mr. Lesperance's conduct on

5    January 6th was serious, it was reckless, and it was

6    dangerous.  And there is indication, including from some of

7    the testimony at trial, that the defendant has not learned

8    from his mistakes.  For that reason, we think that a

9    sentence within the applicable guidelines range -- in fact,

10   close to the bottom of the guidelines range -- of seven

11   months of incarceration and one month -- one year, excuse

12   me, of supervised release is appropriate in this case.

13          Unless Your Honor has any questions, I would

14   submit.

15          THE COURT:  You referenced, I think, two cases in

16   your sentencing memo with respect to each of the defendants

17   for comparative purposes, but when I look at the total body

18   of cases for individuals with the kinds of considerations

19   that you've mentioned, but who nonetheless were only charged

20   with these misdemeanors, were only in the Capitol for a

21   short period of time -- and that's true for each of these

22   defendants, certainly for Mr. Lesperance, who we're talking

23   about right now; engaged with no violence; no property

24   damage; no confrontations with police; had no social media

25   of a concerning nature.  I think it's fair to say that

1    generally such a defendant has not gotten a period of

2    incarceration and certainly not a substantial period of six

3    months or more.  Am I wrong in my assessment?  I know you've

4    picked out two cases to compare with, but I'm comparing with

5    the entire body, and the entire body of cases seems to me to

6    pretty strongly -- I'll almost say overwhelmingly --

7    indicate that the typical sentence is a non-incarceratory

8    sentence.

9              MR. VALENTINI:  Your Honor, I think that the body

10   of cases that did not result in a term of incarcerations are

11   different in kind.  Those tend overwhelmingly to involve

12   guilty pleas and instances in which -- well, not many of

13   those involved actually convictions of 1752 offenses.  Most

14   of them involved convictions under 5104 which is, obviously,

15   a different --

16             THE COURT:  A substantial number do, but not all.

17             MR. VALENTINI:  Not all.  There has been some

18   guilty pleas to 1752 offenses, to be sure.  But those cases,

19   again, involve -- I want to differentiate -- distinguish

20   immediately between cases that involved an acceptance of

21   responsibility and the benefit that flows from that

22   acceptance of responsibility under the guidelines and under

23   our criminal system and cases that don't.  And the two cases

24   that we cite in our memorandum are -- memoranda are some of

25   the few cases that involved only misdemeanors that result in

1    convictions after trial.  A lot of those cases did not go to

2    trial.  That is not to say that some other cases that --

3    misdemeanor cases that result in convictions after trial

4    resulted in sentences below six months.  For instance, the

5    Vargas case is not cited as a comparator in our memorandum,

6    but we have talked about it today.  That case -- in that

7    case, Judge Moss imposed a sentence, I believe, of four

8    months.

9         By and large, my understanding is -- and I don't

10   have the complete body of cases before me at this time, but

11   my understanding is that the cases that resulted in

12   misdemeanor convictions after trial by and large did result

13   in terms of incarceration.  So I want to distinguish those

14   cases.

15        And as to the other two --

16        THE COURT:  And you think that's because -- not

17   because someone is punished for exercising their

18   constitutional rights to go to trial but because, under the

19   guidelines, they get some benefit and, therefore, there's a

20   lower guideline calculation.

21        MR. VALENTINI:  Right.  No, there's no punishment

22   for going to trial at all, but there is a benefit that our

23   system and the guidelines can afford for those who have

24   accepted responsibility and, frankly, those who have showed

25   remorse.  We have neither of those things in this case.  And

1    so that benefit that was accorded to those defendants

2    doesn't really carry over to these cases.

3                THE COURT:  All right.

4                MR. VALENTINI:  And as to those two cases that are

5    cited in our memorandum, one of them especially, it is true

6    there is aspects, like social media involvement and other

7    statements -- perhaps some of the conduct on that day,

8    too -- that are more aggravated, but that case also resulted

9    in a sentence of one year of incarceration.  That's

10   the Alford case.  That's not what we are asking here.  We

11   are asking for seven months for Mr. Lesperance.

12               THE COURT:  All right.  Thank you, Mr. Valentini.

13               MR. VALENTINI:  Thank you.

14               THE COURT:  Ms. Murphy?

15               (Brief pause.)

16               Good morning.

17               MS. MURPHY:  Good morning.  Thank you, Your Honor.

18               As the Court -- you have read our sentencing memo

19   and you also sat through the trial.  So I will try not to

20   repeat things, as well.

21               But with respect to defendant Casey Cusick, we are

22   asking for nine months of incarceration and one year of

23   supervised release, and I'd just like for a moment to focus

24   the Court's attention on his actions and accountability.

25               With respect to actions, he testified before Your

1    Honor here that he was aware of the certification taking

2    place on January 6th.  As we've already discussed, he

3    ignored all of the very obvious signs that a riot was taking

4    place at the Capitol, and notably with respect to

5    Mr. Cusick, he testified that he'd been to the Capitol

6    before; that he'd come to the Capitol several times on tours

7    with his father, which speaks to understanding the sanctity

8    of the Capitol as well as the normal security protocols that

9    would be in place at the Capitol.

10            With respect to actions as well, unlike some of

11   the misdemeanor defendants, I think, that Your Honor's

12   referring to, while the time in the Capitol was brief, the

13   defendant walked the span of the entire Capitol Building

14   outside of the two chambers that had to be evacuated because

15   there were rioters in the building.  So they came in the

16   Senate wing door and walked the length of the Capitol past

17   the house wing door.  They also passed numbers -- scores of

18   police officers, both outside on the terrace and still

19   decided to persist and come in.  There were police officers

20   at the door when defendant Casey Cusick entered that he saw,

21   pointed to, and pointed in the opposite direction and turned

22   and moved away from those officers.

23            They passed police officers on their walk across

24   the Capitol Building after they passed the crypt and went

25   towards the House wing door.  They saw more police officers,

1     turned around.  After scaling the entire length of the

2     building, faced additional officers at the door, and outside

3     on the upper west terrace.  So I think it's disingenuous to

4     say that there was not obvious signs that there was a riot

5     taking place at the Capitol.

6               Further to that, Your Honor, and on the point of

7     accountability, I note that similar to -- although not

8     social media, there are podcasts -- very clear podcasts that

9     defendant Casey Cusick has participated in, as well as

10    hosted himself where he's talked --

11              THE COURT:  What of concern was said during that

12    podcast?

13              MS. MURPHY:  Well, he was disingenuous in that he

14    said he went inside because he needed to use the bathroom,

15    which the evidence at trial showed that he actually did not

16    use the bathroom, and not only did he not use the bathroom

17    but, then, stood outside for another hour in the cold.  So

18    clearly, it was disingenuous to suggest that the reason for

19    entering inside the Capitol Building was to use the

20    restroom.

21              And I relate that back, Your Honor, especially to

22    the fact that he'd been to the Capitol before, you know?

23    Some of our misdemeanor defendants we've talked about in

24    these cases will argue that they don't know the difference

25    between the Capitol and the White House.  They got caught up

1    in the crowd.  That's not what we're dealing with here.

2         The defendants each testified that because

3    of Mr. Lesperance's leg, they took their time and

4    walked purposefully and willingly towards the United States

5    Capitol Building.  They knew where they were.  They knew

6    they were at the Capitol.  And they saw scores of obvious

7    signs.

8         And in these podcasts, Mr. Cusick has not accepted

9    any responsibility or shown any remorse or regret for his

10   actions on January 6th.  And for that reason, we do believe

11   that a significant period of incarceration of nine months --

12   which is within the guidelines, right at the mid-range of

13   the guidelines -- is indeed appropriate, Your Honor.

14        THE COURT:  All right.  Thank you.

15        MS. MURPHY:  Likewise, with respect to Defendant

16   James Cusick, Your Honor, I just note, again, with respect

17   to actions and accountabilities, Mr. Cusick was -- he

18   testified that he has strong feelings about the

19   irregularities, in his view, in the 2020 presidential

20   election and knew on January 6th that the certification was

21   taking place.  Nevertheless, he persisted.  He also ignored

22   all of the signs of a riot.  And, importantly, he testified

23   that he himself had been to the Capitol over a dozen times;

24   that he brought school-aged children to the Capitol and

25   hosted tours.  So again, it speaks to awareness of the

1   sanctity of the Capitol Building and the security protocols,

2   all of which were being ignored during the riot.

3          I think very important with respect to Defendant

4   James Cusick is he is an ordained minister, a leader,

5   obviously, in the community and role model who, again,

6   testified that he brought school-aged children to the United

7   States Capitol.  So he was well aware that what he was

8   seeing at the Capitol was not lawful or appropriate

9   behavior.  And, importantly, he participated in a podcast on

10  Father's Day months -- not even months, Your Honor, I'm

11  sorry -- weeks before the trial in this case where he

12  testified that the riot was like a family picnic.  That

13  testimony, that type of language strongly suggests that

14  there is no remorse; that there is no acceptance of

15  responsibility for the wrongfulness of the conduct; and must

16  be significantly deterred, especially from a leader in the

17  community and someone who is a role model and hosting

18  school-aged kids at the Capitol Building.

19         So with that, we would ask for seven months of

20  incarceration and one year of supervised release for

21  Defendant James Cusick, Your Honor.

22         THE COURT:  Thank you, Ms. Murphy.

23         MS. MURPHY:  Thank you.

24         THE COURT:  Mr. Pierce?

25         MR. PIERCE:  Yes, Your Honor.  Thank you very

 1    much.

 2              I'm going to try to be relatively brief.

 3    Obviously, the Court knows the case very, very well and the

 4    evidence very, very well.  All three defendants would like

 5    the opportunity, Your Honor, to address the Court directly

 6    and there are four family members that would also briefly

 7    like to address the Court.  So I'm going to try to keep my

 8    remarks relatively --

 9              THE COURT:  Okay.

10              MR. PIERCE:  -- brief, if that's okay.

11              So Your Honor, to sum up and then to go into more

12    detail, we would, in the most respectful yet earnest

13    possible way, request that the Court go with the

14    recommendation that the Probation Office has made for there

15    to be no period of incarceration and for -- but for there to

16    be a period of probations as the Court sees fit.

17              There's no question lots of really, really

18    terrible, horrific, at times, things happened on January

19    6th.  There's no question about that.  The defendants

20    realize that.  They didn't realize the full extent of it

21    until they got back to their hotel room that night and saw

22    some of the things that were going on, but they -- but

23    that's reality.  That happened.  And they're aware of that.

24              But as the Court, sort of, has referenced a little

25    bit, I would, you know, respectfully suggest that their

1    conduct, which they do not deny and have never denied and do

2    not deny today -- the facts are what they are -- is toward

3    the side of the spectrum that is, I would say, you know,

4    less culpable than many, many other people who were there on

5    January 6th.

6         These are -- I've gotten to know these defendants

7    exceedingly well.  The Court got to know them well during

8    the trial.  I've gotten to know them very, very well.  These

9    are very, very good, peaceful people.  They -- the reason

10   they went to D.C. that day was they wanted to hear the

11   former President speak and they wanted to be there, you

12   know, to hear him speak and to have their, you know, sort of

13   presence and voices be there with respect to what they

14   believed in terms of there being, you know, some issues in

15   the election, and there are millions and millions and

16   millions of Americans who, you know, certainly believe there

17   were some issues, but that's what they were there for.

18        They did not go to D.C. with any intent to

19   actually walk down to the Capitol grounds.  They didn't go

20   to D.C. with any intent to go inside the Capitol Building.

21   What occurred is when they were listening to the former

22   President speak, they heard his statement, you know, sort

23   of, saying that folks should go down to the Capitol grounds

24   to -- I believe the phrase was "peacefully and patriotically

25   protest," and that's what they did.  They started walking

1    down towards the Capitol grounds.

2           They got there relatively late in the day compared

3    to a lot of other folks.  I think it was right around

4    mid-afternoon that they got down there.  Their testimony was

5    that they did not see signs saying it was a restricted area,

6    that they did not have to navigate across or move any

7    barricades, and that they -- while the -- while -- when they

8    got in the Capitol Building, which I'll touch on in a

9    second, there were obviously, you know, lots of police --

10    law enforcement officers.  When they first got down to the

11    Capitol grounds, they did not see any law enforcement

12    officers and, certainly, none that were indicating that they

13    should leave and, in fact, never did come across any law

14    enforcement officers that directed them to leave.

15           They saw what they saw.  The Court is aware of the

16    evidence.  They saw that the -- that -- one of the things

17    that they saw was that the doors were open and that there

18    were people going in and out of the Capitol Building.  They

19    didn't see -- they walked in the doors.  There were lots of

20    police officers that were at the doors and, sort of,

21    immediately in the, sort of, foyer, or whatever the right

22    word is, when they walked in.  Those police officers were

23    not telling folks to leave.  They were -- in many instances,

24    they were interacting in an almost friendly way with the

25    crowd.

1          And essentially, and the Court, again, knows the

2      evidence, they walked around for 10 to 15 minutes.  They

3      didn't engage in any property destruction.  They didn't have

4      any confrontations.  These are not the kind of people that

5      would have engaged in that.  Essentially, they were milling

6      around and at a certain point they left.  The police did not

7      have to tell them to leave.  They left on their own accord.

8      And they exercised their constitutional right to go to

9      trial.

10          They -- and they're going to speak on their own

11      behalf here.  They take responsibility for the actions that

12      they engaged in.  They felt -- and I believe they, you know,

13      in their own minds, they feel that they had defenses to

14      those -- to the charges, and they came to court and they,

15      you know -- they presented the evidence and they went to

16      trial.  The jury, obviously, disagreed with them.  They

17      accept that fully.

18          These are people that love the country, every

19      single one of them.  They greatly respect the institutions

20      of this country.  They respect the jury's decision.  They

21      very much respect the Court's role here today 100 percent.

22          And I think what I really want to emphasize at

23      this point, Your Honor, is that a term of incarceration

24      would really, really be devastating to these defendants and

25      their families.  I'll just touch on it briefly and then you

1    can hear from them themselves.

2          Mr. James Cusick, he -- there was a little bit of

3    testimony about this at trial.  He has never been in trouble

4    a day in his life.  He volunteered to go to Vietnam.  He has

5    a purple heart and he has a Bronze Star with valor, I

6    believe, and without going into details, the things that he

7    did, I would argue, are heroic in his service to the

8    country.  He essentially, from that point until today, has

9    lived a stellar life.  He is a man of faith.  He is an

10   unbelievably dedicated family man.  He has four incredible

11   children, three of whom I know very well and two of whom are

12   here in the courtroom today and you'll hear from Ms. Katie

13   [ph] Cusick.  He has numerous beautiful grandchildren and he

14   is the leader of -- he's the leader of a church in his

15   community that ministers to many, many people.  And so he is

16   really a pillar of his community.  He would never hurt

17   anyone; he would never destroy any property; and, certainly,

18   nothing like this, I can safely say, is going to happen

19   again.

20         Mr. David Lesperance, 72 years old, I believe;

21   also a veteran and a family man and a man of faith; part of

22   Mr. James Cusick's church down there.  No criminal history.

23   A longtime business owner in his community, which has

24   suffered greatly in light of all this.

25         He has various medical issues.  His wife, they --

1    none of these folks have any money to speak of.  And his

2    wife very much needs him to, you know, try to take care of

3    himself and his wife.

4         Casey Cusick is an amazing father.  His children

5    need him very, very badly.  I don't think it's an

6    exaggeration to say that that family is going to be in -- is

7    going to be in extreme hardship from not only a financial

8    standpoint if Mr. Cusick doesn't have the chance to try to

9    rebuild his career in the aftermath of, you know, again,

10   suffering very much in terms of the, you know, the

11   consequences of January 6th, but his wife and his children

12   need him very badly from the standpoint of having a father

13   and a husband in the home.  I've gotten to know them, you

14   know, very, very well, and I cannot, sort of, overstate that

15   more.

16        I want to emphasize a few more things, Your Honor.

17   These -- I don't -- there is no -- there's no need for --

18   from a deterrence standpoint, with these three individuals,

19   to -- for a term of incarceration.  They -- I believe, as

20   the Probation Office said, a period of probation, whatever

21   the Court might impose, is definitely going to deter, sort

22   of, the purposes of deterrence.  And so if there's any

23   inclination by the Court with respect to -- so we'd ask for

24   no, sort of, period of incarceration.  If there's any -- if

25   the Court's inclined on that front at all, we would ask for

1    a relatively short period of home detention so that they can

2    be with their families and their church and that they can

3    work followed by whatever period of probation that the Court

4    thinks is appropriate.

5         From a standpoint of fine or restitution, these

6    folks don't have any money to speak of.  If the Court is

7    inclined to impose a fine, we would ask that it be as

8    reasonably moderate as possible over a period of time so

9    they can pay for, you know, the necessities of life while

10   paying that off.  With respect to restitution, again, as the

11   Court mentioned, they themselves didn't engage in any

12   property destruction.  And so we would ask that that be as

13   reasonable as possible, if the Court imposes anything.

14        And to sum up, Your Honor, these three folks, they

15   have no idea of, you know -- as I said at the beginning,

16   there are obviously some -- there's a whole range of things

17   that happened on January 6th.  Some were horrific.  People's

18   lives were lost.  They didn't have any idea of the scope or

19   seriousness of that -- of those really, really, really bad

20   things until they saw what was happening on TV.  If these

21   three individuals -- and I think they'll say this

22   themselves -- if they had any idea that those kind of scenes

23   were unfolding or that people were being seriously injured

24   or losing their lives, they would have -- they never would

25   have come anywhere near the building and they would have

1  left immediately.

2          So that pretty much sums it up.  They would each

3  like to address the Court directly, although I'm not --

4  would you rather hear from the family members before the

5  defendants themselves?

6          THE COURT:  I'll hear from the family members

7  first and then I'll hear from them, but first I'm going to

8  hear from you on this issue.

9          MR. PIERCE:  Yes, Your Honor.

10          THE COURT:  And that is I need to consider the

11  imposition of a fine and you've indicated that each of these

12  defendants has no considerable funds.  But the Probation

13  Office has provided information that, through GiveGoSend

14  [sic] webpages, monetary donations have been received on

15  behalf of these three defendants in excess of $120,000.

16  Shouldn't I consider that as I'm deciding whether to impose

17  a fine?

18          MR. PIERCE:  So I would not deny that you should

19  analytically consider it, but if I may just -- can I shed a

20  little bit of light on that or some flesh on the bone, so to

21  speak.

22          So I can tell you because, you know -- because I

23  have percipient knowledge, that a substantial amount of

24  that -- not quite a half of that, but almost a half of that,

25  you know, went toward legal fees and costs.  That ended up

1   being really a fraction of what, you know -- of what was

2   occurred [sic], but nearly half of that went to legal fees

3   and costs.

4          I actually -- I don't know precisely, kind of,

5   details with respect to, you know, the balance that was

6   raised all, with the exception, I can say, certainly,

7   these -- certainly, these folks -- especially, you know -- I

8   know Casey Cusick with the three young kids, he has had an

9   incredibly hard time being able to find work and to be able

10  to, you know, provide for his family.  He has three, you

11  know, young, young children and a wife and we all know how

12  costly that can be.  So I don't know the details with

13  respect to, you know, dollars and cents in terms of all of

14  it, but, you know, I would imagine that, you know, all those

15  funds have been used from a combination of legal fees and

16  expenses and just the basic necessities of life.  That's

17  what I can tell you on that.

18         THE COURT:  All right.  Let me hear from whoever

19  would like to --

20         MR. PIERCE:  Yes, Your Honor.

21         THE COURT:  -- provide information on behalf of

22  any of the three defendants and then I'll hear from each of

23  the three defendants.

24         MR. PIERCE:  Yes, Your Honor.  So first, we're

25  going to hear from Ms. Carol Lesperance, who is the wife of

1    David Lesperance.

2            THE COURT:  And everyone should know that I have

3    read carefully all the materials submitted on behalf of the

4    defendants, all the letters, and bear that in mind, please.

5            Good morning.

6            MS. LESPERANCE:  Good morning, Your Honor.

7            THE COURT:  Identify yourself for the record.

8            MS. LESPERANCE:  I'm Carol [ph] Lesperance,

9    David's wife of 42 years.  I have known him more than half

10   my life and I would just ask for mercy and grace in your

11   sentencing, Your Honor.

12           He is very remorseful.  And, honestly, I can say

13   he had no intention to disrupt or cause fear to anyone on

14   that day or any day.  He's a very good husband and father

15   and grandfather to our two grandchildren.  He's very active

16   in their lives.  They would be devastated not to be with

17   him.  And he has a 94-year-old mom who lives in Zephyrhills

18   [ph] who needs him and depends on him and loves being with

19   him and seeing him, also.

20           He manages the finances at home and the accounts

21   and I need him for that for work.  But also, to give him his

22   meds twice a day.  He is on memory pills.  He's on

23   cholesterol pills and different things.  He is in desperate

24   need of a knee replacement.  And it's -- the medications,

25   the timing of them, I would like to be involved in that.

```
 1              We've been together, as I said, a long time.  And

 2    I'm asking not to be separated, if possible.  And if not, I

 3    would like to go with him.

 4              Thank you, Your Honor.

 5              THE COURT:  Thank you, Ms. Lesperance.

 6              MR. PIERCE:  And then next would be

 7    Mr. Lesperance's sister, Ms. Mary Serre.  I believe the last

 8    name is S-E-R-R-E, I believe.

 9              THE COURT:  Good morning, Ms. Serre.

10              MS. SERRE:  Good morning, Your Honor.  My name is

11    Mary Serre.  I'm Mr. Lesperance's sister.  And it's spelled

12    S, as in "Sam," E, as in "Edward," R-R-E, as in "Edward."

13              Hi.  I'm David's sister.  I'm one of eight

14    siblings.  My mom, I'm her caregiver.  I live with her.  She

15    is a 94-year-old woman.  And on behalf of her and myself, I

16    ask you to please consider -- David's just not a

17    troublemaker.  He's not a violent man.

18              We were raised to be law-abiding citizens, to

19    serve our country.  He served.  I've served.  He's just not

20    a troublemaker.  I'm sure, you know -- we've had many

21    conversations about what brought him here and what happened

22    here.  I was here for the complete trial and I saw the

23    evidence and I -- he's just not a violent person.  He caused

24    no violence that day.  He arrived after the violence

25    happened.  He didn't even yell, "Whose house?  Our house."
```

He didn't yell, "USA."  He had his camera up in the air and

he recorded things and he walked in the Capitol with his

friends, who are also very nice people I've met, and he

walked back out.

He's a good father.  He's a really good brother.

And I really don't want him to go to jail.  It would be

devastating for him and for his family and his grandchildren

and for my mother.  She's very concerned.  She's raised nine

lovely children and he's one of them.  He's the second

oldest, her oldest son.  He's my big brother.

And I really thank you and hope that you will show

mercy and thank you for your time and thank you for the

Court's time.

THE COURT:  Thank you, Ms. Serre.

MR. PIERCE:  Next will be Ms. Katie Cusick,

Mr. James Cusick's daughter and Mr. Casey Cusick's sister,

Your Honor.

MS. KATIE CUSICK:  Good morning.  My name is Katie

Cusick.

THE COURT:  Good morning.

MS. KATIE CUSICK:  Jim is my father.  Casey is my

brother.  And Dave is my family friend.  I could speak on

the character of all three of them, but they have their

wives here.  So I'm speaking on behalf of my father.

My dad has lived 73 years without having any

1    issues or runs-ins with the law.  It's hard to imagine he

2    would now go to jail for walking inside of a federal

3    building.  It's very difficult to wrap my mind around the

4    fact that he is facing jail time and that we are here for

5    his sentencing, something I never thought I would see in my

6    lifetime.

7         Without being disrespectful and in my personal

8    opinion, the punishment here does not fit the crime.  After

9    the news of my father's arrest, we received calls from

10   friends and family around the world and through all phases

11   of his life, everyone in shock and disbelief.  Most calls

12   started with, "There's no way that this is real."

13        It was extremely difficult to sit through the

14   trial and listen to the prosecution side mischaracterize my

15   father.  Accusing him of returning to the scene of the crime

16   to do a victory lap is absolutely absurd and completely out

17   of character of him.  In the most innocent case of winning a

18   game, you would never find my father doing a victory lap.

19   They continually insisted to the jury that his intent was to

20   attack or take down the Capitol which is beyond the realm of

21   reality.

22        They don't know my father at all.  So any

23   judgments they make on him or his intentions are completely

24   not based on any actual facts or evidence.  They didn't see

25   any actions or hear any words that would lead to that

1    conclusion.  To charge him for violent entry is unfathomable

2    because he has never violently entered anywhere and nor will

3    he ever.

4         As for disorderly conduct, my father is against

5    any vandalism or destruction of property.  As I said in my

6    testimony, coming to D.C. as a child, my dad would always

7    sternly advise us to be respectful and act accordingly at

8    all the monuments.  There was no evidence of my father

9    parading or picketing in or outside of the Capitol.  This

10   doesn't surprise me, because going to watch the Florida

11   Gators, his favorite football team, play, he never yelled or

12   chanted "Go Gators."  It is not in his nature.  The video

13   that we watched during the trial will back up my statements.

14        In regards to the charge of entering and remaining

15   in a restricted building, the charge is irrefutable as seen

16   in the video and according to his own testimony; however, I

17   can't imagine he could possibly spend a year in federal

18   prison after having proven to be a law abiding citizen for

19   73 years.

20        Because our family has not lived a criminal

21   lifestyle, these last two years have been overwhelming and

22   surreal with our house being raided, my dad having to call

23   and get permission to travel outside of our town, answering

24   to a probation officer, surrendering his passport that he's

25   used to go on numerous mission trips, and having the courts

1    drop by our house whenever they see fit.

2              The reason I love God, the reason I love my

3    family, and the reason I love my country is because of my

4    father.  He's been a wonderful example of a godly man and I

5    hope to one day marry somebody like him.  Regardless of your

6    decision today, I will continue to love and support him and

7    stand with him, as well as our whole family and community

8    around the world.  But I ask you respectfully, if there's

9    another way, please don't put him in jail.

10             Thank you.

11             THE COURT:  Thank you, Ms. Cusick.

12             MR. PIERCE:  And then finally, Your Honor, we'll

13   have Mrs. Ruth Cusick, who is Casey Cusick's wife.

14             THE COURT:  Good morning, Ms. Cusick.  Welcome,

15   again.

16             MS. RUTH CUSICK:  Good morning.  My name is Ruth

17   Cusick.

18             Today, I'm speaking on behalf of Casey Cusick, my

19   husband and the father of our three children.

20             I have had the opportunity to speak on Casey's

21   character throughout this trial and in the letter I

22   submitted to the Court.  But what I really want to highlight

23   and focus on right now is the impact that any amount of

24   incarceration time would -- the impact that that would have

25   on our children and our household.

1          As we were preparing to come to D.C., I was able

2     to understand the -- how much of all of this our oldest

3     really understood because I overheard her, as Casey was

4     packing her things, ask him if he was nervous, and for a

5     six-year-old that is extremely advanced in just wanting to

6     know how somebody's doing and emotional intelligence in a

7     six-year-old is -- that just impressed me and informed me of

8     how much she really understands, and not only that, but is

9     feeling and has been feeling all of this since it started.

10    And even just now as I was sitting there, our youngest was

11    wanting to be with daddy and that just goes to show how much

12    they really love him and that coming from a child -- I mean,

13    they tell truth.

14          You can see how much Casey cares for his kids; not

15    only that, but for me, and they can see the love that we've

16    been able to form in our house and create through everything

17    that we've been through.  It has brought us together, and

18    even through COVID, it's -- I read something where for a

19    marriage, it was, like, as if you were 10 years -- you had

20    lived 10 years in just that short amount of time that we

21    were not allowed to leave our homes, and I can say that

22    that's how it was for us.  It developed our relationship and

23    it strengthened us and it would really affect our family in

24    a negative way if, for any amount of time, he was to be

25    incarcerated.  And so that's my main ask, is for that not to

1    happen.

2          He is a wonderful father and a loving father and

3    very attentive to every single one of our needs.  And the

4    absence of him from our home not only would be felt in the

5    atmosphere and, you know, the absence of his presence,

6    but -- I mean, financially, we have been trying our best and

7    doing our best to stay afloat.

8          With his podcasts, a three-second clip can be

9    taken out of context super easily -- and we can all see that

10   throughout social media -- and it can be used against

11   anybody's character, but if anybody would take the time to

12   actually listen to the full length of what he talks about,

13   you would see that what he does is encourage everyone -- not

14   only men -- to step up and be a good man in their home but

15   highlights hope.  And we get letters in the mail.  People

16   write checks thanking him for his encouragement because they

17   don't understand how he can be so uplifting and full of hope

18   with, you know, a trial going on in his life.  And I can

19   honestly say that is because of the love of God that he has

20   and the way that he was raised by Jim, my father-in-law.

21   Everything that Katie said previously is -- it just goes to

22   show how good of a man he really is and his children are the

23   best thing that I can show that really goes to show what he

24   is like and who he is to the core.

25          Thank you.

1          THE COURT:  Thank you, Ms. Cusick.

2          MR. PIERCE:  And then, again, briefly, Your Honor,

3     the three defendants would like to address the Court, if

4     that's okay.

5          So first, we're going to have Mr. James Cusick

6     address the Court.

7          THE COURT:  Good morning, Mr. Cusick.

8          DEFENDANT JAMES CUSICK:  Good morning, Your Honor.

9     My name is Jim Cusick.  James Cusick is, I guess, the legal

10    name.

11         I didn't have letters written.  I don't actually

12    have anybody in the court except Katie shared some nice

13    things.  I'm not going to stand up and defend myself,

14    explaining how wonderful I am.  I'll just say my life should

15    exemplify my love for this country and respect for this

16    country, respect for law, respect for courts.

17         In our church, we used to do law enforcement day,

18    meeting the local police departments and have -- the chief

19    of police from Orlando would come over and minister to all

20    the police officers in our area in Brevard County, including

21    the Brevard County Sheriff and local towns.  We fed them, we

22    encouraged them, and I would even take -- we have Christian

23    school and I would take the kids up to the county jail to

24    let them see what the life of crime will do, and on

25    occasions they would send representatives down from the

1   county jail to talk to our students because, again, we --

2   the purpose of our school was to teach our kids, first of

3   all, to serve God, but how to be good citizens; how to be

4   good mamas and daddies; and friends with the, you know --

5   with their peers.

6            And so never would we have any intent to come up

7   and do any kind of destruction here.  We didn't come to

8   Washington to go to the Capitol.  We didn't know anything

9   about what was going to happen up there at all.  We came to

10  a rally.  The President asked supporters to come up to this

11  rally, kind of to show support for this election.  And at

12  the end of the election he asked us to go to the Capitol and

13  do a peaceful, lawful demonstration just to let, you know,

14  our voice be heard.  And to us, if the President, who would

15  be the chief cop, says you can go there, okay, we can go.

16  So we never thought about any restricted area.

17           Of course, we knew about the certification, but I

18  didn't know you couldn't go there.  I've asked people on the

19  street, anywhere I see people, I say, "Do you know that

20  you're not allowed on the Capitol grounds if the President

21  or Vice President is in the Capitol?"  "Of course we don't

22  know."  Nobody knows that.

23           So we went up there.  We did not go to do any

24  damage, and as the video showed and the captain -- the

25  Capitol Police who testified here said, we didn't do

 1   anything.  We were milling around.

 2          Now, are we regretful?  A hundred percent.  If we

 3   knew these things were going on up there -- and, again, in

 4   our testimony, we stated we did not see any rioting.  We

 5   didn't see anybody hit anybody.  We didn't see anybody

 6   breaking windows.  We didn't -- and, as the lady said, I

 7   won't necessarily call it a family picnic, but it was like a

 8   family thing because people with kids, wagons, and buggies

 9   were walking up, they were singing patriotic songs, and we

10   did not see any of these things.

11          And anyway, if I had -- if I knew there was a

12   riot, no way would I have gone, nor would I have allowed my

13   son to go up there, nor would I have encouraged my friend

14   Dave to go up there.  We would have done what we came up

15   here to do, go to the rally and then visit some time in

16   Washington and go home the next day.

17          But I appreciate Your Honor.  You presided over

18   this extremely well.  And I appreciate a chance to hear us.

19          Thank you.

20          THE COURT:  Thank you, Mr. Cusick.

21          MR. PIERCE:  And next, Mr. David Lesperance, Your

22   Honor.

23          THE COURT:  Good morning, Mr. Lesperance.

24          DEFENDANT LESPERANCE:  Good morning, Your Honor.

25          My name is David Lesperance.  And I want to say

1    I'm 72 years old.  I've always followed the law.  I regret

2    what happened in the situation.  I was not -- it was not my

3    intent to cause a problem.  And I apologize to this Court

4    and I apologize to my family, who suffered so greatly due to

5    my actions.

6             Thank you.

7             THE COURT:  Thank you, Mr. Lesperance.

8             MR. PIERCE:  And then finally Defendant Casey

9    Cusick, Your Honor.

10            THE COURT:  Good morning, Mr. Cusick.

11            DEFENDANT CASEY CUSICK:  Good morning, Your Honor.

12            My name is Casey Cusick.  Thank you so much for

13   giving me an opportunity to speak.

14            I just wanted to -- I just want to start out with

15   saying that this whole thing has affected my children in

16   such a harsh way from the police officers coming to my house

17   with guns on us, AR-15s drawn.  My three-year-old at the

18   time just mentioned to me every single time that the

19   pretrial people come to the house to do the walkthrough, you

20   know, she gets really nervous because she's scared, again,

21   that they're going to lock my hands behind my back and I

22   have to tell her for 20 minutes and calm her down and say

23   it's okay.  They're just going to be here a short time.

24   They're not here to hurt anybody.  They're not going to harm

25   you.  But I just want to say that my family will not

1    survive, if I have to go to jail, financially.  I saw in the

2    report they said I sold my house.  I did.  Most of that

3    money's gone because I've had to survive since that time.  I

4    lost my business.  I've lost friends on account of this.

5             I don't regret going to the rally that day, but I,

6    100 percent, regret going to the Capitol.  I wish we would

7    have never even gone up there.  But like they said -- and it

8    is the truth -- President Trump mentioned, "Let's go down

9    and peacefully protest," and the way he even said it was as

10   if he was going to be joining us there.  He never did.

11            But my child -- my daughter Ella, even this

12   morning, asked my sister again, "Are you nervous that the

13   judge is going to send daddy to jail?"  And she said, you

14   know, "A little."  And, like my wife said, she asked me

15   before we came here, am I nervous?  And my answer to her

16   was, "Yes."  I said, "Are you nervous?"  And she said, "Yes,

17   I am."

18            I'm asking you for grace and mercy.  I've watched

19   you since this trial started, sir.  You seem to be a very

20   fair man.  I've heard from others that you're a fair man.  I

21   want this to be over.  For two-and-a-half years now this has

22   gone on.  And, like I said, financially, if I didn't start a

23   podcast, for what that's worth, I probably would already be

24   bankrupt and my family would be homeless if I didn't have

25   them.  If I didn't go on other people's podcasts, I wouldn't

1     have money to buy groceries at the grocery store.

2              I've had three or four jobs lined up.  Every

3     single one of them has fallen through on account of this

4     case, whether it be having to come here for trial, whether

5     it be just being a Jan 6er or whether it be coming here for

6     sentencing, but I would love to move on with my life.

7              I understand if there's any way that -- if you

8     have to have sentencing as far as incarceration, could you

9     please let me do it at my house?  If not, I would love it

10    that I could just please get on with my life.  I want to

11    move on with this whole situation and, like I said, I'm

12    sorry that the court even had to spend the money to follow

13    us around, to listen in on my podcasts, and all the other

14    things that they did.

15             I appreciate it so much, Your Honor.  And I'm

16    thankful and I'm grateful.  Thank you, sir.

17             THE COURT:  Thank you, Mr. Cusick.

18             All right.  This is a hard day, obviously, for all

19    of you.  Sentencing is a hard thing for a judge in a

20    circumstance like this.  There are lots of competing

21    pressures and considerations.  I've reviewed all the

22    materials that have been provided to me, the presentence

23    reports, three of them; the sentencing memos, three from the

24    defense, three from the Government; and letters on behalf of

25    several of the defendants; and I've heard everything that's

1    been said today, including what has been said on behalf of

2    each of the defendants by family members and by themselves.

3            First, I'll address restitution.  There are two

4    restitution provisions, 3663 and 3663A of Title 18.  Relying

5    only on the discretionary provision, the Court -- the judges

6    in this court have found, and other courts in other

7    circumstances have found, that a collective consideration is

8    appropriate.  The Supreme Court has so indicated.  And I

9    find that a restitution award is appropriate here.  It is

10   warranted because all who participated in the riot on

11   January 6th, 2021, at the Capitol -- and I call it a riot.

12   Notwithstanding each individual's different level of

13   participation, the overall event was, in fact, in my

14   judgment, a riot.  But each of the participants contributed

15   to some degree to the approximately $3 million in damages

16   that have been suffered as a result.  And under the

17   restitution provision, I am going to award restitution

18   against each of the defendants in the amount of $500, and

19   that is consistent with the amount of restitution that has

20   been imposed in other cases for misdemeanor offenses.

21           That brings me to a fine.  Again, I'm going to

22   deal with this collectively at the moment, but then I'm

23   going to make some comments with respect to each of the

24   defendants before I impose a sentence individually with

25   respect to each defendant.

1    With respect to a fine, but for the GiveGoSend

2    [sic] webpage funding that has occurred, part of which, as

3    Mr. Pierce has indicated, has gone to the payment for legal

4    fees, but for that, I would not impose a fine here, but I

5    think I have to take that into account.  I think it's

6    appropriate to take it into account.  I think that no matter

7    how you look at the individual circumstances here with

8    respect to each of these three defendants, the concept of

9    raising money off of participation in the January 6th riot

10   at the Capitol is a somewhat offensive concept, and I am

11   going to take into account those funds that have been raised

12   as I decide whether to impose a fine here.

13   So now, I'm going to indicate the reasons for the

14   sentence to be imposed with respect to each of the

15   defendants.  I'll do this collectively.  I won't have you

16   come up to the lectern, as I usually do when I'm imposing a

17   sentence, because I don't want the gathering of five of you,

18   three defendants and two counsel, at the lectern.  I think

19   that's unnecessary.  So I'll allow you to stay at the

20   counsel -- at counsel table seated.

21   This has been said many times.  I think it's been

22   acknowledged by these three participants and their counsel.

23   The January 6th events are extremely serious in this

24   nation's history.  The offenses committed there on that date

25   are extremely serious.  An active threat to our democratic

1   values and principles was posed.  There was an attempt to

2   disrupt or even prevent the certification of the Electoral

3   College vote, and that posed a threat to the peaceful

4   transition of power to a new president in our democratic

5   system.  That's a hallmark of our democratic system

6   cherished within our country and admired outside of the

7   country.  And that envy is important in terms of the esteem

8   that this country and our governmental system has been held

9   in throughout the world.

10          Each of the defendants participated to some extent

11   in that riot.  They willingly, and while fully aware that

12   there would be some interference with the Electoral College

13   certification, participated in some events at the Capitol on

14   January 6th, and I say "some" because it's limited.

15          James Cusick was in the Capitol for only about 11

16   minutes; Casey Cusick and David Lesperance for about 15

17   minutes.  They had the opportunity to not go into the

18   Capitol.  They had the opportunity to leave immediately.

19   They didn't.

20          I do not credit and the jury did not credit the

21   view that they saw no evidence of barriers there at the

22   Capitol on January 6th or signs prohibiting entry or a

23   police presence that was to prohibit entry.  They saw

24   shattered windows that permitted entry into the Capitol.

25   They heard a blaring alarm.  They even experienced, to some

1    degree, based on the testimony of one of the defendants, to

2    another of the defendants, the presence of pepper spray in

3    the air.  They saw rioters scaling the wall of the Capitol

4    to get in.  These were all warning signs not to proceed into

5    the Capitol.  They were clear warning signs.  But they were

6    disregarded.  And each defendant entered the Capitol and

7    remained there for a short but nonetheless meaningful period

8    of time.

9         What they didn't do is also important.  They

10   didn't engage in any violence.  They didn't engage in any

11   destruction of property.  They didn't personally confront

12   police officers or break through police lines.  And, as I

13   said, they were only in the Capitol briefly.  All of that is

14   to their credit.  So there's a balance here.

15        The jury verdict warrants respect.  And,

16   obviously, the testimony of each of the defendants, to some

17   degree, was rejected by the jury.  And I, too, reject some

18   of the testimony that each of the defendants gave.  Some of

19   the rationale for why they went into the Capitol does not

20   hold up in terms of looking for a bathroom for two of the

21   defendants.  What they claim not to have seen does not hold

22   up when you look at all the video evidence.

23        And that brings me to something that's very

24   important in the consideration of sentencing in this case,

25   and that is the two issues of acceptance of responsibility

1    and remorse.

2         Now, technically, there's no acceptance of

3    responsibility in terms of the guideline calculation.  I'm

4    not talking about it in that technical sense.  I'm talking

5    about whether each of the defendants individually has really

6    accepted responsibility for what they have done and then,

7    secondarily -- or secondly, not secondarily -- secondly,

8    whether they've shown remorse.

9         And we've heard from each of them today.  Excuse

10   me.  James Cusick did not say anything that actually

11   accepted responsibility and did not say anything that

12   actually showed remorse.  What he said was, and I quote him,

13   he is regretful.  I'm not sure that regret -- which is a

14   term used by the other two defendants -- is the same as

15   remorse.  Regret often just means, "Jeez, I'm sorry I went

16   there because I got caught and I'm now faced with a criminal

17   conviction and the possible penalties that that entails."

18        So I don't -- I can't -- based on what they've

19   said in their testimony at trial and here today, I can't

20   give full credit for acceptance of responsibility and a

21   showing of remorse.  It just has not come forth from them.

22        Two of them -- I think only two of them.  I don't

23   think Casey Cusick has military service.  If I'm wrong, then

24   I apologize for that.  Military service matters to me.  I

25   served in Vietnam.  Military service is important, in my

1   view, and it's something that warrants credit normally in a

2   sentencing in a criminal case.  I say "normally," because

3   here it cuts both ways.  Yes, I acknowledge and give credit

4   for military service, but when you serve in the military and

5   you take an oath under the Constitution to respect and

6   defend the Constitution and the country, that turns out to

7   be somewhat inconsistent with engaging in some of the

8   conduct that occurred on January 6th.  These three

9   defendants did not engage in the worst of the conduct,

10  however, and so I'm not going to hold the military service

11  against them.  I give them credit for their military

12  service.

13          So where do we wind up?  Well, we have the

14  sentencing guidelines saying 6 to 12 months is the

15  appropriate sentence of incarceration.  The Probation Office

16  is not recommending a sentence of incarceration.  And the

17  defendants, like the Probation Office, are seeking only a

18  sentence of probation.  Four years probation is the

19  Probation Office's recommendation.  One year is the request

20  of the defendants.  The Government is asking for a sentence

21  of nine months' incarceration along with some supervised

22  release thereafter for Casey Cusick and seven months for

23  each of the other two defendants.

24          I do have some concern for the truthfulness of the

25  testimony that was provided by each of the defendants during

1    trial.  For the most part, that relates to what they claim

2    to have seen or not seen.  It's not the worst of what I have

3    heard from some defendants -- January 6th defendants in

4    their testimony at trial.  But as the jury, I believe,

5    concluded and as I agree, that testimony was not entitled to

6    full credit for its truthfulness.

7           Family and community times -- ties are important.

8    Family responsibilities are important.  And, certainly,

9    Casey Cusick has substantial responsibilities and the other

10   defendants do have some responsibilities, as well.  The

11   support of the family is important.  We've heard that

12   support here today.

13          I've concluded that a lengthy period of

14   incarceration is not warranted here.  It is not necessary

15   either for deterrence or punishment.  But the defendants are

16   not free from criminal responsibility or, to quote the

17   defense filings, among the least culpable on January 6th.

18   Yes, they were in -- briefly in the Capitol, but no violence

19   or property damage; no confrontation of police; and,

20   importantly, no encouragement of others to engage in that

21   conduct, and that's why the period of incarceration the

22   Government has requested and recommended is, in my judgment,

23   not warranted.

24          There was no social media of great concern here.

25   The podcast, after -- long after January 6th may be a little

1        concerning, but it's not significantly of concern.

2                I believe that, consistent with what has happened

3        in other cases, a period of incarceration measured in months

4        is not warranted, and indeed I don't think even a period of

5        incarceration measured in weeks is warranted; however, I do

6        believe that the absence of true remorse and full acceptance

7        of responsibility is meaningful here and must be taken into

8        account, and the conduct was not conduct that was totally

9        innocent.  They knew full well what was supposed to be going

10       on in Congress that day.  They nonetheless, despite numerous

11       warning signs, went into the Capitol; stayed in the Capitol

12       for some period of time, although a fairly short period of

13       time; and thereafter, have not really -- other than

14       regretting -- which is a term that is ambiguous at the

15       least -- they have not shown full acceptance of

16       responsibility and remorse, in my judgment, and, therefore,

17       I am going to impose a brief period of incarceration as to

18       each of the defendants along with a more substantial period

19       of supervised release thereafter.

20               So now I'm going to read the sentence for each of

21       the defendants.  I'll do that one by one, because you are

22       entitled to an individual sentencing determination, and I

23       have made that determination on an individual basis.

24               So why don't we do it with each of the defendants

25       coming up to the lectern while I do this.  And we're going

1    to start with Casey Cusick.  Please come up, Mr. Cusick.

2         And I'll say one thing.  I -- the past criminal

3    conviction that you have is relevant, but it doesn't

4    determine the sentence in this case.  It's of only marginal

5    relevance, in my view, but not irrelevant.  And I've taken

6    into account, as I have for the others, what you have said

7    here today and what you have not said and what you said

8    during trial.

9         With that, pursuant to the Sentencing Reform Act

10   of 1984 and in consideration of the provisions of Title 18

11   of the United States Code Section 3553 as well as the

12   advisory sentencing guidelines, it is the judgment of the

13   Court that you, Casey Cusick, are hereby sentenced to a term

14   of 10 days' incarceration followed by 2 years of supervised

15   release on Counts 1 and 2.  The period of incarceration and

16   the period of supervised release will run concurrently.  In

17   other words, it totals only 10 days of incarceration and 2

18   years of supervised release.

19        And then on Counts 3 and 4, I sentence you to a

20   period of two years' probation on each of those counts which

21   will run concurrently with each other and concurrent to the

22   periods of supervised release for Counts 1 and 2.

23        In addition, you are ordered to pay a special

24   assessment of $70 in accordance with Title 18 of the United

25   States Code Section 3013.  And that adds up to $25 on Count

1      1, $25 on Count 2, and $10 on each of Counts 3 and 4.

2            While on supervision or on probation, you shall

3      abide by the following mandatory conditions as well as all

4      discretionary conditions recommended by the Probation Office

5      in Part D, sentencing options, of the presentence report

6      which are imposed to establish the basic expectations for

7      your conduct while on supervision.

8            The mandatory conditions include, first, you must

9      not commit another federal, state, or local crime.

10            Second, you must not unlawfully possess a

11      controlled substance.

12            Third, you must refrain from any unlawful use of a

13      controlled substance.

14            You must submit to one drug test within 15 days of

15      placement on supervision and at least two periodic drug

16      tests thereafter as determined by the Court.

17            Fourth, you must make restitution in accordance

18      with 18 U.S.C. Sections 3663 and 3663A or any other statute

19      authorizing a sentence of restitution.

20            And, fifth, you must participate in an approved

21      program for domestic violence.

22            The Court authorizes supervision and jurisdiction

23      of this case to be transferred to the United States District

24      Court for the Northern District of Oklahoma.  And I will

25      note that it is my expectation that the period of

incarceration will be served there in Oklahoma.  So you will not be at a far distance from your family.

You shall comply with the following special conditions:

Financial information disclosure.  You must provide the probation officer with access to any requested financial information and authorize the release of any financial information.  The Probation Office may share financial information with the United States Attorney's Office.

Financial restrictions.  You must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

And a firearm restriction.  You shall remove firearms, destructive devices, or other dangerous weapons from areas over which you have access or control until the term of supervision expires.

You are ordered to pay a fine in the amount of $3,000.  I don't have a means to calculate exactly what a fine should be based on your ability to pay in light of any funds from the websites that have raised funding, but I believe a nominal fine -- in this case $3,000 -- is appropriate.

The Court determines that you do not have the ability to pay interest and, therefore, waives any interest

1     or penalties that may accrue on the balance.

2              Restitution payments shall be made to the Clerk of

3     the Court for the United States District Court, District of

4     Columbia, for disbursement to the following victim, and that

5     is the Architect of the Capitol, Office of the Chief

6     Financial Officer, Ford House Office Building, Room H2-205B,

7     in Washington, and that amount is $500.

8              You must pay the balance of any financial

9     obligations owed at a rate of no less than $100 each month

10    and provide verification of the same to the Probation

11    Office.

12             The financial obligations are immediately payable

13    to the Clerk of the Court for the U.S. District Court here

14    at this address.  And within 30 days of any change of

15    address, you shall notify the Clerk of the Court of the

16    change until such time as the financial obligation is paid

17    in full.

18             I also sentence you to 50 hours of community

19    service to be completed within the first year of supervision

20    or probation, and that will be at the direction of the

21    Probation Office.

22             The Probation Office shall release the presentence

23    investigation report to all appropriate agencies which

24    includes the United States Probation Office in the approved

25    district of residence in order to execute the sentence of

1    the Court.  Treatment agencies shall return the presentence

2    report to the Probation Office upon the defendant's

3    completion or termination from treatment.

4              And that is the sentence with respect to Casey

5    Cusick.

6              You may have a seat.

7              And now, if James Cusick would come up, please.

8              Excuse me for one second.

9              (Brief pause.)

10             I'm sorry.  I have another matter at 12:00 o'clock

11   that I have to have someone cover for a minute.

12             Same things I've said with respect to the kinds of

13   considerations go with respect to James Cusick.  And I honor

14   your service to the country and your service to the

15   community in your capacity as a pastor.  But I also

16   acknowledge your conduct on January 6th, which is what we're

17   here for today.

18             Pursuant to the Sentencing Reform Act of 1984 and

19   in consideration of the provisions of Title 18 of the United

20   States Code Section 3553 as well as the advisory sentencing

21   guidelines, it is the judgment of the Court that you, James

22   Varnell Cusick, Jr., are hereby sentenced to a term of 10

23   days of incarceration followed by 2 years of supervised

24   release on each of Counts 1 and 2 with the sentence of

25   incarceration and the supervised release to be served

1    concurrently.

2           And on Counts 3 and 4, I sentence you to two years

3    of probation on each of those counts with that term to be

4    served concurrently both with each other and with the

5    supervised release on Counts 1 and 2.

6           In addition, you are ordered to pay a special

7    assessment of $70 in accordance with Title 18 of the U.S.

8    Code Section 3013.

9           While on supervision, you shall abide by the

10   following mandatory conditions as well as all discretionary

11   conditions recommended by the Probation Office in Part D,

12   sentencing options, of the presentence report which are

13   imposed to establish the basic expectations for your conduct

14   while on supervision.

15          The mandatory conditions include that you must not

16   commit another federal, state, or local crime.

17          You must not unlawfully possess a controlled

18   substance.

19          You must refrain from any unlawful use of a

20   controlled substance.

21          The mandatory drug testing condition is suspended

22   based on the Court's determination that you pose a low risk

23   of future substance abuse.

24          You must make restitution in accordance with Title

25   18 of the U.S. Code Sections 3663 and 3663A or any other

1     statute authorizing a sentence of restitution.

2          The Court authorizes supervision and jurisdiction

3     of this case to be transferred to the United States District

4     Court for the Middle District of Florida.

5          You shall comply with the following special

6     conditions:

7          You must provide the probation officer with access

8     to any requested financial information and authorize the

9     release of any financial information.  The Probation Office

10    may share financial information with the United States

11    Attorney's Office.

12         You must not incur new credit charges or open

13    additional lines of credit without the approval of the

14    Probation Office.

15         You shall remove firearms, destructive devices, or

16    other dangerous weapons from areas over which you have

17    access or control until the term of supervision expires.

18         You are ordered to pay a fine in the amount of

19    $3,000 for the reasons that I described earlier.

20         The Court has determined that you do not have the

21    ability to pay interest and, therefore, waives any interest

22    or penalties that may accrue on the balance.

23         Restitution payments shall be made to the Clerk of

24    the Court for the United States District Court, District of

25    Columbia, for disbursement to the Architect of the Capitol

1    at the address here in Washington in the amount of $500.

2         You must pay the balance of any financial

3    obligation owed at a rate of no less than $100 each month

4    and provide verification of the same to the Probation

5    Office.

6         The financial obligations are immediately payable

7    to the Clerk of the Court for the U.S. District Court at the

8    address here in Washington.  And within 30 days of any

9    change of address, you shall notify the Clerk of the Court

10   of the change until such time as the financial obligation is

11   paid in full.

12        I sentence you as well to 50 hours of community

13   service.  That's something that you should be very familiar

14   with, as I'm sure you have been throughout your adult life.

15   And that will be completed within the first year of

16   supervision and at the direction of the Probation Office.

17        The Probation Office shall release the presentence

18   investigation report to all appropriate agencies which

19   includes the United States Probation Office in the approved

20   district of residence in order to execute the sentence of

21   the Court.  Treatment agencies shall return the presentence

22   report to the Probation Office upon the defendant's

23   completion or termination from treatment.

24        And that is the sentence of the Court with respect

25   to James Cusick.

1          Lastly, Mr. Lesperance.

2          And many of the things that I have said with

3    respect to the sentencing of your co-defendants are true

4    here as well, and I honor your service.

5          Pursuant to the Sentencing Reform Act of 1984 and

6    in consideration of the provisions of 18 U.S.C. Section 3553

7    as well as the advisory sentencing guidelines, it is the

8    judgment of the Court that you, David John Lesperance, are

9    hereby sentenced to a term of 10 days of incarceration

10   followed by 2 years of supervised release on each of Counts

11   1 and 2.  The incarceration and the supervised release is

12   concurrent.

13         And with respect to Counts 3 and 4, on each of

14   those counts, I sentence you to two years of probation.

15   Those terms are concurrent with each other and concurrent to

16   the supervised release term on Counts 1 and 2.

17         While on supervision, you shall abide by the

18   following mandatory conditions as well as all discretionary

19   conditions recommended by the Probation Office in Part D,

20   sentencing options, of the presentence report which are

21   imposed to establish the basic expectations for your conduct

22   while on supervision.

23         The mandatory conditions include that you must not

24   commit another federal, state, or local crime.

25         You must not unlawfully possess a controlled

1    substance.

2              The mandatory drug testing condition is suspended

3    based on the Court's determination that you pose a low risk

4    of future substance abuse.

5              And you must make restitution in accordance with

6    Title 18 of the U.S. Code Sections 3663 and 3663A or any

7    other statute that authorizes a sentence of restitution.

8              The Court authorizes supervision and jurisdiction

9    of this case to be transferred to the United States District

10   Court for the Middle District of Florida.

11             You shall comply with the following special

12   conditions:

13             You must provide the probation officer with access

14   to any requested financial information and authorize the

15   release of any financial information.  The Probation Office

16   may share financial information with the United States

17   Attorney's Office.

18             You must not incur new credit charges or open

19   additional lines of credit without the approval of the

20   Probation Office.

21             You shall remove firearms, destructive devices, or

22   other dangerous weapons from areas over which you have

23   access or control until the term of supervision expires.

24             And you must participate in a mental health

25   treatment program and follow the rules and regulations of

1    that program.  The probation officer, in consultation with
2    the treatment provider, will supervise your participation in
3    the program with respect to provider, location, modality,
4    duration, intensity, et cetera.
5         You are ordered to pay a fine in the amount of
6    $3,000 for the reasons that I have already described.
7         The Court determined that you do not have the
8    ability to pay interest and, therefore, waives any interest
9    or penalties that may accrue on the balance.
10        Restitution payments shall be made to the Clerk of
11   the Court of the United States District Court, District of
12   Columbia, for disbursement to the following victim, and that
13   is the Architect of the Capitol at the address here in
14   Washington, D.C., and the amount of restitution award is
15   $500.
16        You must pay the balance of any financial
17   obligation owed at a rate of no less than 1,000 -- I'm
18   sorry -- $100 each month and provide verification of the
19   same to the Probation Office.
20        The financial obligations are immediately payable
21   to the Clerk of the Court for the U.S. District Court, 333
22   Constitution Avenue, NW, Washington, D.C.  Within 30 days of
23   any change of address, you shall notify the Clerk of the
24   Court of the change until such time as the financial
25   obligation is paid in full.

1          I sentence you as well to 50 hours of community

2     service, and that is to be completed within the first year

3     of supervision at the direction of the Probation Office.

4          The Probation Office shall release the presentence

5     investigation report to all appropriate agencies which

6     includes the United States Probation Office in the approved

7     District of residence in order to execute the sentence of

8     the Court.  Treatment agencies shall return the presentence

9     report to the Probation Office upon the defendant's

10    completion or termination from treatment.

11         And that is the sentence of the Court with respect

12    to David Lesperance.

13         And you can have a seat, as well.

14         So now, a couple of other things.

15         First of all, I will say, generally, for all three

16    defendants, your family circumstances and your family

17    responsibilities have weighed on the Court -- particularly

18    with respect to Casey Cusick, I would say -- and I have

19    taken that into account in ensuring that any period of

20    incarceration will not significantly interfere with those

21    family responsibilities.

22         Each of you has the right to appeal your

23    convictions in this case to the United States Court of

24    Appeals for the District of Columbia Circuit.  And you also

25    have a statutory right to appeal the sentence that I have

1    imposed to that same court particularly if you think the

2    sentence was imposed in violation of law or as a result of

3    an incorrect application of the sentencing guidelines or is

4    more severe than the maximum that may be established under

5    the guidelines or the statutory provisions.

6          You may also appeal your sentence if you believe

7    that you received ineffective assistance of counseling -- of

8    counsel during the course of this case and particularly at

9    sentencing.

10          And you have the right to challenge the conviction

11   entered or the sentence imposed to the extent permitted

12   under 28 U.S.C. Section 2255.

13          Any notice of appeal must be filed within 14 days

14   of the entry of judgment, or if the Government files a

15   notice of appeal, within 14 days of that.  Judgment will

16   probably be entered today or tomorrow, and you would have 14

17   days from that time to appeal.

18          If you're unable to afford the costs of appeal,

19   you may have the right to apply for leave to appeal in forma

20   pauperis which basically means free of cost.  And if you

21   were to so request and qualify, then the Clerk of the Court

22   would prepare and file a notice of appeal on your behalf.

23   But I note that you have able counsel who is representing

24   you here who presumably would assist you in that process if

25   you wished to file -- follow it and file an appeal.

1          With few exceptions, any notice of appeal must be

2     filed within 14 days of the entry of judgment.  That isn't

3     today but when the judgment is entered in writing.

4          All right.  With that, Mr. Pierce and Mr. Roots,

5     is there any reason, other than reasons that already have

6     been stated and argued, why the sentence for each of the

7     defendants should not be imposed as I have just indicated?

8          MR. PIERCE:  No, not in addition to the things

9     already stated and argued today.

10         THE COURT:  All right.  Same question to the

11    Government.

12         MR. VALENTINI:  Nothing in addition to what was

13    said before.

14         THE COURT:  All right.  And is there anything else

15    from the Probation Office?

16         THE PROBATION OFFICER:  Your Honor, would the

17    Court be inclined to allow each of the defendants to

18    voluntary surrender?

19         THE COURT:  I'll get to that in a moment.

20         THE PROBATION OFFICER:  Thank you, Your Honor.

21         THE COURT:  Is there anything other than that that

22    we still need to cover?  There are no counts that need to be

23    taken care of.  Everything was resolved by the jury.

24         MR. VALENTINI:  Correct, Your Honor.  Nothing

25    further from the Government.

1      THE COURT:  And with respect to the place of

2   incarceration, I will indicate in the judgment the

3   recommendation that the defendants -- each defendant be able

4   to serve their short term of incarceration at a location

5   close to their home of residence.

6          Is there any other request?

7          MR. PIERCE:  No, Your Honor, not that -- no.

8          THE COURT:  All right.  With that, the sentence is

9   imposed for each of the defendants, James Cusick, Casey

10   Cusick, and David Lesperance, as I have indicated and

11   stated.  That is the sentence of the Court.

12          And with respect to voluntary surrender, is there

13   any request by the Government other than that?

14          MR. VALENTINI:  No.  No, Your Honor.

15          THE COURT:  All right.  I will allow each of the

16   defendants to surrender voluntarily.

17          You'll be informed of a place and time to

18   surrender for service of the sentence of incarceration, and

19   that will be determined not by me but by the authorities and

20   the Probation Office, the Bureau of Prisons, et cetera, and

21   you'll get that notification and you need to report,

22   obviously, when you are at the place and time as you are

23   notified.

24          With that, this doesn't bring this case to an end.

25   It brings it to an end before me, and I hope for your

1   benefit not to see you again.  I'm sure you hope the same.

2   And I wish each of you well, but you have an obligation to

3   bear in mind what has occurred and why it has occurred and

4   that the responsibility for that ultimately doesn't rest on

5   law enforcement authorities or the Court.  It rests on you.

6   You chose to engage in the conduct that you engaged in.  And

7   the system fairly and equitably has simply dealt with the

8   conduct that you chose to engage in, but I wish each of you

9   well.  I think you are responsible members of society.  And

10  with family commitments and family who obviously loves and

11  supports you, but it's not over because you will be under

12  supervision for some period of time and you have this period

13  of incarceration to serve.

14          With that, this proceeding is completed and good

15  day to everyone.

16          MR. ROOTS:  (Indicating.)

17          THE COURT:  Mr. Roots?

18          MR. ROOTS:  Very briefly, a question about

19  passports.  I believe all three surrendered their passports.

20  With regard to the two years' probation, supervised release,

21  you know, with regard to travel restrictions, of course, all

22  three would have -- Mr. Cusick has had missions -- a mission

23  project in Israel.  Anyway, if we could request a return of

24  the passports.

25          THE COURT:  Well, I -- that's something that the

```
 1    Probation Office will handle.  I certainly do not see any

 2    independent reason to retain those passports for the next

 3    few years if there are travels that the -- any of the

 4    defendants wish to engage in, particularly travels for the

 5    kinds of purposes that you just mentioned, Mr. Roots, but

 6    that's up to the Probation Office and they will deal with

 7    that, but they will deal with it knowing that I don't see

 8    any reason to withhold the passports from the defendants for

 9    this entire period of supervision if they have reasons to

10    need and use those passports.

11              With that, anything else?

12              MR. PIERCE:  No, Your Honor.

13              MR. VALENTINI:  No, Your Honor.

14              THE COURT:  All right.  Thank you, all.

15              MR. PIERCE:  Thank you.

16              THE DEPUTY CLERK:  All rise.

17              (Proceedings concluded at 12:13 p.m.)

18                    * * * * * * * * * * * *

19              CERTIFICATE OF OFFICIAL COURT REPORTER

20    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

21    that the above and foregoing constitutes a true and accurate

22    transcript of my stenographic notes and is a full, true and

23    complete transcript of the proceedings to the best of my

24    ability, dated this 13th day of May 2024.

25                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
```



United States Courthouse
Room 6722
333 Constitution Avenue, NW
Washington, DC 20001